# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________ |

**SUMMONS**

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is that the contracts that are the subject of this litigation designate New York County as the venue. In addition, Thryve Wealth Management LLC conducts and transacts significant business in New York.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated: New York, New York
November 17, 2026

**DAVIS WRIGHT TREMAINE LLP**

By: /s/ Michael V. Rella
Michael V. Rella, Esq.
Shanaye Carvajal, Esq.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 880-3973
MichaelRella@dwt.com
ShanayeCarvajal@dwt.com

Thomas P. DeFranco, Esq.
1301 K Street NW
Suite 500 East
(202) 220-1928
Washington, DC 20005
TomDeFranco@dwt.com

*Attorneys for Plaintiffs SCS Capital Management LLC and Focus Financial Partners, LLC*

**TO:**

Jeffrey Csercsevits, Esq.
Christopher J. Merken, Esq.
Fisher & Phillips
Two Logan Square, 12th Floor
Philadelphia, PA 19103
*Counsel for Brad Parsons and Thryve Wealth Management LLC*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________<br><br>**COMPLAINT** |

Plaintiffs SCS Capital Management LLC ("SCS" or the "Company") and Focus Financial Partners, LLC ("Focus," and, together with SCS, "Plaintiffs"), by and through their undersigned counsel, Davis Wright Tremaine LLP, alleges upon personal knowledge as to themselves and their own acts, and upon information and belief, as follows:

## NATURE OF THE ACTION

1. This action arises from the calculated and ongoing breach by Defendant Brad Parsons ("Parsons") of the restrictive covenants he agreed to—and was paid handsomely for—when he sold the personal goodwill associated with his client relationships and later became a Managing Director of SCS. SCS is an SEC-registered investment adviser firm that provides investment advisory and wealth management services to retail and institutional clients.

2. In August 2022, Parsons sold the personal goodwill associated with his investment advisory client relationships to Focus's wholly-owned subsidiary Edge Capital Group, LLC ("Edge"), SCS's predecessor-in-interest, for an upfront purchase price of $3 million in cash, plus

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the opportunity to earn up to $12 million in additional purchase price payments pursuant to an Assert Purchase Agreement, dated August 26, 2022, among Edge, Focus, and Parsons (the "APA"). In exchange, and in recognition of "the highly competitive nature of the" wealth management business, Parsons agreed that, for five years—through August 26, 2027—he would not (i) act as an employee of any business engaged in or in competition with the wealth management business he had just sold or (ii) solicit, market to, sell, or provide investment advisory or similar services to any existing, former, or prospective client of the business he sold, other than on behalf Edge (including its successor and assigns) as the purchaser.

3. In January 2025, in connection with the combination of the Edge business into SCS, Parsons executed a Restrictive Covenant Agreement with SCS in which he again agreed that, for twenty-four months following his separation from SCS, he would not solicit, divert, perform services for, deal with, or accept business from SCS's clients, would not use SCS's confidential information, and would not solicit SCS's employees.

4. Parsons has flagrantly violated each of these covenants. In the months before his departure, while still an SCS Managing Director and fiduciary, Parsons forwarded SCS's confidential client and prospect information—including client portfolio reports showing holdings, performance, and account values, and confidential notes regarding private co-investment opportunities offered to SCS clients—to his personal email account.

5. On Friday, October 23, 2026, Parsons abruptly resigned without providing the two weeks' written notice the Restrictive Covenant Agreement requires. He thereafter immediately began contacting SCS clients to solicit them to move their accounts to his new firm, Defendant Thryve Wealth Management LLC ("Thryve"), a competing wealth management firm with which he registered on or about November 2, 2026.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

6. Parsons, through counsel, has admitted that he "announced his new employment to his clients," and has taken the position that if those clients "choose to open accounts at Thryve," that is their "decision." That is not the bargain Parsons struck. Under New York law and the plain terms of his agreements, including his non-competition, non-service, and non-accept restrictive covenants, announcing one's new affiliation to a former firm's clients is solicitation. In any event, Parsons expressly agreed not to compete with SCS or otherwise accept business from, or perform services for, those clients regardless of who initiates contact.

7. The harm is already concrete and accelerating. On or about November 6, 2026, an SCS client family whose relationship Parsons serviced at SCS terminated its relationship with SCS, and SCS has since learned of the potential loss of another large client relationship generating approximately $300,000 in annual revenue. Thryve has continued to employ Parsons and to accept these client relationships notwithstanding written notice, delivered November 3, 2026, of his restrictive covenants and his ongoing breaches.

8. Despite their ability to do so, Plaintiffs do not, by this action, seek to enjoin Parsons from earning a living or from working at Thryve – although they seek damages for his violations of his non-compete. Instead, the injunctive relief Plaintiffs seek is to require Parsons to abide by the contractual non-solicitation, non-service, and non-accept covenants for which he received considerable consideration, and to stop Thryve from knowingly reaping the benefit of his breaches. The Plaintiffs seek temporary, preliminary, and permanent injunctive relief, compensatory damages, disgorgement, and its attorneys' fees and costs as provided by Parsons's agreements.

## THE PARTIES

9. Plaintiff SCS is a Delaware limited liability company with its principal place of business at 888 Boylston Street, Boston, Massachusetts 02199. SCS is an investment adviser



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

registered with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940 and is a wholly-owned subsidiary of Focus. SCS is the successor-in-interest to Edge pursuant to an Assignment and Assumption Agreement dated February 1, 2025 (the "Edge-SCS Assignment Agreement").

10. Plaintiff Focus is a Delaware limited liability company with its principal place of business at 1325 Avenue of the Americas, 11th Floor, New York, NY 10019. Focus invests in SEC-registered investment advisors and other fiduciary wealth management firms. Focus is the ultimate corporate parent of SCS, as well as SCS's predecessor-in-interest, Edge.

11. Upon information and belief, Defendant Parsons is a natural person residing at 4440 Northcrest Road, Dallas, Texas 75229. Until October 23, 2026, Parsons was employed by SCS as a Managing Director in its Private Client Group and was registered as an investment adviser representative of SCS.

12. Upon information and belief, Defendant Thryve is a California limited liability company with its principal place of business at 523 Chapala Street, Santa Barbara, California 93101 that provides investment advisory and wealth management services in competition with SCS. Upon information and belief, Parsons became registered with Thryve on or about November 2, 2026.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to N.Y. Const. CPLR § 6301.

14. This Court has personal jurisdiction over Parsons because he expressly and irrevocably consented to the jurisdiction of the state and federal courts in the County of New York in both the Restrictive Covenant Agreement he signed on January 10, 2025 (the "RCA")



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

and the APA. Section 21 of the RCA provides that "any suit or proceeding arising directly and/or indirectly pursuant to or under this Agreement shall be brought solely in the appropriate federal or state court in the County of New York, State of New York," and that the parties "irrevocably submit to the in personam jurisdiction of any such federal or state court" and "waive any claim that any such jurisdiction is not a convenient forum." Section 9.8 of the APA likewise provides that the parties "irrevocably submit to the jurisdiction of any state court or federal court in the County of New York, State of New York, in any suit, action or proceeding arising out of or relating to this Agreement."

15. This Court has personal jurisdiction over Thryve pursuant to CPLR § 302(a) because Thryve transacts business within New York and/or contracts to supply services in New York. Additionally, Thryve committed tortious acts causing injury to Focus within New York, where Focus is headquartered. And Thryve expects or should reasonably expect its acts to have consequences in New York and derives substantial revenue from interstate commerce.

16. Moreover, Thryve has received notice of the APA and RCA. Subsequent to its receipt of such notice, Thryve has continued to act in concert with Parsons, who has consented to this Court's jurisdiction. The APA expressly contemplates injunctive relief against "each and every person or entity acting in concert or participation with" Parsons. APA § 9.2(f).

17. Venue is proper in New York County pursuant to CPLR § 501 and the forum-selection clauses in Section 21 of the RCA and Section 9.8 of the APA.[1]

---

[1] This action is properly brought in this Court notwithstanding any arbitration provision. The Offer Letter (defined below) provides that "the Company may seek any form of relief from a court (including without limitation temporary or preliminary injunctive relief or monetary damages) in connection with any breach or alleged breach by [Parsons] of any of [his] obligations under the RCA," and the Arbitration Agreement annexed to it expressly excludes "any claim relating to any breach or alleged breach of [Parsons's] confidentiality or non-disclosure obligations, non-solicitation obligations or any other restrictive covenants." Offer Letter § 9; Arbitration Agreement § 3(vi). The APA likewise provides that "[n]othing contained herein shall preclude any party from seeking emergency or preliminary injunctive or other equitable relief in any court of competent jurisdiction," and that the purchaser and its successors "are entitled to seek an injunction . . . to be issued by any court of competent



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

## FACTUAL ALLEGATIONS

### A. SCS Is a Registered Investment Adviser That Depends on Long-Term, Trust-Based Client Relationships

18. SCS is an SEC-registered investment adviser that provides discretionary and non-discretionary investment management, wealth planning, private investment access, and client-aligned investment advice to high-net-worth families and institutional investors. SCS is a wholly-owned indirect subsidiary of Focus.

19. As a registered investment adviser, SCS owes its clients fiduciary duties of care and loyalty under the Investment Advisers Act of 1940. SCS's clients entrust it with intimate, non-public financial information—including holdings, account values, performance, liquidity needs, estate and tax plans, and family circumstances—so that SCS can design and implement investment strategies tailored to each client. SCS and its advisors like Parsons are in turn obligated to safeguard that information.

20. SCS's client relationships are typically long-term and produce revenue through asset-based advisory fees. A single relationship can generate hundreds of thousands of dollars in annual revenue, and SCS's clients are a principal source of referrals for new business. SCS invests substantial resources in developing and supporting those relationships, including through its investment team, its proprietary private-investment and co-investment platform, and its Family Office & Shared Service Solutions platform, which offers clients coordinated trust and estate, tax, trustee, insurance, private banking, aviation, family governance, philanthropy, and lifestyle services through internal SCS resources, Focus shared services, and vetted outside providers.

---

jurisdiction ordering compliance with this Agreement by the Seller or enjoining and restraining the Seller from breaching ARTICLE VIII." APA §§ 9.2(e), 9.2(f).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

21. The wealth management industry is intensely competitive. Advisory firms compete for a limited universe of high-net-worth clients, and the identity of those clients, their contact information, their financial profiles, and the details of their portfolios are not publicly available and could be duplicated only through extraordinary effort. Protecting the confidentiality of that information and the goodwill of its client relationships is essential to SCS's business.

**B. Parsons Sells the Goodwill Associated with His Client Relationships for $3 Million and Agrees to Five-Year Restrictive Covenants**

22. On August 26, 2022, Parsons, Edge, and Focus entered into the APA, a true and correct copy of which is annexed to the accompanying Affirmation of Will Skeean (the "Skeean Aff.") as Exhibit 1. Under the APA, Parsons sold to Edge "personal goodwill associated with relationships with the clients set forth on the Client List" (the "Assets"). APA, Recitals & § 2.1. The APA defines the "Clients" as "each of the client relationships of [Parsons] as of the Closing Date," and the "Personal Client Relationships" as "the relationships with the Clients." APA § 1.1. Parsons delivered the list of the Clients (the "Client List") to Edge pursuant to Section 3.2(c) of the APA.

23. In consideration for the purchase of the Assets, Edge agreed to pay Parsons an upfront purchase price (the "Basic Purchase Price") of $3 million in cash on November 7, 2022. APA § 2.4(a). Parsons was also eligible to receive two Additional Purchase Price Payments of $4 million and $8 million, respectively, if trailing-twelve-month revenue from the Clients reached $3 million and $5 million during the sixty months following closing. APA § 2.5(a).

24. Parsons expressly acknowledged "the highly competitive nature of the Business"—defined as "the investment advisory, wealth management, financial planning and



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

related services of [Parsons]"—and that "the success of the Business is dependent on the maintenance of the Personal Client Relationships." APA §§ 1.1, 8.1(a), 8.1(c).

25. Section 8.1(c) of the APA (the "APA Non-Solicitation and Non-Service Covenant") provides that, for the period beginning on the Closing Date (August 26, 2022) and ending on the fifth anniversary of the Closing Date (August 26, 2027), Parsons will not:

> "(other than on behalf of or for the benefit of the Business): (i) directly or indirectly, solicit the sale of, market, sell or provide products or services, similar to those products or services sold or provided by the Business, to any existing, former or prospective client of the Business or its affiliates; or (ii) directly or indirectly: . . . (4) induce any supplier, licensor, licensee, business relation, representative or agent of the Purchaser or any of its affiliates to terminate or modify its relationship with the Purchaser or any of its affiliates, or in any way interfere with the relationship between the Purchaser or any of its affiliates on the one hand, and such other party on the other hand (including, without limitation, making any negative or disparaging statements regarding the Purchaser or its affiliates)."

26. Section 8.1(a) of the APA further provides that, for the same five-year period and as to "any activity conducted in or directed at clients or prospective clients of the Purchaser in the United States of America," Parsons will not "act as a partner, manager, member, principal, executive, employee, agent, representative, consultant or independent contractor of . . . any business engaged in or competitive with the Business." APA §§ 8.1(a)–(b). Plaintiffs, by this action, seek only monetary relief for the breach of this non-compete provision and do not seek to enjoin Parsons's employment with Thryve.

27. Parsons, Focus, and Edge agreed that, if any restriction in Section 8.1 were found unreasonable, it would "be deemed amended as to such restriction as such court may judicially determine or indicate to be reasonable." APA § 8.2. Parsons further agreed that Edge, Focus, and their successors and assigns "are entitled to seek an injunction, including a mandatory injunction, to be issued by any court of competent jurisdiction ordering compliance with this Agreement by



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Seller or enjoining and restraining the Seller from breaching ARTICLE VIII, and each and every person or entity acting in concert or participation with such breaching party," and that Parsons "will pay to the Purchaser and Focus all ascertainable damages, including the posting of any necessary bond and any other costs and reasonable attorneys' fees." APA § 9.2(f).

28. The APA is governed by New York law, binds and inures to the benefit of the parties' successors and permitted assigns, and permits Edge to assign its rights to any successor in connection with any sale of a significant portion of its assets. APA §§ 9.8, 9.11. Effective February 1, 2025, the APA was assigned to SCS as successor to Edge.

### C. SCS Acquires Edge, Employs Parsons as a Managing Director, and Parsons Executes the RCA

29. On February 1, 2025, pursuant to the Edge-SCS Assignment Agreement, the Edge business was transferred and assigned to SCS (the "Transaction").

30. In connection with the Transaction and prior to its consummation, SCS extended to Parsons an offer of employment dated January 10, 2025 (the "Offer Letter"), which Parsons accepted. A true and correct copy of the Offer Letter is annexed to the Skeean Aff. as Exhibit 2. Under the Offer Letter, Parsons became a Managing Director of SCS on February 1, 2025, based principally in SCS's Dallas office, with a base salary plus quarterly payout compensation equal to 40% of the first $3 million, and 45% of all amounts in excess of $3 million, of "Annual Client Revenue"—a term defined to include revenue from the very "Clients" whose goodwill Parsons had sold under the APA. Offer Letter §§ 1, 2(a).

31. The Offer Letter expressly preserved the APA: "nothing herein shall impact or modify the respective rights or obligations of you or the other applicable parties under the APA and the other Related Agreements, each of which shall continue in full force and effect in accordance with their terms." Offer Letter § 10.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

32. As a condition of his employment, Parsons executed the RCA, a true and correct copy of which is annexed to the Skeean Aff. as Exhibit 3. Parsons acknowledged that he had been advised to, and had the opportunity to, review the RCA with counsel of his choosing. RCA § 10; Offer Letter § 6.

33. Section 2(a) of the RCA (the "RCA Non-Solicitation, Non-Service, and Non-Accept Covenant") provides that, during Parsons's employment and "for a period of twenty-four (24) months after termination of [his] employment or service with the Company for any reason (the 'Restricted Period')," Parsons "shall not, directly or indirectly, except in the course of performing duties assigned to [him] by the Company":

> "i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual or Prospective clients (each as defined below) of the Company;
>
> ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual or Prospective clients of the Company;
>
> iii. solicit, recruit, or take away, or attempt to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company, either for Employee's own business or for any other person or entity; . . . or
>
> v. solicit, recruit, or otherwise induce or influence any . . . client . . . or any other person that has a business relationship with the Company, and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, to discontinue, reduce, or modify such business relationship with the Company."

RCA §§ 2(a)(i)–(iii), (v); *Id.* App. A (Sections 2(a)(i) and 2(a)(ii)).

34. The RCA defines an "Actual" client, after termination, as "any person or entity to whom the Company or any of its representatives provided services within twelve (12) months prior to the date of such termination . . . and with whom Employee had material contact or about whom Employee learned Confidential Information." RCA § 2(a). "Prospective" client is defined,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

in relevant part, as any person or entity to whom the Company sent any written or electronic communication within the twelve months prior to termination, with whom Parsons had material contact, and about whom he obtained Confidential Information. RCA App. A. "Competing Service" means "any service or process of any person or entity other than the Company . . . which is competitive with, or an alternative or substitute for, any process or service of the Company." RCA § 2(a). The RCA further provides that "the term 'solicit' shall include, but not be limited to, initiation of contact with Actual clients to the extent such contact concerns Competing Services." *Id.* Parsons's employment terminated on October 23, 2026 when he abruptly left without any notice to join a direct competitor. Accordingly, the Restricted Period runs through at least October 23, 2028, and is "automatically . . . extended by the length of time during which [Parsons] shall have been in breach of such restrictions." RCA § 8.

35. In Section 3 of the RCA, Parsons acknowledged that he would acquire SCS's Confidential Information; that "the misuse, misappropriation, or disclosure of such Confidential Information would constitute a breach of trust and could cause irreparable injury to the Company"; and that he "shall not, either during or following [his] employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself . . . or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company)." RCA §§ 3(a)–(b). "Confidential Information" includes "client information," "financial data," "client and supplier lists," "contacts at or knowledge of Actual clients or prospective clients of the Company," and "business, marketing, and strategic plans." RCA § 3(c). Parsons further agreed that, upon termination, he would "deliver promptly to the Company all paper and/or



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

electronic documents and files concerning the Company . . . and any and all Confidential Information." RCA § 3(g).

36. Parsons also agreed (a) to "disclose the existence and terms of [the RCA] to any prospective employer . . . prior to entering into an employment . . . relationship with such person or entity" (RCA § 7); and (b) if he voluntarily separated, to "provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture" (RCA § 11).

37. Parsons agreed that the RCA's restrictions "are necessary for the protection of the business and goodwill of the Company and are considered by Employee to be reasonable for such purpose," that "any breach of this Agreement may cause the Company substantial and irrevocable harm," and that the Company "may be entitled to specific performance and other injunctive relief." RCA § 16. He agreed that the Company may recover "its costs and expenses (including reasonable attorneys' fees)" in any action in which it obtains an enforceable judgment or injunction. RCA § 17. And he agreed that the RCA's covenants "are in addition to and not in lieu of" his continuing obligations under any prior agreement with a predecessor of the Company—including the APA. RCA § 19.

### D. Parsons Services the Purchased Client Relationships at SCS and Is Entrusted with SCS's Confidential Information

38. From February 1, 2025 until October 23, 2026, Parsons served as a Managing Director and Senior Wealth Advisor in SCS's Private Client Group, where his "primary focus [was] delivering holistic wealth management services to a select group of entrepreneurs, business owners, and family offices." He was registered as an investment adviser representative of SCS.

39. In that role, Parsons was the primary relationship manager for the Clients whose goodwill Edge, SCS's predecessor had purchased in 2022 (the "APA Clients"), as well as for



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

other SCS clients and prospects. Before his resignation, Parsons serviced approximately 10 client households, representing approximately $230 million in assets under management and $1.3 million in annual advisory revenue. Parsons was compensated with a substantial percentage of the revenue those relationships generated.

40. By virtue of his position, Parsons had access to, and regularly used, SCS's most sensitive Confidential Information, including client portfolio reports, account values, holdings, and performance data; SCS's pipeline of prospective clients and their financial profiles; SCS's Family Office & Shared Service Solutions Guide; and confidential information regarding private co-investment opportunities made available to SCS clients.

**E. While Still Employed, Parsons Forwards SCS's Confidential Information to His Personal Email Account**

41. In the months preceding his resignation, and while still employed by and owing a duty of loyalty to SCS, Parsons forwarded SCS Confidential Information from his SCS email account (bparsons@scsfinancial.com) to his personal email account (bparsons713@gmail.com), including, without limitation:

- On July 29, 2026, a communication from a Dallas-based private equity firm seeking to discuss a potential investment relationship and separate-account arrangement with SCS's alternative investments platform;
- On September 4, 2026, confidential notes of a September 3, 2026 call between SCS professionals and a venture capital sponsor regarding allocations in a current co-investment round available only to SCS client families who had invested in a prior round, the funding timeline, and other expected co-investment opportunities the sponsor intended to show SCS; and



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- On October 6, 2026—just seventeen days before he resigned—a confidential 2026 portfolio report for an SCS client family showing the family's investments, performance, and account values.

42. Upon information and belief, Parsons also forwarded or otherwise retained additional SCS Confidential Information, including (a) other SCS client portfolio reports reflecting holdings, realized and unrealized gains and losses, and account values in the tens of millions of dollars; (b) SCS's internal Family Office & Shared Service Solutions Guide, which identifies SCS's internal and Focus shared-service resources and vetted external providers and their contact information; and (c) a list of at least seven prospective ultra-high-net-worth client relationships he was cultivating on SCS's behalf, including each prospect's estimated liquidity and net worth, the source of referral, the anticipated timing and probability of conversion, and sensitive family and business information.

43. Parsons had no legitimate business reason to send this information to his personal email account. Through counsel, Parsons has conceded that he emailed SCS information to his personal account and that he has located "old emails pertaining to his work at SCS" and "text messages with clients" from his time at SCS. Yet despite Plaintiffs' numerous requests, Parsons has not returned that information, has not provided the sworn certification SCS requested, and has not identified to whom, if anyone, it has been disclosed.

### F. Parsons Resigns Without Notice and Immediately Solicits SCS's Clients and Employees

44. On Friday, October 23, 2026, Parsons resigned from SCS effective immediately, without providing the two weeks' written notice contractually required by Section 11 of the RCA. The same day, he shipped his SCS laptop and certain hard-copy materials to SCS by FedEx.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

45. On October 26, 2026, SCS's General Counsel sent Parsons a letter reminding him of his continuing obligations under the APA and RCA, enclosing a copy of the RCA, and advising that SCS would enforce its rights to the fullest extent permitted by law (the "October 26 Letter"). A true and correct copy of the October 26 Letter is annexed to the Affirmation of Michael V. Rella (the "Rella Aff.") as Exhibit 1.

46. Parsons did not wait to violate his covenants. Upon information and belief, over the weekend of October 24–25, 2026—within forty-eight hours of resigning—Parsons affirmatively contacted at least one SCS client, informed that client that he had left SCS, and encouraged the client to transfer its accounts from SCS to his new firm.

47. On October 23, 2026, Parsons solicited an SCS employee to leave SCS and join him at his new firm, in violation of Section 2(a)(iii) of the RCA and Section 8.1(c)(ii) of the APA. Specifically, Parsons asked the employee what her current salary at SCS was and informed her that Thryve would "make it worth your while" if she were to leave SCS for Thryve. Parsons also informed the employee that he believed Thryve would offer her equity if she followed him there.

48. On October 27, 2026, SCS, through outside counsel, sent Parsons a cease-and-desist letter (the "October 27 Letter") identifying his breaches; demanding that he cease and desist from contacting, soliciting, marketing to, accepting business from, or providing services to any SCS clients; demanding that he return all Confidential Information and provide a sworn certification; demanding that he disclose the RCA to any prospective employer, including Thryve; and directing him to preserve relevant evidence. A true and correct copy of the October 27 Letter is annexed to the Rella Aff. as Exhibit 2.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

49. On October 28, 2026, Parsons's counsel responded by letter. The response did not deny that Parsons had solicited SCS clients or employees and did not address the APA or RCA client covenants other than to assert, without elaboration, that they are "fatally overbroad and against public policy." Parsons did not provide the requested sworn certification. Moreover, despite several requests, Parsons's counsel refused to tell Plaintiffs' counsel whether Parsons intended to affiliate with another wealth management firm and/or compete with SCS.

50. On or about November 2, 2026, SCS learned that Parsons had affirmatively reached out to another SCS client to solicit that client's business. That same day, Parsons registered with Thryve.

51. On November 3, 2026 – the day *after* Parsons joined Thryve – Parsons's counsel finally confirmed that Parsons "is now registered with Thryve Wealth Management" and that "Mr. Parsons announced his new employment to his clients." Counsel further stated, ignoring the non-accept and non-service provisions to which Parsons agreed, that "If clients choose to open accounts at Thryve Wealth Management, that is the clients' decision." Parsons's counsel also conceded that, after receiving the October 27 Letter, Parsons "found some old emails pertaining to his work at SCS" and "text messages with clients . . . that occurred while he was with SCS/Focus."

**G. Thryve Is Placed on Notice but Continues to Employ Parsons and Accept SCS Clients**

52. On November 3, 2026, SCS, through counsel, sent Thryve written notice of Parsons's restrictive covenants and ongoing violations, enclosing the October 27 Letter (which quoted Sections 8.1(a) and 8.1(c) of the APA and described Parsons's RCA obligations), and advising Thryve that its continued employment of Parsons in the face of those violations exposed it to liability for tortious interference and aiding and abetting (the "November 3 Letter"). The



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

November 3 Letter was addressed to Thryve's Vice President of Operations, Nicole Saragosa, with a copy to Gary Dorfman of Thryve. A true and correct copy is annexed to the Rella Aff. as Exhibit 4.

53. That same evening, Thryve's counsel—the same counsel representing Parsons—acknowledged receipt and confirmed that it represents Thryve.

54. Notwithstanding actual knowledge of Parsons's covenants and breaches, Thryve has continued to employ Parsons, and, upon information and belief, has permitted and encouraged him to solicit and service SCS clients on Thryve's behalf, and has accepted, or is continuing to accept, the accounts of SCS clients that Parsons serviced at SCS. Upon information and belief, Thryve has provided Parsons with compensation and other incentives tied to the client assets he brings to Thryve.

### H. SCS Begins Losing the Client Relationships It Purchased

55. On or about Friday, November 6, 2026, an SCS client family whose relationship Parsons serviced at SCS terminated its relationship with SCS and, upon information and belief, transferred its accounts to Thryve to be serviced by Parsons.

56. On or about November 11, 2026, SCS learned of the potential loss of another large client relationship serviced by Parsons, representing approximately $300,000 in annual revenue to SCS. Upon information and belief, Parsons and Thryve solicited this client.

57. SCS has identified additional client relationships serviced by Parsons that remain at risk of departure as a result of Parsons's solicitations, collectively representing approximately $1 million in annual revenue.

58. Each of these clients is an "Actual" client of SCS within the meaning of the RCA: SCS provided services to each within the twelve months before Parsons's termination, and



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Parsons had material contact with and learned Confidential Information about each. Upon information and belief, each is also an existing client of the Business under the APA.

59. Parsons's and Thryve's conduct is causing SCS irreparable harm, including the loss of client relationships and goodwill for which SCS's predecessor paid $3 million; the loss of future referrals from those clients; the disclosure and misuse of confidential client information that SCS is obligated to protect; and disruption of SCS's business and workforce. The precise duration of each lost relationship and the stream of referrals each would have generated are impossible to calculate with certainty.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – RCA Section 2(a)(i), (ii), and (v): Client Non-Solicitation, Non-Service, and Non-Accept Covenants – Against Parsons)**

60. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

61. The RCA is a valid and binding contract between SCS and Parsons supported by adequate consideration, including Parsons's employment and compensation, access to Confidential Information, and authorization to develop goodwill with SCS's clients. SCS and its assignee and third-party beneficiaries are entitled to enforce it. RCA §§ 1, 18.

62. SCS has performed all of its obligations under the RCA.

63. The covenants in Sections 2(a)(i), 2(a)(ii), and 2(a)(v) are reasonable in duration (twenty-four months), are limited to clients with whom Parsons had material contact or about whom he learned Confidential Information, impose no geographic restriction on Parsons's ability to work in the industry, and are necessary to protect SCS's legitimate interests in its client goodwill and Confidential Information.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

64. Parsons breached Section 2(a)(ii) by soliciting, diverting, and taking away, and attempting to solicit, divert, and take away, the business and patronage of SCS's Actual clients, including by initiating contact with such clients concerning Competing Services, and by announcing his new employment to his SCS clients for the purpose of inducing them to move to Thryve.

65. Parsons breached Section 2(a)(i) by performing services for, dealing with, and accepting business from SCS's Actual clients relating to Competing Services at Thryve. Section 2(a)(i) prohibits such conduct regardless of whether Parsons or the client initiated contact.

66. Parsons breached Section 2(a)(v) by inducing or influencing SCS clients with whom he had material contact to discontinue, reduce, or modify their business relationships with SCS.

67. As a direct and proximate result, SCS has suffered and will continue to suffer damages in an amount to be determined at trial and irreparable harm for which there is no adequate remedy at law. SCS is entitled to temporary, preliminary, and permanent injunctive relief, to an order tolling the Restricted Period for the duration of Parsons's breaches pursuant to RCA § 8, to damages, and to its costs and reasonable attorneys' fees pursuant to RCA § 17.

## SECOND CAUSE OF ACTION

**(Breach of Contract – RCA Sections 3, 7, 11, and 2(a)(iii): Confidentiality, Return of Information, Disclosure, Notice, and Employee Non-Solicitation – Against Parsons)**

68. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

69. Parsons breached Sections 3(a) and 3(b) of the RCA by transmitting SCS's Confidential Information to his personal email account for purposes other than performing his



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

duties for SCS and, upon information and belief, by using that information to identify, contact, and solicit SCS's clients and prospects for Thryve's benefit.

70. Parsons breached Section 3(g) of the RCA by failing, upon the termination of his employment, to deliver promptly to SCS all electronic documents and files concerning SCS and all Confidential Information, including the materials residing in his personal email account and his text messages with SCS clients.

71. Parsons breached Section 2(a)(iii) of the RCA by soliciting, recruiting, or attempting to solicit or recruit at least one SCS employee to leave SCS.

72. Parsons breached Section 11 of the RCA by voluntarily separating from SCS without providing two weeks' written notice to SCS.

73. As a direct and proximate result, SCS has suffered damages in an amount to be determined at trial and irreparable harm, and is entitled to injunctive relief requiring the return and non-use of its Confidential Information, damages, and its costs and attorneys' fees pursuant to RCA § 17.

**THIRD CAUSE OF ACTION**
**(Breach of Contract – APA Section 8.1 – Against Parsons)**

74. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

75. The APA is a valid and binding contract among Focus, Edge, and Parsons. It is supported by substantial consideration, including the $3 million cash Basic Purchase Price paid to Parsons. SCS, as Edge's successor and assignee, is entitled to enforce it. APA §§ 9.6, 9.11.

76. Focus, Edge, and SCS, as Edge's successor, performed all their respective obligations under the APA, including payment of the $3 million Basic Purchase Price.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

77. The APA Non-Solicitation and Non-Service Covenant was made in connection with the sale of the goodwill of Parsons's business, runs for a reasonable five-year period ending August 26, 2027, and is narrowly directed at the very client relationships Focus and SCS's predecessor purchased. It is enforceable to protect Plaintiffs' legitimate interest in the goodwill they acquired.

78. Parsons breached Section 8.1(c)(i) of the APA by, directly and indirectly, soliciting the sale of, marketing, selling, and providing investment advisory and wealth management services similar to those provided by the Business to existing clients of the Business and its affiliates—including, upon information and belief, APA Clients—other than on behalf of or for the benefit of the Business.

79. Parsons breached Section 8.1(c)(ii) of the APA by inducing clients and business relations of SCS to terminate or modify their relationships with SCS, interfering with those relationships, and, upon information and belief, soliciting at least one SCS employee.

80. Parsons further breached Section 8.1(a) of the APA by becoming an employee and representative of Thryve, a business engaged in and competitive with the Business, with respect to activity directed at clients of SCS in the United States, before August 26, 2027. SCS seeks only monetary relief for this breach.

81. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined, including, at a minimum, the $3 million purchase price, and irreparable harm for which they are entitled to injunctive relief under APA §§ 9.2(e)–(f), together with costs and reasonable attorneys' fees under APA §§ 9.1 and 9.2(f).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty and Duty of Loyalty – Against Parsons)**

82. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

83. As a Managing Director, Senior Wealth Advisor, and registered investment adviser representative of SCS, Parsons owed SCS fiduciary duties of loyalty, good faith, and fidelity throughout his employment, including the duty not to use SCS's confidential information or time to advance his own or a competitor's interests and not to divert SCS's clients and business opportunities.

84. Parsons breached those duties by, while still employed by SCS, forwarding SCS's Confidential Information—including client portfolio reports, prospect information, and confidential co-investment information—to his personal email account in anticipation of his departure and, upon information and belief, using that confidential information for Thryve's benefit. Additionally, Parsons breached his fiduciary duties by planning the transfer of SCS client relationships to Thryve and soliciting an SCS employee to join him, while still employed by SCS.

85. Parsons's disloyalty was substantial and related to the performance of his duties, rendering him a faithless servant.

86. As a direct and proximate result, SCS has been damaged in an amount to be determined at trial, and is entitled to recover its damages, disgorgement of all compensation paid to Parsons during the period of his disloyalty, and punitive damages in light of Parsons's willful and wanton conduct.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

## FIFTH CAUSE OF ACTION
**(Tortious Interference with Contract – Against Thryve)**

87. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

88. The RCA and the APA are valid contracts between Focus, SCS (as party and successor-in-interest to Edge), and Parsons.

89. Thryve had actual knowledge of the RCA and APA and their restrictive covenants no later than November 3, 2026, when it received the November 3 Letter and the October 27 Letter, and upon information and belief earlier, through Parsons's disclosure under RCA § 7 and Thryve's own pre-hire diligence.

90. Thryve intentionally and improperly procured Parsons's breaches of the RCA and APA, without justification, by employing Parsons to solicit and service SCS's clients, by accepting the accounts of SCS clients serviced by Parsons, and, upon information and belief, by compensating Parsons based on the SCS client assets he transferred to Thryve.

91. Upon information and belief, Thryve procured Parsons breach of the RCA by committing to a compensation package for an SCS employee in order to facilitate Parsons's solicitation of that SCS employee to leave SCS for Thryve.

92. But for Thryve's conduct, Parsons would not have breached, or would not have continued to breach, the RCA and APA.

93. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial and irreparable harm, and are entitled to injunctive relief, compensatory damages, and punitive damages.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

## SIXTH CAUSE OF ACTION
**(Tortious Interference with Business Relations and Prospective Economic Advantage – Against All Defendants)**

94. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

95. SCS has existing and prospective business relationships with its advisory clients, including the APA Clients and the prospects identified in its Confidential Information, from which it reasonably expects continuing advisory fees and referrals.

96. Defendants knew of those relationships.

97. Defendants intentionally interfered with those relationships by wrongful means and for the purpose of harming Plaintiffs, including through Parsons's breaches of his fiduciary duties and his misappropriation and use of SCS's Confidential Information to target SCS clients and prospects, and through Thryve's knowing exploitation of that misconduct.

98. Defendants' interference has caused, and threatens to cause, SCS's clients to terminate their relationships with SCS, causing SCS damages in an amount to be determined at trial and irreparable harm.

## SEVENTH CAUSE OF ACTION
**(Unfair Competition – Against All Defendants)**

99. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

100. Defendants have acted in bad faith to misappropriate the labors, skills, expenditures, and goodwill of Plaintiffs—including the client relationships and goodwill Focus and Edge, SCS's predecessor-in-interest, purchased for $3 million, as well as SCS's Confidential Information—for their own commercial advantage.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

101. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be determined at trial and irreparable harm, and are entitled to injunctive relief, compensatory damages, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

1. Temporarily, preliminarily, and permanently enjoining Parsons, Thryve, and all persons directly or indirectly acting in concert or participation with them, through and including the later of October 23, 2028 (as extended pursuant to RCA § 8) and, as to the APA covenants, August 26, 2027 (as extended by any equitable tolling), from directly or indirectly soliciting, diverting, taking away, performing services for, dealing with, accepting business from, or providing investment advisory, wealth management, financial planning, or related services to any APA Client or other Actual client of SCS;

2. Ordering Parsons to return to Plaintiffs, and thereafter permanently delete, all Confidential Information in his possession, custody, or control, and to provide a sworn certification of compliance;

3. Awarding Plaintiffs compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest;

4. Awarding Plaintiffs their costs and reasonable attorneys' fees pursuant to RCA § 17 and APA §§ 9.1 and 9.2(f); and

5. Granting such other and further relief as the Court deems just and proper.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

Dated: New York, New York

November 17, 2026

**DAVIS WRIGHT TREMAINE LLP**

By: /s/ Michael V. Rella
Michael V. Rella
Shanaye Carvajal
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 880-3973
MichaelRella@dwt.com
ShanayeCarvajal@dwt.com

Thomas P. DeFranco
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 220-1928
TomDeFranco@dwt.com

*Attorneys for Plaintiffs SCS Capital Management LLC and Focus Financial Partners, LLC*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________ |

Pursuant to Rule 35 of the Rules of the Commercial Division of the Supreme Court, the undersigned counsel for Plaintiff SCS Capital Management LLC ("SCS") affirms Plaintiff Focus Financial Partners, LLC indirectly or directly owns more than 10% of SCS's membership interests.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated: New York, NY
November 17, 2026

Respectfully submitted,

**DAVIS WRIGHT TREMAINE LLP**

By: /s/ Michael V. Rella
Michael V. Rella, Esq.
Shanaye Carvajal, Esq.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 880-3973
MichaelRella@dwt.com
ShanayeCarvajal@dwt.com

Thomas P. DeFranco, Esq.
1301 K Street NW
Suite 500 East
(202) 220-1928
Washington, DC 20005
TomDeFranco@dwt.com

*Attorneys for Plaintiffs SCS Capital Management LLC and Focus Financial Partners, LLC*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


At I.A.S. Part ___ of the Supreme Court of the State of New York, held in and for the County of New York, at the County Courthouse thereof, located at 60 Centre Street, New York, New York, on the ___ day of November, 2026

Present: Hon. ____________________

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: _____________ |

**[PROPOSED] ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

**UPON READING** the Affirmation of Michael V. Rella , dated November 16, 2026, together with the exhibit(s) attached thereto; the Affirmation of William Skeean, dated November 17, 2026; together with the exhibit(s) attached thereto; the Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, dated November 17, 2026; and all of the pleadings and proceedings previously filed herein; and, upon due consideration and deliberation of this Court, it is hereby:

**ORDERED** that Defendants Brad Parsons ("Parsons") and Thryve Wealth Management LLC ("Thryve," and together with Parsons, "Defendants"), or their attorneys, appear and show



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


cause at a hearing before this Court, at Part ___, of the Supreme Court of the State of New York for the County of New York, Room ___, located at 60 Centre Street, New York, New York 10007, on the ___ day of ____________, 2026, at ___ o'clock a.m./p.m., or as soon thereafter as counsel can be heard, why an order should not be made and entered on behalf of Plaintiff SCS Capital Management LLC ("Plaintiff" or "SCS"):

1. Enjoining and restraining Defendants, and their officers, agents, servants, employees, and all other persons in active concert or participation with them who receive actual notice of this Order, through and including the earlier of the hearing and determination of Plaintiff's motion for a preliminary injunction or further order of this Court, from directly or indirectly:

   a. soliciting, diverting, or taking away, or attempting to solicit, divert, or take away, the business or patronage of any APA Client;[1]

   b. performing services for, dealing with, or accepting business from any APA Client, in each case relating in any manner to Competing Services;

   c. soliciting the sale of, marketing, selling, or providing products or services similar to those sold or provided by the Business—including investment advisory, wealth management, financial planning, and related services—to any APA Client, other than on behalf of or for the benefit of SCS; and

   d. soliciting, recruiting, or otherwise inducing or influencing any APA Client to discontinue, reduce, or modify its business relationship with SCS, or otherwise interfering with the relationship between SCS and any APA Client;

[1] All capitalized terms used herein are assigned the same meaning as given in the Complaint.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


e. accessing, using, or disclosing any of SCS's Confidential Information ;

2. Granting limited discovery on an expedited basis, which shall be completed on or before ____________, 2026, which shall include (a) the oral depositions of (i) Parsons and (ii) a corporate representative of Thryve, and (b) document discovery of the following five discovery requests: (i) from July 1, 2026 to the present, all documents and communications concerning any communication between Parsons (or anyone acting on his or Thryve's behalf) and any APA Client or other current, former, or prospective client of SCS, including all announcements of Parsons's new affiliation; (ii) from July 1, 2026 to the present, all documents and communications concerning Parsons's potential or actual employment or affiliation with Thryve, including offer letters, compensation or incentive arrangements, transition or recruitment packages, and any representations by Parsons regarding clients or assets he expected to bring to Thryve; (iii) documents sufficient to identify each client of SCS, and the assets and accounts of each such client, that has opened an account with, transferred assets to, or executed an advisory agreement with Thryve since October 23, 2026, together with the related account-transfer and onboarding documents; (iv) all documents and communications concerning Parsons's disclosure of the RCA or the APA to Thryve; and (v) all documents and communications containing or concerning any SCS Confidential Information; and

1. granting such other, further, and different relief as the Court deems just and proper;

and it is further

**ORDERED** that, pending the hearing and determination of Plaintiff's motion for a preliminary injunction, Defendants, and all persons in active concert or participation with them



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


who receive actual notice of this Order, are temporarily restrained and enjoined as prescribed in paragraph (1)(a) through (1)(e) above; and it is further

**ORDERED** that, pending the hearing and determination of Plaintiff's motion, Defendants shall preserve all documents, communications (including text messages and messages on personal devices and accounts), and electronically stored information concerning any APA Client or other client of SCS, Parsons's affiliation with Thryve, and any SCS Confidential Information, including all account-transfer (ACAT) forms, account-opening documents, and onboarding materials; and it is further

**ORDERED** that service of a copy of this Order to Show Cause, together with a copy of all supporting papers, be made by service to counsel for Defendants and Thryve on or before _________________, 2026, and shall be deemed good and sufficient service thereof; and it is further

**ORDERED** that this motion shall be orally argued, and that answering papers from Defendants, if any, shall be served upon counsel for Plaintiffs by electronic filing through NYSCEF so as to be received by ______ a.m./p.m. on or before _____________, 2026; and it is further

**ORDERED** that Plaintiff shall serve its reply papers by electronic filing through NYSCEF so as to be received by ______ a.m./p.m. on or before _____________, 2026; and it is further

**ORDERED** that oral argument on this application will take place on the ___ day of _____________, 2026, at ______ a.m./p.m. before Hon. _______________________ at 60 Centre Street, New York, New York 10007, Room ___.

Enter,

______________________________


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Dated: New York, NY
November __, 2026


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________ |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY

**DAVIS WRIGHT TREMAINE LLP**
Michael V. Rella, Esq.
Shanaye Carvajal, Esq.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 880-3973
MichaelRella@dwt.com
ShanayeCarvajal@dwt.com

Thomas P. DeFranco, Esq.
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 220-1928
TomDeFranco@dwt.com

*Attorneys for Plaintiffs SCS Capital Management LLC and Focus Financial Partners, LLC*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1
BACKGROUND ........ 3
A. SCS Operates Within a Highly Competitive Industry ........ 3
B. Focus and Edge, SCS's Predecessor-in-Interest, Pay Parsons $3 Million for the Goodwill of His Client Relationships ........ 4
C. Parsons Joins SCS and Executes the RCA ........ 5
D. Parsons Takes SCS's Confidential Information, Resigns Without Notice, and Solicits SCS's Clients and Employees for Thryve ........ 6
ARGUMENT ........ 7
I. PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ........ 7
a. Legal Standard ........ 7
b. Plaintiffs Are Likely to Succeed on the Merits ........ 8
i. The APA and RCA Client Covenants Are Enforceable ........ 8
ii. Parsons Has Breached the Non-Solicitation Restrictive Covenants ........ 10
iii. Thryve Is Tortiously Interfering with the APA and RCA ........ 11
iv. Parsons Breached His Fiduciary Duty of Loyalty ........ 12
c. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ........ 13
d. The Balance of the Equities Favors Plaintiffs ........ 14
II. PLAINTIFFS SHOULD BE GRANTED LIMITED EXPEDITED DISCOVERY ........ 15
CONCLUSION ........ 15



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance Capital Mgmt. L.P. v. McCool*,
No. 107804/04, 2004 N.Y. Misc. LEXIS 3260 (Sup. Ct. N.Y. Cnty. 2004) ....10

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ....9, 11, 13

*Bessemer Tr. Co., N.A. v. Branin*,
16 N.Y.3d 549 (2011) ....8

*Borne Chem. Co. v. Dictrow*,
445 N.Y.S.2d 406 (2d Dep't 1981) .... 8-9

*Broker Genius, Inc. v. Volpone*,
313 F. Supp. 3d 484 (S.D.N.Y. 2018) ....14

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (2004) ....12

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
234 A.D.2d 200 (1st Dep't 1996) .... 9-10, 11, 13

*Cornerstone Wealth Grp., LLC v. Barnes*,
Index No. 653665/2025 (Sup. Ct. N.Y. Cnty. June 23, 2025) ....10

*Duane Jones Co. v. Burke*,
306 N.Y. 172 (1954) ....12

*Feiger v. Iral Jewelry, Ltd.*,
41 N.Y.2d 928 (1977) .... 12-13

*Ingenuit, Ltd. v. Harriff*,
33 A.D.3d 589 (2d Dep't 2006) ....13

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) .... 11-12

*Lamdin v. Broadway Surface Adv. Corp.*,
272 N.Y. 133 (1936) ....12

*Loughlin v. Meghji*,
132 N.Y.S.3d 65 (2d Dep't 2020) ....8



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co.*,
114 A.D.2d 165 (2d Dep't 1986) ....................14

*Mohawk Maint. Co. v. Kessler*,
52 N.Y.2d 276 (1981) ....................8

*Park v. Kim*,
205 A.D.3d 429 (1st Dep't 2022) ....................8

*Phansalkar v. Andersen Weinroth & Co.*,
344 F.3d 184 (2d Cir. 2003)....................13

*Purchasing Assocs., Inc. v. Weitz*,
13 N.Y.2d 267 (1963) ....................8

*Rational Strategies Fund v. Hill*,
40 Misc. 3d 1214(A), 2013 WL 3779654 (Sup. Ct. N.Y. Cnty. 2013)....................15

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................14

*Second on Second Café, Inc. v. Hing Sing Trading, Inc.*,
66 A.D.3d 255 (1st Dep't 2009) ....................7

*Silva v. Silva*,
27 Misc. 3d 526 (Sup. Ct. Nassau Cnty. 2010)....................7

*U.S. Tr. Co. of N.Y. v. MacLachlan*,
No. 602908/07, 2008 N.Y. Misc. LEXIS 7748 (Sup. Ct. N.Y. Cnty. 2008) ....................10

*Willis of N.Y., Inc. v. DeFelice*,
299 A.D.2d 240 (1st Dep't 2002) ....................13

**Other Authorities**

CPLR
§ 6301....................7, 12
§ 6313(a) ....................7



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

Plaintiffs SCS Capital Management LLC ("SCS" or the "Company") and Focus Financial Partners, LLC ("Focus," and, together with SCS, "Plaintiffs") submit this memorandum of law in support of their motion (the "Motion") for a temporary restraining order, preliminary injunction, and expedited discovery against Defendants Brad Parsons ("Parsons") and Thryve Wealth Management LLC (together with its parents, subsidiaries, and affiliates, "Thryve"). For the reasons set forth below, Plaintiffs' Motion should be granted in its entirety.

## PRELIMINARY STATEMENT

This case concerns Defendant Brad Parsons's flagrant breaches of the client non-solicitation, non-service, and non-accept covenants he agreed to when he was paid $3 million in exchange for conveying the goodwill associated with his investment advisory client relationships to Focus and SCS's predecessor-in-interest, Edge Capital Group, LLC ("Edge"). Parsons re-committed to those same restrictive covenants when he became a managing director of SCS. Yet, just four years after Plaintiffs made him a millionaire, Parsons abruptly resigned on Friday, October 23, 2026 from SCS without providing the contractually-required two-weeks' notice. He thereafter immediately began specifically targeting and affirmatively contacting the same SCS clients for which he received $3 million to move their accounts to his new firm that directly competes with SCS.

In an attempt to exercise restraint, Plaintiffs' counsel sought to obtain information about Parsons's future plans, including whether Parsons intended to associate with a competing firm or service SCS's clients. Parsons's counsel stonewalled Plaintiffs in response. Ten days later, Plaintiffs learned that Parsons had affiliated with a direct competitor of SCS, Thryve, and his counsel conceded that he had "announced his new employment to his clients." Two weeks after Parsons's resignation, SCS lost its first client family. SCS has since been informed of the potential



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

loss of another relationship generating approximately $300,000 in annual revenue. Approximately $1 million of annualized revenue remains at risk of being misappropriated by Parsons.

Plaintiffs have uncovered that Parsons's misconduct began before he left SCS. In the weeks leading up to his resignation, while he still owed SCS a duty of loyalty, Parsons secretly forwarded SCS's confidential information to his personal email account, including a client family's 2026 portfolio report (sent seventeen days before he resigned) and confidential notes regarding private co-investment allocations available only to SCS client families. Despite Plaintiffs' numerous requests, he has not returned that information and has refused to provide a sworn certification regarding its use.

SCS is an SEC-registered investment adviser ("RIA"). Its principal assets, and the source of its revenues, are its client relationships. Those relationships are often multi-generational, and are built on years of trust. They generate recurring asset-based advisory fees and are the primary source of SCS's organic growth. That is precisely why Edge, SCS's predecessor, paid Parsons $3 million for the goodwill of his client relationships.

Focus is SCS's parent company. It invests in RIAs and provides back office and financial support to SCS and its network of affiliates. Focus was a party to the transaction between Edge and Parsons, including the restrictive covenants to which Parsons agreed.

Specifically, Parsons agreed not to compete with the wealth management business he sold for a period of five years. He also agreed not to solicit, market to, or provide services to the clients of the business he sold for five years following the "Closing Date" of August 26, 2022. In addition to the $3 million in upfront consideration he earned, SCS also paid Parsons a substantial share of the revenue those very clients would generate in exchange for his role in providing investment advisory services to the clients on its behalf. Parsons further agreed that he would not solicit,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

perform services for, deal with, or accept business from SCS's clients for twenty-four (24) months following his departure from SCS.

Plaintiffs now seek narrowly tailored injunctive relief to stop the bleeding and to hold Parsons to his bargain. Plaintiffs satisfy each element necessary to justify that relief. *First*, Plaintiffs are likely to succeed on the merits: the covenants are reasonable, were given in connection with the sale of a business's goodwill for substantial consideration, and have been breached by Parsons's own admission. *Second*, Plaintiffs face imminent and irreparable injury, including the loss of client goodwill and relationships that cannot be quantified or restored. *Third*, the equities tilt decisively in Plaintiffs' favor. Despite their ability to do so, Plaintiffs are *not* seeking injunctive relief in connection with the non-competition covenant in the APA; nor are they seeking to remove Parsons from Thryve. Parsons is free to work at Thryve and to serve any client *other than the client relationships for which he was paid $3,000,000.* Accordingly, Plaintiffs respectfully request that the Court grant their Motion in its entirety.

## BACKGROUND

The facts are set forth in the Complaint ("Compl."), the Affirmation of Will Skeean ("Skeean Aff."), and the Affirmation of Michael V. Rella ("Rella Aff."), and are summarized here.

### A. SCS Operates Within a Highly Competitive Industry

SCS is an SEC-registered investment adviser that provides discretionary and non-discretionary investment management, wealth planning, private investment access, and client-aligned investment advice to high-net-worth families and institutional investors. (Skeean Aff. ¶ 6.) As a fiduciary under the Investment Advisers Act of 1940, SCS holds its clients' holdings, account values, performance, liquidity needs, and family and estate information in strict confidence. (Skeean Aff. ¶ 7.) Advisory relationships are long-term, often multi-generational, and are



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

compensated by recurring asset-based fees. In addition to providing immediate revenue to RIAs, client relationships are the source of SCS's organic growth. Deepening relationships with its clients provides SCS with the opportunity to (i) benefit from word-of-mouth referrals by those trusted clients to their friends and family, (ii) grow the assets entrusted to them (and thus the total assets under management) by clients, and (iii) encourage clients to commit additional outside assets to SCS's stewardship. Accordingly, competition for these relationships is fierce, and the identity and financial profiles of SCS's clients are not publicly available. (Skeean Aff. ¶ 9.)

### B. Focus and Edge, SCS's Predecessor-in-Interest, Pay Parsons $3 Million for the Goodwill of His Client Relationships

On August 26, 2022, Parsons, Edge, and Focus entered into an Asset Purchase Agreement (the "APA"), under which Parsons sold to Edge the "personal goodwill associated with relationships with the clients set forth on the Client List." (Skeean Aff. at Ex. 1, "APA," Recitals & § 2.1.) Edge paid Parsons a Basic Purchase Price of $3 million in cash and offered him up to $12 million in additional milestone-based payments. (APA §§ 2.4(a), 2.5(a).) Parsons acknowledged "the highly competitive nature of the Business" and that "the success of the Business is dependent on the maintenance of the Personal Client Relationships." (APA §§ 8.1(a), (c).)

Parsons also agreed that, through August 26, 2027, he would not, "other than on behalf of or for the benefit of the Business," "directly or indirectly, solicit the sale of, market, sell or provide products or services, similar to those products or services sold or provided by the Business, to any existing, former or prospective client of the Business or its affiliates," or induce any business relation of the purchaser "to terminate or modify its relationship" with it. (APA § 8.1(c).) He further agreed that the purchaser and its successors "are entitled to seek an injunction . . . enjoining and restraining the Seller from breaching ARTICLE VIII, and each and every person or entity



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

acting in concert or participation with such breaching party." (APA § 9.2(f).) The APA was assigned to SCS, Edge's successor, effective February 1, 2025. (Skeean Aff. ¶ 12.)

**C. Parsons Joins SCS and Executes the RCA**

In connection with SCS's acquisition of Edge, Parsons became an SCS Managing Director pursuant to an Offer Letter dated January 10, 2025 (the "Offer Letter"). The Offer Letter set out that Parsons would be compensated with 40% to 45% of the revenue generated by his clients—expressly including the APA Clients. (Skeean Aff. Ex. 2, "Offer Letter" §§ 1, 2(a).) The Offer Letter expressly preserved the APA "in full force and effect." (*Id.* § 10.) As a condition of his employment with SCS, Parsons executed the Restrictive Covenant Agreement (the "RCA") on January 28, 2025, after being advised to consult counsel. (Skeean Aff. Ex. 3, "RCA" § 10.)

In Section 2(a) of the RCA, Parsons agreed that, for twenty-four months after his separation (the "Restricted Period"), he would not, directly or indirectly: "(i) perform services for, deal with, solicit, divert, or accept business from, in each case . . . relating in any manner to Competing Services . . . any of the Actual or Prospective clients . . . of the Company"; "(ii) solicit, divert, or take away . . . the business or patronage of any of the Actual or Prospective clients of the Company"; or "(v) solicit, recruit, or otherwise induce or influence any . . . client . . . with whom Employee had material contact or about whom Employee learned Confidential Information . . . to discontinue, reduce, or modify such business relationship with the Company." (RCA § 2(a) & App. A.)

The RCA defines "solicit" to include "initiation of contact with Actual clients to the extent such contact concerns Competing Services." (*Id.* § 2(a).) Parsons agreed that the Restricted Period would be "automatically . . . extended by the length of time during which [he] shall have been in breach" (*id.* § 8); that the restrictions are "necessary for the protection of the business and goodwill



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

of the Company" and "reasonable for such purpose"; and that any breach "may cause the Company substantial and irrevocable harm" warranting "specific performance and other injunctive relief." (*Id.* § 16.) He also agreed not to use or disclose SCS's Confidential Information and to return it upon termination. (*Id.* §§ 3(b), (g).)

### D. Parsons Takes SCS's Confidential Information, Resigns Without Notice, and Solicits SCS's Clients and Employees for Thryve

Between July and October 2026, while still employed by SCS, Parsons forwarded SCS Confidential Information to his personal Gmail account, including (i) on September 4, 2026, confidential notes of a call regarding co-investment allocations available only to SCS client families who had invested in a prior round; and (ii) on October 6, 2026, a client family's 2026 portfolio report. (Skeean Aff. ¶ 24.) It appears that Parsons also retained other portfolio reports, SCS's Family Office & Shared Service Solutions Guide, and a list of at least seven high-net-worth prospects with their estimated liquidity and net worth. (Skeean Aff. ¶ 25.)

On Friday, October 23, 2026, Parsons resigned effective immediately, without providing the two weeks' written notice contractually required by the RCA. (RCA § 11; Skeean Aff. ¶ 27.) That same day, Parsons solicited an SCS employee to leave SCS and join him at Thryve. Parsons asked the employee what her current salary at SCS was and informed her that Thryve would "make it worth your while" if she were to leave SCS for Thryve. Parsons also informed the employee that he believed Thryve would offer her equity if she followed him there. (Skeean Aff. ¶ 30.) Over the following weekend, he contacted at least one SCS client to encourage the client to move its accounts to his new firm. (Skeean Aff. ¶ 28.) SCS sent Parsons letters on October 26 and October 27, 2026, reminding him of his covenants and demanding that he cease and desist his efforts to breach the APA and the RCA. (Rella Aff. Exs. 1, 2.) Parsons did not comply.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

On or about November 2, 2026, SCS learned that Parsons had solicited another SCS client, and Parsons formally registered with Thryve. (Skeean Aff. ¶ 30.) On November 3, 2026, despite previously refusing to inform Plaintiffs' counsel whether Parsons intended to affiliate with another wealth management firm or service SCS's clients, Parsons's counsel finally confirmed that Parsons had "announced his new employment to his clients," and asserted that if clients "choose to open accounts at Thryve," that is "the clients' decision." (Rella Aff. Ex. 5.) The same day, SCS gave Thryve written notice of Parsons's covenants and ongoing breaches. (*Id.* Ex. 4.) Nonetheless, despite being aware of Parsons's non-compete, non-service, and non-accept provisions, Thryve has continued to employ Parsons and allow him to service SCS clients on its platform. Indeed, on or about November 6, 2026, an SCS client family serviced by Parsons terminated its relationship with SCS and joined Thryve, and SCS has since been informed of the potential loss of another relationship generating approximately $300,000 in annual revenue. (Skeean Aff. ¶ 32-33.) Approximately $1 million in annualized revenues associated with SCS client relationships serviced by Parsons remain at risk. (Skeean Aff. ¶¶ 22, 34.)

## <u>ARGUMENT</u>

### I. PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

#### a. Legal Standard

Preliminary injunctive relief is warranted where the movant demonstrates "(i) a probability of success on the merits; (ii) danger of irreparable injury in the absence of an injunction; and (iii) a balance of equities in its favor." *Second on Second Café, Inc. v. Hing Sing Trading, Inc.*, 66 A.D.3d 255, 264 (1st Dep't 2009); CPLR 6301. The standard for a temporary restraining order is essentially the same. *Silva v. Silva*, 27 Misc. 3d 526, 530–31 (Sup. Ct. Nassau Cnty. 2010); CPLR § 6313(a). Under New York law, which governs both the APA and the RCA (APA § 9.8; RCA §



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

21), the elements of a breach of contract claim are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Park v. Kim*, 205 A.D.3d 429, 430 (1st Dep't 2022). There is no dispute that Parsons entered into the APA and RCA, or that SCS and Focus performed under those agreements—including by paying Parsons $3 million.

**b. Plaintiffs Are Likely to Succeed on the Merits**

i. <u>The APA and RCA Client Covenants Are Enforceable</u>

**The APA:** Parsons agreed to the restrictive covenants in the APA in connection with the sale of the goodwill associated with his wealth management clients to Edge, SCS's predecessor-in-interest. New York courts apply a more lenient standard to restrictive covenants given in connection with the sale of a business. A seller who receives consideration for the goodwill of his business may not thereafter "depreciate the value of the very thing he sold" by luring away the customers whose patronage he conveyed. *See Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283–85 (1981); *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 271–72 (1963).

Moreover, the sale of goodwill imposes upon the seller a "duty to refrain from soliciting former customers," and gives the purchaser an "acquir[ed] right to expect that the firm's established customers will continue to patronize the business." *Bessemer Tr. Co., N.A. v. Branin*, 16 N.Y.3d 549, 557 (2011). "[M]odern cases favor according such covenants full effect, if not unduly burdensome, in cases where the agreement in question is made in connection with the sale of a business and its good will," and "[t]he sole limitation on the enforceability of such a covenant is that its duration and scope be reasonably necessary to protect the buyer's legitimate interest in the purchased asset." *Loughlin v. Meghji*, 132 N.Y.S.3d 65, 71 (2d Dep't 2020); *see also Borne*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*Chem. Co. v. Dictrow*, 445 N.Y.S.2d 406, 410 (2d Dep't 1981) ("Implicit in the sale of a business, unless expressly reserved, is the sale of its 'good will.'").

That is precisely what occurred here. Parsons was paid $3 million in upfront cash consideration (in addition to the ability to earn up to $12 million in earnout consideration) in exchange for the goodwill associated with his client relationships and the revenue streams tied to those client relationships. The APA's restrictive covenants are limited to five years from the Closing Date, and further limited to reach only the existing, former, or prospective clients of the very business Parsons sold. Enforcement of the restrictive covenants is necessary to protect SCS's interest in the asset it purchased. To do otherwise is to provide Parsons with a $3 million windfall.

**The RCA:** Even outside the sale-of-business context, a restrictive covenant is enforceable if it "(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999). Employers have a legitimate interest in protecting "client relationships which were developed by a former employee at the employer's expense" and in preventing the "competitive use, for a time, of information or relationships which pertain peculiarly to the employer." *Id.* at 391–92.

In *BDO Seidman*, the Court of Appeals enforced a covenant barring a former employee from serving his former employer's clients for eighteen months. *Id.* at 393. The First Department has likewise affirmed a preliminary injunction enforcing a two-year covenant barring former employees from "solicit[ing], join[ing], provid[ing] services to, [or] advis[ing]" the former employer's clients, noting that the covenant "does not prohibit defendant from pursuing his profession" because "the only restriction imposed upon him is that he is not permitted to deal with plaintiff's clients." *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 202–03 (1st



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dep't 1996). Courts in this County routinely enforce such covenants against departing financial advisors. *See, e.g.*, *Cornerstone Wealth Grp., LLC v. Barnes*, Index No. 653665/2025 (Sup. Ct. N.Y. Cnty. June 23, 2025) (Bannon, J.) (granting order to show cause with TRO enjoining departing advisor from soliciting or providing services to former firm's clients).

The RCA's restrictive covenants (which are substantively similar to those considered in *Barnes*, a litigation involving another Focus affiliate) readily satisfy this test. Those restrictive covenants run for twenty-four months, and are limited to "Actual" clients (those SCS served within twelve months of Parsons's departure and with whom he had material contact or about whom he learned Confidential Information) and "Prospective" clients with whom Parsons had material contact. The restrictive covenants within the RCA contain no geographic restriction on Parsons's ability to practice. SCS paid Parsons a substantial share of the revenue from these very relationships, and supported Parsons's ability to develop those relationships by providing him with access to its investment platform, co-investment access, and family office resources. The relief sought here is narrower still: SCS asks the Court to enforce the covenants only as to the APA Clients—the relationships for which Parsons was separately paid $3,000,000.

ii. <u>Parsons Has Breached the Non-Solicitation Restrictive Covenants</u>

Parsons has breached the non-solicitation restrictive covenants. His counsel concedes that Parsons "announced his new employment to his clients." Under New York law, "[c]ontacting former clients to advise them of one's new business contact information constitutes solicitation." *U.S. Tr. Co. of N.Y. v. MacLachlan*, No. 602908/07, 2008 N.Y. Misc. LEXIS 7748, at *8 (Sup. Ct. N.Y. Cnty. 2008); *see also Alliance Capital Mgmt. L.P. v. McCool*, No. 107804/04, 2004 N.Y. Misc. LEXIS 3260, at *8 (Sup. Ct. N.Y. Cnty. 2004) (rejecting argument that announcements of departing advisor's new affiliation were not solicitation). The RCA confirms the point: "solicit"



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

includes the "initiation of contact with Actual clients to the extent such contact concerns Competing Services." (RCA § 2(a).) And Parsons went further than mere announcements: within forty-eight hours of resigning, he affirmatively contacted at least one SCS client to encourage the client to move its accounts, and he solicited another SCS client to move its business on or about November 2, 2026. (Skeean Aff. ¶¶ 28-30.)

Moreover, Parsons's claim that clients are free to follow him is off the mark. While certainly true that clients are free to choose to seek investment advisory services elsewhere, Parsons is not free to provide them those services. Both restrictive covenants at issue expressly prohibit Parsons from the provision of investment advisory services to the subject clients. The RCA forbids Parsons to "perform services for, deal with, . . . or accept business from" SCS's Actual clients (RCA § 2(a)(i)), and the APA forbids him to "sell or provide products or services" to the clients of the Business (APA § 8.1(c)(i)). These non-service and non-accept provisions apply regardless of who initiates contact. *See BDO Seidman*, 93 N.Y.2d at 393; *Chernoff Diamond*, 234 A.D.2d at 202–03. Parsons is currently breaching the APA and RCA with respect to those SCS clients he is currently servicing at Thryve, and every APA Client that Parsons services at Thryve is a fresh breach.

Moreover, at least one SCS employee has confirmed being solicited by Parsons to join Thryve. Indeed, the employee confirmed that Parsons offered her significant compensation if she were to leave SCS, and even dangled the prospect of equity at Thryve. (*See* Skeean Aff. ¶ 30.) That is an express violation of Section 2(a)(iii) of the RCA and Section 8.1(c)(ii) of the APA.

iii. <u>Thryve Is Tortiously Interfering with the APA and RCA</u>

A claim for tortious interference with contract requires "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). Thryve has had actual knowledge of Parsons's restrictive covenants since at least November 3, 2026, when SCS sent it the October 27 Letter quoting the APA covenants verbatim. (Rella Aff. Ex. 4.) Thryve has nonetheless continued to employ Parsons, and continued to allow him to service SCS's clients and accept those client accounts to Thryve's investment advisory platform. Doubtless, Thryve approved Parsons offer of significant compensation and equity to an SCS employee on the very same day that he resigned from SCS. (*See* Skeean Aff. ¶ 30.)

In short, Thryve's knowing participation independently warrants injunctive relief, and the APA expressly authorizes an injunction against "each and every person or entity acting in concert or participation with" Parsons. (APA § 9.2(f).) *See also* CPLR § 6301. Indeed, Thryve has knowingly facilitated and exploited Parsons's breach of his fiduciary duties to Plaintiffs, as well as his breach of the APA. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190–91 (2004).

iv. Parsons Breached His Fiduciary Duty of Loyalty

An employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Lamdin v. Broadway Surface Adv. Corp.*, 272 N.Y. 133, 138 (1936); *see Duane Jones Co. v. Burke*, 306 N.Y. 172, 188–89 (1954). Forwarding a former employer's confidential client information to a personal email account in anticipation of departure is a paradigmatic breach. Here, Parsons sent a client's portfolio report to his email account seventeen days before resigning without notice. (Compl. ¶ [#].) That conduct supports both injunctive relief and, ultimately, forfeiture of compensation under the faithless servant doctrine. *See Feiger v. Iral Jewelry, Ltd.*, 41



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

N.Y.2d 928, 928–29 (1977); *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 200–02 (2d Cir. 2003).

**c. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction**

New York courts routinely find irreparable harm where a departing employee solicits and services a former employer's clients in violation of restrictive covenants. In *BDO Seidman*, the Court of Appeals recognized that "[b]ecause of the inability to project with any degree of certainty how long a given client would have remained" with the employer, its "actual lost profits . . . would be impossible to determine with any precision." 93 N.Y.2d at 396*; see also Willis of N.Y., Inc. v. DeFelice*, 299 A.D.2d 240, 242 (1st Dep't 2002) (irreparable harm shown where, absent restraint on solicitation of clients, plaintiffs "would likely sustain a loss of business impossible, or very difficult, to quantify"); *Chernoff Diamond*, 234 A.D.2d at 203 (irreparable harm "clearly shown" where clients would terminate relationships to use defendant's services). The loss of confidential client information likewise constitutes irreparable harm. *See Ingenuit, Ltd. v. Harriff*, 33 A.D.3d 589, 590 (2d Dep't 2006).

The harm here is acute. Advisory fees are asset-based and fluctuate with market performance and client decisions; the duration of each relationship and the referrals it would have generated are inherently unknowable. Parsons was responsible for servicing 10 ultra-high-net-worth client households at SCS that represented approximately $230 million in client assets under management and $1.3 million of recurring annualized advisory revenue. (Skeean Aff. ¶ 22.) SCS has already lost multiple client families serviced by Parsons, faces the loss of an additional relationship generating approximately $300,000 in annual revenue, and has identified other at-risk relationships representing approximately $1 million in annual revenue. Once accounts are transferred and accepted by Thryve, the goodwill SCS purchased cannot be restored. Parsons



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

himself agreed that any breach "may cause the Company substantial and irrevocable harm." (RCA § 16.) Courts give weight to such contractual acknowledgments. *See, e.g.*, *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496 (S.D.N.Y. 2018); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

**d. The Balance of the Equities Favors Plaintiffs**

The equities weigh heavily in favor of an injunction. Plaintiffs seek only to hold Parsons to the contractual promises for which he was paid $3 million in cash, plus a substantial share of the revenue from these same relationships while employed at SCS. The relief is narrowly tailored: it reaches only the APA Clients, and it expressly permits Parsons to remain employed at Thryve and to serve client relationships *other than the ones he sold to SCS's predecessor for substantial consideration*.

While Parsons will likely complain about his ability to earn a living if injunctive relief is granted, his argument should fall on deaf ears; indeed, he was paid $3 million in cash and received significant compensation while employed by SCS. Moreover, Plaintiffs are not seeking to enjoin Parsons from working at Thryve through this Motion. Accordingly, Parsons "will be able to earn a living if the preliminary injunction is [granted]; the restraint is only that [he] may not solicit the plaintiff's customers in order to do so." *McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co.*, 114 A.D.2d 165, 174–75 (2d Dep't 1986).

Absent immediate injunctive relief, by contrast, Plaintiffs will lose the very goodwill they purchased from Parsons and the benefit of their bargain. Thryve, a direct competitor that hired Parsons with knowledge of his restrictive covenants and continued to employ him after written notice, cannot claim any cognizable hardship. And the public interest favors the enforcement of valid contracts and the protection of investors' confidential financial information.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

## II. PLAINTIFFS SHOULD BE GRANTED LIMITED EXPEDITED DISCOVERY

Plaintiffs seek targeted, expedited discovery to preserve highly relevant evidence uniquely within Defendants' control and to develop the record for the preliminary injunction hearing. "The decision of whether to grant expedited discovery is within the discretion of this Court." *Rational Strategies Fund v. Hill*, 40 Misc. 3d 1214(A), 2013 WL 3779654, at *3 (Sup. Ct. N.Y. Cnty. 2013).

Here, Plaintiffs seek two depositions—of Parsons and a Thryve corporate representative—and five targeted categories of documents: (i) Parsons's communications with SCS clients since July 1, 2026; (ii) documents concerning his affiliation with Thryve, including compensation arrangements and representations regarding expected client assets; (iii) documents sufficient to identify the SCS clients and accounts that have moved to Thryve, with account-transfer and onboarding records; (iv) documents concerning Parsons's disclosure of the RCA and APA to Thryve; and (v) all SCS Confidential Information in Defendants' possession, including in Parsons's personal email accounts and devices. These requests are narrowly tailored to the issues on the Motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion and enter an Order consistent with the proposed Order to Show Cause submitted herewith, and award Plaintiffs such other and further relief as the Court deems just and proper.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated: New York, New York
November 17, 2026

**DAVIS WRIGHT TREMAINE LLP**

By: /s/ Michael V. Rella

Michael V. Rella, Esq.
Shanaye Carvajal, Esq.
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 880-3973
MichaelRella@dwt.com
ShanayeCarvajal@dwt.com

Thomas P. DeFranco, Esq.
1301 K Street NW
Suite 500 East
(202) 220-1928
Washington, DC 20005
TomDeFranco@dwt.com

*Attorneys for Plaintiffs SCS Capital Management LLC and Focus Financial Partners, LLC*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## COMMERCIAL DIVISION RULE 17 CERTIFICATION

Michael V. Rella, an attorney for Plaintiffs, hereby certifies pursuant to Rule 17 of the Rules of the Commercial Division of the Supreme Court (22 NYCRR 202.70(g)) that the foregoing memorandum of law contains 4635 words, exclusive of the caption, table of contents, table of authorities, and signature block, as calculated by the word-processing system used to prepare it, and therefore complies with the 7,000-word limit of Rule 17.

/s/ Michael V. Rella
Michael V. Rella



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC,<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________<br><br>**AFFIRMATION OF MICHAEL V. RELLA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY** |

Michael V. Rella, an attorney duly admitted to practice before this Court, hereby affirms under penalty of perjury pursuant to CPLR § 2106 that:

1. I am a Partner with the law firm of Davis Wright Tremaine LLP, attorneys for Plaintiffs SCS Capital Management LLC ("SCS") and Focus Financial Partners, LLC ("Focus," and together with SCS, "Plaintiffs"). I submit this affirmation in support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery (the "Motion"), and to place before the Court certain documents and information that are relevant to the Motion.

2. Defendant Brad Parsons ("Parsons") and SCS are parties to the Restrictive Covenant Agreement, executed by SCS on January 10, 2025 and by Parsons on January 28, 2025 (the "RCA," a true and correct copy of which is attached to the Affirmation of William Skeean (the "Skeean Aff.") as Exhibit 3). Parsons, Focus, and Edge Capital Group, LLC ("Edge"),

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SCS's predecessor-in-interest, are parties to the Asset Purchase Agreement, dated August 26, 2022 (the "APA," a true and correct copy of which is attached to the Skeean Aff. as Exhibit 1).

3. On October 26, 2026, SCS's General Counsel, Karla Sullivan, sent Parsons a letter on SCS's behalf reminding him of his ongoing obligations under the restrictive covenants he agreed to in the APA and the RCA (the "October 26 Letter"). A true and correct copy of the October 26 Letter is attached as Exhibit 1.

4. On October 27, 2026, I sent Parsons a letter on Plaintiffs' behalf, by email and Federal Express, demanding that he immediately cease and desist from violating the restrictive covenants to which he had agreed, return all of SCS's Confidential Information and provide a sworn certification by 5:00 p.m. ET on October 28, 2026, disclose the RCA to any prospective employer, including Defendant Thryve Wealth Management LLC ("Thryve"), and preserve all relevant evidence (the "October 27 Letter"). A true and correct copy of the October 27 Letter is attached as Exhibit 2.

5. On October 28, 2026, Jeffrey Csercsevits of Fisher & Phillips LLP, counsel for Parsons, responded by letter (the "October 28 Letter"). A true and correct copy of the October 28 Letter is attached as Exhibit 3. The October 28 Letter did not deny that Parsons had solicited SCS's clients or employees and did not provide the sworn certification Plaintiffs requested.

6. On October 29, 2026, my colleague Shanaye Carvajal and I spoke with Parsons's counsel by video conference and asked, among other things, whether Parsons intended to affiliate with another wealth management firm and whether he intended to contact or service SCS's clients. Parsons's counsel did not answer those questions and asked that we put them in writing, which we did. Despite our repeated follow-up, including on November 2, 2026,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Parsons's counsel did not answer whether Parsons intended to register with Thryve or any other wealth management firm, or whether he intended to call or service SCS clients.

7. On November 3, 2026, I sent a letter by email to Nicole Saragosa, Thryve's Vice President of Operations, with a copy to Gary Dorfman Thryve's CEO, placing Thryve on notice of Parsons's ongoing violations of his restrictive covenants and enclosing the October 27 Letter (the "November 3 Letter"). A true and correct copy of the November 3 Letter, with its enclosure, is attached as Exhibit 4.

8. That same evening, Christopher J. Merken of Fisher & Phillips LLP responded by email confirming that Fisher & Phillips LLP represents Thryve, that "Mr. Parsons is now registered with Thryve Wealth Management," and that "Mr. Parsons announced his new employment to his clients." Counsel further stated: "If clients choose to open accounts at Thryve Wealth Management, that is the clients' decision." Counsel also stated that, after receiving the October 27 Letter, Parsons "found some old emails pertaining to his work at SCS" and "text messages with clients . . . that occurred while he was with SCS/Focus." A true and correct copy of the November 3, 2026 email is attached as Exhibit 5.

9. Plaintiffs have not made any prior application for the relief requested in the Motion against Parsons or Thryve.

10. Pursuant to 22 NYCRR 202.7(f), on November 17, 2026, Ms. Carvajal notified Mr. Csercsevits and Mr. Merken, counsel for both Parsons and Thryve that Plaintiffs would present the Motion, and provided them with copies of the moving papers.

11. I affirm this 17th day of November, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated: November 16, 2026
New York, New York

__/s/ Michael V. Rella___________
Michael V. Rella



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## ATTORNEY CERTIFICATION PURSUANT TO COMMERCIAL DIVISION RULE 17

I, Michael V. Rella, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Affirmation of Michael V. Rella in Support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery complies with the word count limit set forth in Rule 17 of the Commercial Division of the Supreme Court (22 NYCRR 202.70(g)) because it contains 815 words, excluding the parts of the affirmation exempted by Rule 17 of the Commercial Division of the Supreme Court (22 NYCRR 202.70(g)). In preparing this certification, I have relied on the word count function of the word-processing system (Microsoft Word) that was used to prepare this affirmation.

Dated: November 17, 2026
New York, NY

__/s/ Michael V. Rella__________
Michael V. Rella



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

October 26, 2026

**VIA E-MAIL**: bparsons713@gmail.com

Brad Parsons
4440 Northcrest Road
Dallas, Texas 75229

Re: August 26, 2022 Edge Capital Group, LLC Asset Purchase Agreement as assigned to SCS Capital Management LLC effective February 1, 2025 ("APA") and February 1, 2025 SCS Capital Management LLC Restrictive Covenant Agreement, as assigned to Focus Operating, LLC, effective January 1, 2026 ("RCA") (collectively, the "Agreements")

Dear Mr. Parsons:

On behalf of the Company, given your separation, I am writing to remind you of certain post-employment obligations that you remain subject to pursuant to the terms of the restrictive covenants that you executed with the Company and/or any of its affiliates (including any of their respective predecessors, successors and/or assigns) including but not limited to the above-referenced Agreements. The RCA is attached as Exhibit A. The Company takes compliance with the Agreements seriously and will enforce its rights to the fullest extent permitted by law. Capitalized terms used herein, but otherwise not defined, shall have the meanings set forth in the applicable Agreement.

As you know, the RCA includes restrictive covenants, as modified by state riders, including, without limitation, (i) non-solicitation and non-service of Actual or Prospective clients related to Competing Services, and (ii) non-solicitation of officers, employees, partners, principals or members of the Company, in each case, during the term of your employment and for a 24 month period thereafter. In addition, the RCA includes confidentiality obligations pursuant to which you acknowledged and agreed that (i) you acquired Confidential Information from the Company, (ii) the Confidential Information is the property of the Company, (iii) the misuse, misappropriation, or disclosure of such Confidential Information would cause the Company irreparable harm, and (iv) it is essential to the protection of the Company's goodwill and competitive position that the Confidential Information be kept secret and that you not disclose that information to others or use it for your own advantage, "both during and after [your] employment." You further agreed that you "shall not, either during or following [your] employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for [yourself] or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company), except in the course of performing duties assigned to [you] by the Company."

The restrictive covenants in the APA include, without limitation, (i) non-competition with the Business with respect to any activity conducted in or directed at clients or prospective clients of the Purchaser in the United States, (ii) non-solicitation and non-service of any existing, former or prospective client of the Business or its affiliates, and (iii) non-solicitation of employees of the Purchaser or any of its affiliates, in each case ending on August 26, 2027.

As stated above, this letter is to remind you of your legal obligations and provide you with notice that the Company intends to enforce such obligations. We wish you all the best in the next chapter of your career and thank you for your contributions to the Company.

{4405382:2}

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Sincerely,

Karla Sullivan
General Counsel
SCS Capital Management LLC

Enclosure



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


SCS FINANCIAL
Strategic Capital Solutions

# RESTRICTIVE COVENANT AGREEMENT

This RESTRICTIVE COVENANT AGREEMENT (this "Agreement") is made by the undersigned individual ("Employee") and SCS CAPITAL MANAGEMENT LLC, a Delaware limited liability company (together with any subsidiary, direct predecessor, predecessor of any previous predecessor, or subsidiary through purchase, merger or other business combination, including without limitation a transfer of assets, "Firm"), and effective as of Employee's first day of employment with the Firm (the "Effective Date"). In the event that Employee does not commence employment with Firm, this Agreement shall be null and void.

**WHEREAS**, Employee desires to be employed and/or continue to be employed by the Company (as defined below); and

**WHEREAS**, Firm's willingness to employ and/or continue the employment of Employee is conditioned upon Employee entering into this Agreement.

**NOW, THEREFORE**, in consideration of Employee's current and/or future employment and service with the Company, the opportunity to progress at the Company, professional training related to the Company's business, access to and acquisition of trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers, Employee and Firm agree as follows (unless otherwise provided in **Appendix A** hereto):

1. Third-Party Beneficiaries. The parties hereto agree that any subsidiaries or other associated affiliates of Firm comprising the SCS group of companies (collectively, "Firm Group Members"), and Focus Financial Partners, LLC ("Focus"), Focus Financial Partners Inc., Focus Operating, LLC and each other direct or indirect parent of Firm, including the respective successors and assigns of Firm, any such Firm Group Members, Focus and any such other parent entities, are each express third-party beneficiaries of the rights of Firm hereunder. For the purposes of this Agreement, all references to the "Company" shall include Firm and each Firm Group Member, including any add-on acquisitions of any of the foregoing; provided, however, that for avoidance of doubt, references to the "Company" shall not include any affiliates of Firm that are not Firm Group Members (as defined above), but are affiliates of Firm solely by virtue of common ownership by Focus or Focus Operating, LLC.

2. Non-Solicitation and Referral Program Participation Restrictions

a. Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, except in the course of performing duties assigned to Employee by the Company:

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual clients (as defined below) of the Company;

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual clients of the Company;

iii. solicit, recruit, or take away, or attempt to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company, either for Employee's own business or for any other person or entity;

iv. hire or attempt to hire any officer, employee, partner, principal or member of the Company, except any former officer, employee, partner, principal or member of the Company whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire; or

v. solicit, recruit, or otherwise induce or influence any proprietor, stockholder, lender, director, sales agent, independent contractor, business partner, joint venturer, investor, lessor, supplier, client, agent, representative, or any other person that has a business relationship with the Company, and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, to discontinue, reduce, or modify such business relationship with the Company.

For purposes of this Agreement, (i) an "Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives provided services within twelve (12) months prior to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the date of such termination of Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company; and (ii) "Competing Service" means any service or process of any person or entity other than the Company, in existence or under development, which is competitive with, or an alternative or substitute for, any process or service of the Company, in existence or under development, at or any time during the period of Employee's employment with or service to the Company or about which Employee acquires Confidential Information (as defined below).

Additionally, for purposes of this Section 2, the term "solicit" shall include, but not be limited to, initiation of contact with Actual clients to the extent such contact concerns Competing Services.

b. If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

3. Confidential and Proprietary Information.

a. Employee recognizes, acknowledges, and agrees that (i) Employee has acquired and/or will acquire Confidential Information from the Company, Focus and their affiliates, (ii) such Confidential Information is the property of the Company, Focus and their affiliates, (iii) the misuse, misappropriation, or disclosure of such Confidential Information would constitute a breach of trust and could cause irreparable injury to the Company, Focus and their affiliates, and (iv) it is essential to the protection of the Company's goodwill and competitive position that such Confidential Information be kept secret and that Employee not disclose the Confidential Information to others or use the Confidential Information to Employee's own advantage or the advantage of others, except as required in the performance of Employee's duties to the Company, both during and after Employee's employment.

b. Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, either during or following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

c. Employee understands that "Confidential Information" means any of the Company's, Focus' or any of their affiliate's confidential or proprietary information, technical data, know-how, client information, or other business information disclosed to Employee, whether directly or indirectly, in writing or orally, by the Company, Focus, any of their affiliates or a third party, including, without limitation:

i. formulas; research and development techniques or projects; processes; products and/or services; computer programs (including, without limitation, software used pursuant to a license agreement); software (including, without limitation, all programs, specifications, applications, routines, subroutines, techniques, and ideas for formulas); discoveries; inventions; innovations; creations; writings; and other works of authorship;

ii. financial data (including, without limitation, all information about costs, profits, markets, sales, budgets, projections, contracts, and clients, partners, officers, employees, distributors, and pricing methods); client and supplier lists; and contacts at or knowledge of Actual clients or prospective clients of the Company; business, marketing, and strategic plans; negotiation strategies; and

iii. personnel files and compensation information, except to the extent disclosure is protected by applicable law.

d. Employee understands that Confidential Information does not include any information that (i) arises from Employee's general training, knowledge, skill, or experience, whether gained on the job or otherwise; (ii) has become publicly known or been made generally available to the public through no wrongful act of Employee; or (iii) has been developed by Employee independently of his or her employment or service with the Company (and not in violation of this Agreement or any other agreement). Employee further agrees

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

that all Confidential Information at all times shall remain the property of the Company, Focus and their respective affiliates.

e. Employee recognizes, acknowledges, and agrees to be bound by the Privacy Statement, Privacy Notice, Privacy Policy and/or the applicable equivalent thereof and all other policies of the Company governing the handling or use of Confidential Information or other information or property of the Company as are in effect from time to time.

f. Employee recognizes, acknowledges, and agrees that the investment performance record of any client accounts with which Employee is associated while employed at the Company is attributable to a team of professionals of the Company and not solely to the efforts of any single individual, and that, therefore, the performance records of the accounts managed by the Company are and shall be the exclusive property of the Company.

g. Upon the termination of Employee's employment, Employee agrees to deliver promptly to the Company all paper and/or electronic documents and files concerning the Company, Focus and their respective affiliates and any and all Confidential Information, provided, however, that Employee may retain a copy of documents relating solely to the employee-employer relationship (*i.e.*, offer letter, this Agreement, profit sharing statements, benefit statements, and other similar documents) between Employee and the Company.

h. In the event that Employee is ordered to disclose Confidential Information pursuant to a judicial request, requirement, or order, Employee shall, prior to disclosure, promptly notify the Company and take all reasonable steps to assist the Company in protecting the rights of the Company. In addition, notwithstanding anything herein to the contrary, this Agreement and Company policies shall not be enforced in such a way as to impede Employee from communicating directly with, cooperating with, or providing information (including with respect to possible violations of law) to, or receiving financial awards from, any federal, state or local government agency, including without limitation the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission, or the U.S. National Labor Relations Board, or any self-regulatory organization, without notifying or seeking permission from the Company. Furthermore, nothing in this Agreement or any Company policy prohibits or restricts Employee from (i) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful, (ii) speaking with law enforcement, the Equal Employment Opportunity Commission, the state division of human rights, the attorney general, a local commission on human rights, or an attorney retained by Employee, or (iii) exercising any right Employee has under Section 7 of the National Labor Relations Act.

i. In addition, and notwithstanding anything herein to the contrary, Employee hereby acknowledges, understands and agrees that (i) the Confidential Information may contain or constitute material non-public information concerning Focus, the Company or their affiliates and (ii) trading in the securities of any of the foregoing while in possession of material nonpublic information or communicating that information to any other person or entity who trades in such securities could subject Employee or his or her affiliates to liability under the U.S. federal and state securities laws, and the rules and regulations promulgated thereunder, including Section 10(b) of the U.S. Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. Employee agrees that he or she and his or her affiliates will not trade in the securities of Focus, the Company or their affiliates while in possession of material nonpublic information or at all until Employee or such affiliates can do so in compliance with all applicable laws and without breach of the terms hereof.

4. Invention Ideas. "Inventions" and "Invention Ideas" are understood to include all contributions, inventions, ideas, formulae, works, modifications, processes, discoveries, techniques, designs, methods, trade secrets, technical specifications and data, know-how, show-how, concepts, expressions, creations, improvements, works of authorship, ideas and other developments, whether or not they are patentable or copyrightable or subject to analogous protection and regardless of their form or state of development, and whether or not Employee have made them alone or with others, developed during Employee's employment that relates in any manner to the business of the Company. Employee covenants and agrees (a) to disclose promptly to the Company or its nominee any and all Invention Ideas authored, conceived, or made by Employee during the period of Employee's employment and related to the business or activities of the Company; (b) that all Invention Ideas will belong solely to the Company from conception as "works made for hire" (as that term is used under U.S. copyright law) or otherwise; (c) to the extent that title to any such Invention Ideas do not, by operation of law, vest in the Company, Employee hereby irrevocably assigns to the Company all right, title and interest, including, without limitation, tangible and intangible rights such as patent rights, trademarks, copyrights, trade secrets rights and mask work rights, that Employee may have or may acquire in and to all such contributions and Inventions, benefits and/or rights resulting therefrom, and agrees to promptly execute any further specific assignments related to such contributions or Inventions, benefits and/or rights at the request of the Company; and (d) in the event any Invention Idea shall be deemed by the Company to be patentable or otherwise registrable, to do all things necessary or proper to obtain letters of patent or other applicable registrations thereon and to vest the Company with full title thereto. Notwithstanding the foregoing, any provision in this Agreement which provides that Employee shall assign, or offer to assign, any of his or her rights in an invention to the Company shall not apply to an invention that Employee developed entirely on his or her own time without using the Company's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by Employee for the Company.

5. Professionalism. Employee covenants and agrees that during Employee's employment or service with the Company and after the termination of such employment and service for any reason, subject to Section 3(h) above, Employee will not make any malicious, false, offensive or hostile statements regarding the Company, Focus or their affiliates (or any of its or their members, managers, directors,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

officers, employees, agents, or representatives) or any statements regarding the business affairs or financial condition of the Company, Focus or their affiliates to any media outlet, industry, group, financial institution, current or former employee, consultant, or client of the Company.

6. Photography and Video Authorization and Release. Employee grants to the Company, Focus and their affiliates the irrevocable right and permission concerning photographs or videos that were or may be taken of him or her, or in which he or she may be included with others, in connection with Employee's employment or service with the Company (collectively, the "Photographs and Videos"), to use and publish the Photographs and Videos in whole or in part, individually or in connection with other material, without restriction as to alteration, in any and all media, including the internet, that the Company, Focus and their affiliates employ including illustration, promotion, and marketing of the Company, Focus and their affiliates. Employee releases and discharges the Company, Focus and their affiliates from any and all claims and demands that may arise out of or in connection with said use of the Photographs and Videos. This authorization and release shall inure to the benefit of the legal representative, licensees, and assigns of the Company, Focus and their affiliates. This release shall be binding upon Employee's heirs, legal representative, and assigns.

7. Disclosure to Prospective Employers. Employee covenants and agrees to disclose the existence and terms of this Agreement to any prospective employer, partner, or co-venturer prior to entering into an employment, partnership, or other business relationship with such person or entity. In addition, Employee expressly consents to the Company's right and authority to disclose the existence and terms of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee, and Employee indemnifies and holds harmless the Company and its affiliates, representatives, members, managers, employees, and attorneys from and against any and all losses, claims, damages, liabilities, costs, and expenses, actual or threatened, relating to, or arising directly or indirectly out of or in connection with the Company's disclosure of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee.

8. Tolling Period. The restrictions contained in Section 2 of this Agreement automatically shall, unless prohibited by applicable law, be extended by the length of time during which Employee shall have been in breach of such restrictions.

9. No Prior Agreements. Employee represents and warrants to the Company that: (a) the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound; (b) except as Employee has disclosed in writing to the Company, Employee is not bound by the terms of any agreement with any previous employer, current employer, client/customer or other person or entity (i) to refrain from soliciting, directly or indirectly, the employees or current or prospective clients, customers, accounts or investors of such previous employer or other party, (ii) to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, (iii) to refrain from using or disclosing any trade secret or other confidential or proprietary information of such previous employer or other party in the course of Employee's employment or service with the Company, or (iv) to assign any invention ideas to such previous employer or other party; and (c) Employee has complied with the terms of each agreement, if any, that Employee has disclosed to the Company pursuant to this Section 9 through the date hereof. The Company has not requested or been provided with (and the Company prohibits Employee from obtaining for or disclosing to the Company) information that may be considered confidential under the terms of each agreement, if any, that Employee has disclosed pursuant to clause (b) of this Section 9.

10. Review by Counsel. Employee represents and warrants that Employee has been advised by the Company, and offered the opportunity, to review and discuss fully the terms of this Agreement with an attorney of Employee's own choosing. Employee represents and warrants that Employee received a copy of this Agreement with the offer letter of employment or service with the Company, and prior to the commencement of employment or service with the Company.

11. Not an Employment Contract. Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue Employee's employment or service for any period of time, and does not change the at-will nature of Employee's employment. Notwithstanding the foregoing, if Employee voluntarily separates employment or service with the Company, Employee shall provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture. The Company may, in its sole discretion, waive such notice period (in whole or in part).

12. Interpretation. If any restriction set forth in this Agreement is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable.

13. Severability. Any restrictive covenants in this Agreement shall only apply to the extent not prohibited by applicable law. The invalidity of any portion hereof shall not affect the validity, force, or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law.

14. Waiver of Rights. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15. Company Violation Not a Defense. In an action by the Company to enforce this Agreement, any claims asserted by Employee against the Company, other than claims arising under or pertaining to this Agreement, shall not constitute a defense to the Company's action.

16. Equitable Remedies. The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by Employee to be reasonable for such purpose. Employee agrees that any breach of this Agreement may cause the Company substantial and irrevocable harm and therefore, in the event of any such breach, Employee agrees that the Company, in addition to such other remedies which may be available, may be entitled to specific performance and other injunctive relief.

17. Attorney's Fees. If the Company brings any legal action or other proceeding to enforce its rights under this Agreement and obtains any enforceable judgment or injunction, the Company may recover its costs and expenses (including reasonable attorneys' fees) incurred in connection with the action and any appeal from Employee, in addition to any other relief to which the Company may be entitled.

18. Assignability; Binding Effect. This Agreement shall be binding on and inure to the benefit of the successors in interest of the parties; provided, however, that Employee's obligations under this Agreement are personal and may not be assigned by Employee except with the written consent of the Company. Firm may assign this Agreement and its rights and obligations hereunder to Focus or any of its affiliates, including any of the third-party beneficiaries set forth in Section 1, or to any successor to all or substantially all of the business and/or assets of Firm.

19. Entire Agreement, Etc. This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and, except as otherwise provided in Section 23, may be amended only by a writing signed by each of them. Notwithstanding the foregoing or anything herein to the contrary, and for the avoidance of doubt, Employee's covenants and obligations hereunder are in addition to and not in lieu of or exclusive of any other continuing obligations and duties that Employee may have to any of the Company, Focus, and/or any of their respective affiliates, predecessors, successors and/or assigns, including without limitation under any agreement Employee entered into prior to the Effective Date with any predecessor or affiliate of the Company, in Employee's capacity as an officer, employee, partner, principal or member of such predecessor or affiliate, containing confidentiality, non-solicitation, non-competition and/or any similar covenants or obligations.

20. Counterparts; Transmission. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument. The signature of a party on any counterpart that is transmitted by facsimile or via .pdf file to another party or legal counsel for another party shall be deemed an original signature binding upon the executing party and acceptable to all other parties.

21. Governing Law; Choice of Forum. Unless otherwise provided in Appendix A hereto: This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles; provided, however, that if the State of New York enacts a law that bans any restriction set forth in Section 2 of this Agreement, and if Employee primarily resides and provides services to the Company outside of the State of New York, then this Agreement shall be governed by, and construed in accordance with, the laws of the state in which Employee primarily provides services to the Company without regard to conflict of laws principles. The parties hereto hereby irrevocably agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this Agreement shall be brought solely in the appropriate federal or state court in the County of New York, State of New York. By their execution of this Agreement, the parties hereby covenant and irrevocably submit to the in personam jurisdiction of any such federal or state court, and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail upon them or their agent, return receipt requested, with the same full force and effect as if personally served upon them in the State of New York. The parties hereto waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense based on lack of in personam jurisdiction with respect thereto.

22. Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement to the contrary: (a) Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made: (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and (b) if Employee files a lawsuit for retaliation by the Company or its affiliates for reporting a suspected violation of law, Employee may disclose the trade secrets of the Company or its affiliates to Employee's attorney and use the trade secret information in the court proceeding if Employee (i) files any document containing the trade secret under seal and (ii) does not disclose the trade secret, except pursuant to court order.

23. State Law Modifications. If Employee primarily resides and provides services to the Company in a state listed on Appendix A hereto, or if otherwise required with respect to Employee by the applicable law of a particular state, the modifications set forth on Appendix A for that state shall apply to Employee. Employee acknowledges and agrees that the Company may issue updates to Appendix A from time to time (including the addition of states) to either narrow the scope of a particular restriction or to comply with applicable state or federal law, and Employee hereby consents to any such updates.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates below written, to be effective as of the Effective Date (as defined herein).

SCS CAPITAL MANAGEMENT LLC

By: [redacted] Date: January 10, 2025
Name: Melissa Schneberger
Title: Chief Talent Officer

**EMPLOYEE:**

By: [redacted] Date: January 28, 2025

Name:Brad Parsons

**APPENDIX A**
**CERTAIN MODIFICATIONS OF RESTRICTIVE COVENANTS**

If Employee primarily resides and provides services to the Company in a state listed below, or if otherwise required with respect to Employee by the applicable law of a state below, the modifications set forth below for that state shall apply.

For purposes of this **Appendix A**, the "post-employment portion" of the Restricted Period or the Referral Program Participation Restricted Period means the period remaining in the Restricted Period or Referral Program Participation Restricted Period, as applicable, following Employee's last day of employment and service with the Company.

**Sections 2(a)(i) and 2(a)(ii)**

All States other than Colorado, Illinois, Indiana, Maryland, New Hampshire, New Jersey, New York, Oklahoma, and Oregon:

The following shall replace Section 2(a)(i):

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual or Prospective clients (each as defined below) of the Company;

The following shall replace Section 2(a)(ii):

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual or Prospective clients of the Company;

The following shall be added as a definition of "Prospective" client:

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company.

Arizona: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's last day of employment or service with the Company. Additionally, following Employee's last day of employment or service with the Company, the terms Actual and Prospective client shall not include any person or entity who has terminated its contract, account or relationship with the Company prior to Employee's last day of employment or service, without any solicitation or interference by Employee.

California: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or diversion described in Sections 2(a)(i) or 2(a)(ii).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

Georgia; Missouri: The following definitions of Actual and Prospective clients shall apply:

"Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provided services within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company.

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company.

In addition, nothing in Sections 2(a)(i) or 2(a)(ii) shall restrict Employee from soliciting any Actual or Prospective client for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(i) and 2(a)(ii) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

Nevada: The following shall be added to the end of Section 2(a)(i):

Notwithstanding the foregoing, during the post-employment portion of the Restricted Period, this Section 2(a)(i) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Oklahoma: Sections 2(a)(i) and 2(a)(ii) shall be replaced with the following:

> directly solicit the sale of goods, services, or a combination of goods and services from the established customers of the Company;

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(i) and 2(a)(ii), the "Restricted Period" shall be the term of Employee's employment or service with the Company and for a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(a)(iii)**

Alabama: The restriction contained in Section 2(a)(iii) will apply only with respect to officers, employees, partners, principals or members who hold or held a position uniquely essential to the management, organization or service of the Company.

Arizona: The restrictions set forth in Section 2(a)(iii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(iii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or recruitment described in Section 2(a)(iii).

Georgia: The restrictions set forth in Section 2(a)(iii) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iii) shall apply only with respect to soliciting, recruiting, or taking away, or attempting to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company who possess or have access to Confidential Information that would give an unfair advantage to a business in competition with the Company.

**Section 2(a)(iv)**

Alabama: The restriction contained in Section 2(a)(iv) will apply only to officers, employees, partners, principals, or members who hold or held a position uniquely essential to the management, organization or service of the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

Arizona: The restrictions set forth in Section 2(a)(iv) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: Section 2(a)(iv) shall be deemed deleted.

Georgia: The restrictions set forth in Section 2(a)(iv) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iv) shall apply only with respect to hiring or attempting to hire any officers, employees, partners, principals or members of the Company who possess or have (or possessed or had) access to Confidential Information that would give an unfair advantage to a business in competition with the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

**Section 2(a)(v)**

Arizona: The restrictions set forth in Section 2(a)(v) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(v) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to violate Section 2(a)(v).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% of the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

Georgia: The restrictions set forth in Section 2(a)(v) shall apply only with respect to those business relations of the Company with whom Employee had material contact during Employee's employment or service with the Company. Nothing in Sections 2(a)(v) shall restrict Employee from soliciting any business relation of the Company for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Section 2(a)(v) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(v) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(v), the "Restricted Period" shall be the term of Employee's employment or service with the Company and a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(b)**

California; Minnesota; Montana; North Dakota; Oklahoma: The restrictions set forth in Section 2(b) shall apply only during Employee's employment or services with the Company.

Colorado: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns annualized cash compensation at or above the threshold amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., $123,750 in annual compensation for 2024), as set forth in CO Rev. Stat. 8-2-113.

District of Columbia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns or is reasonably expected to earn at or above the minimum qualifying annual compensation ($154,200 in 2024) per year (which amount shall increase each year in proportion to the annual average increase, if any, in the Consumer Price Index for All Urban Consumers in the Washington Metropolitan Statistical Area published by the Bureau of Labor Statistics of the United States Department of Labor for the previous calendar year adjusted to the nearest whole dollar).

District of Columbia; Georgia; Idaho; Illinois; Indiana; Maryland; Michigan; North Carolina; Pennsylvania; South Carolina; Texas; Virginia; Wisconsin: The following sentence shall be added to the end of Section 2(b):

> Notwithstanding the foregoing, nothing in this Section 2(b) shall prohibit Employee from being employed or engaged, during the post-employment portion of the Referral Program Participation Restricted Period, by any person or entity in a role that does not have responsibility for, or require performance of, any of the same or similar functions, duties or activities that Employee performed or had oversight for on behalf of the Company.

Georgia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee (a) customarily and regularly solicits for Company customers or prospective customers; or (b) customarily and regularly engages in making sales or obtaining orders or contracts for products or services to be performed by others; or (c) performs the following duties: (i) has a primary duty of managing the enterprise in which Employee is employed or of a customarily recognized department or subdivision thereof; (ii) customarily and regularly directs the work of two or more other employees; and (iii) has the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (d) performs the duties of a key employee or of a professional.

Idaho: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is a "key employee," which means any employee or independent contractor who (i) has, by reason of the Company's investment of time, money, trust, exposure to the public or exposure to technologies, intellectual property, business plans, business processes and methods of operation, customers, vendors or other business relationships during the course of employment or service, gained a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company and, as a result, has the ability to harm or threaten the Company's legitimate business interests, and/or (ii) is among the highest paid five percent (5%) of the Company's employees and independent contractors.

Illinois: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee has actual or

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($75,000 per year in 2024, increasing to $80,000 starting in 2027).

Louisiana: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the Referral Program Participation Restricted Territory (as defined below), that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes hereof, "Referral Program Participation Restricted Territory" shall mean (A) each of the following parishes and municipalities for so long as the Company carries on business in such parish or municipality: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana and Winn; and (B) any other state, municipality or locale in the United States in which the Company carries on business for so long as the Company continues to carry on business therein.

Maine: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee, at the time Employee enters into this Agreement, earns wages in excess of four hundred percent (400%) of the federal poverty level.

Massachusetts: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason except as set forth in this Section 2(b) below (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, own, be employed in a Restricted Capacity by, or perform services in a Restricted Capacity for, any advisory firm, anywhere in the United States in which Employee, during the last two (2) years of Employee's employment or service with the Company provided services or had a material presence or influence, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes of this Section 2(b), "Restricted Capacity" means any capacity (whether as an owner, partner, employee, officer, director, independent contractor, consultant, advisor or in any other capacity calling for the rendition of services, advice, or acts of management, operation or control) in which Employee would provide or engage in services that are the same as or substantially similar to the services Employee provided to the Company during the then most-recent two (2) years of Employee's employment with or service to the Company. Notwithstanding anything to the contrary in this Section 2(b), the post-employment portion of the restrictions contained in this Section 2(b) will not apply if (A) the Company terminates Employee's employment and services without Cause (as defined below) or because of a layoff, (B) Employee is classified as a non-exempt employee under the Fair Labor Standards Act, (C) Employee is an undergraduate or graduate student enrolled in a full-time or part-time undergraduate or graduate

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

educational institution, or (D) Employee is age 18 or younger ("Disqualifying Reason"). For purposes of this Section 2(b), "Cause" means, in addition to "Cause" as defined in any other agreement between Employee and the Company, a reasonable and good faith basis for the Company to be dissatisfied with Employee's job performance, conduct, or behavior. As additional consideration for Employee's obligations under this Section 2(b), unless there is a Disqualifying Reason, the Company shall pay Employee during the post-employment portion of the Referral Program Participation Restricted Period at a rate equal to 50% of Employee's highest annualized base salary within the two years immediately preceding Employee's last day of employment (with such payments to be paid to Employee in equal installments over the course of the Referral Program Participation Restricted Period, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard payroll practices) (the "Garden Leave Payments"); provided, however, in the event that the Company, in its discretion, waives Employee's obligations under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to Employee shall cease. Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with Employee's obligations under this Section 2(b). Any Garden Leave Payments paid by the Company will be payable as salary continuation in accordance with its standard payroll practices as described above. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Nevada: The following shall be added to the end of Section 2(b):

Notwithstanding the foregoing, during the post-employment portion of the Referral Program Participation Restricted Period, this Section 2(b) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

New Hampshire: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns above 200% of the federal minimum wage.

Idaho; Nebraska; North Carolina; South Carolina; Pennsylvania; Texas; Wisconsin: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States in which Employee provided services or had a material presence or influence during Employee's employment or service with the Company, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

Oregon: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if (i) (A) Firm informs Employee in a written employment offer received by Employee at least two (2) weeks before the first day of Employee's employment that a non-competition agreement is required as a condition of employment or (B) Employee executes this Agreement upon a *bona fide* advancement, (ii) Employee is classified as exempt under state wage and hour law, (iii) Employee has access to trade secrets of the Company or competitively sensitive Confidential Information, and (iv) as of the date of Employee's termination of employment, the total amount of Employee's annual gross salary and commissions, calculated on an annual basis, exceeds $108,581 (adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the date of Employee's termination of employment); provided, however, that if Employee does not satisfy prongs (ii) or (iv) of the foregoing, in order for the restrictions set forth in Section 2(b) to apply to such Employee during the post-employment portion of the Referral Program Participation Restricted Period, the Company agrees to pay such Employee, during the post-employment portion of the Referral Program Participation Restricted Period, the greater of compensation equal to at least fifty percent (50%) of (x) Employee's annual gross base salary and commissions at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the time of Employee's termination of employment or (y) $108,581, adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the termination of Employee's employment (the "Garden Leave Payments"); provided, further, that (1) in the event that the Company, in its discretion, waives such obligations of Employee under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to such Employee shall cease, (2) Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with such Employee's obligations under this Section 2(b), and (3) any Garden Leave Payments paid by the Company will be payable as salary continuation, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard regular payroll practices. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Rhode Island: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has annual earnings at or below two hundred fifty percent (250%) of the federal poverty level as established by the United States Department of Health and Human Services federal poverty guidelines (excluding overtime), (ii) is 18 years of age or younger, (iii) is an undergraduate or graduate student or (iv) is an employee who is nonexempt under the Fair Labor Standards Act.

South Dakota: The post-employment portion of the Referral Program Participation Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has average weekly earnings less than the average weekly wage of the Commonwealth as determined by the Virginia Employment Commission, (ii) is an intern, student, apprentice or trainee employed, with or without pay, at a trade or occupation in order to gain work or educational experience or (iii) is an independent contractor compensated at an hourly rate that is less than Virginia's median hourly wage for all occupations for the preceding year, as reported by the U.S. Bureau of Labor Statistics. Notwithstanding the foregoing, Section 2(b) shall apply if Employee's compensation is derived in whole or in predominant part from sales commissions, incentives or bonuses.

Washington: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is (i) an employee of the Company whose earnings from the Company exceed the threshold set forth in RCW 49.62.020 when annualized ($120,559.99 in 2024) or (ii) an independent contractor of the Company or any of its Subsidiaries whose earnings from the Company exceed the threshold set forth in RCW 49.62.030 per year ($301,399.98 in 2024), each amount to be adjusted annually for inflation as calculated by the Washington Department of Labor and Industries pursuant to RCW 49.62.040; provided, however, in the event that at any time Employee's compensation level exceeds such thresholds, as of such time the full Referral Program Participation Restricted Period shall be in place. Further, to the extent Employee's employment or service is terminated by the Company as part of a layoff, then the post-employment portion of the Referral Program Participation Restricted Period shall be enforced only to the extent that Firm, at its option, continues to pay Employee his or her base salary, at the annual rate in effect as of the date of Employee's termination of employment, in accordance with Firm's regular payroll practices, and subject to deduction for any compensation earned through subsequent employment during the period of enforcement ("Garden Leave Payments"). Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise. Furthermore, if Employee earns less than twice the applicable state minimum hourly wage, Section 2(b) shall not restrict, restrain or prohibit Employee from having an additional job, supplementing Employee's income by working for another employer, working as an independent contractor or being self-employed, provided that such additional services do not raise issues of safety for Employee, coworkers or the public, or interfere with the reasonable and normal scheduling expectations of the Company. Nothing in the foregoing sentence alters the obligations of Employee to the Company under existing law, including the common law duty of loyalty and laws preventing conflicts of interest and any corresponding policies addressing such obligations.

**Section 3(b)**

Arizona; Florida; Georgia; Illinois; New Jersey; South Carolina; Virginia: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

Wisconsin: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or Prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company. As applied to Confidential Information that does not constitute a trade secret under applicable law, the nondisclosure provision shall apply only in geographic areas where the unauthorized disclosure or use of Confidential Information would be competitively damaging to the Company.

**Section 3(h)**

Washington: The following language shall be added to the end of Section 3(h):

Nothing in this Agreement shall prohibit or is intended to restrict or impede Employee from exercising Employee's rights under Washington's Silenced No More Act or from disclosing or discussing (i) illegal acts of discrimination, harassment, retaliation, wage and hour violations, sexual assault, or other conduct recognized as being against a clear mandate of public policy occurring in the workplace, at work-related events, between employees, or between an employer and an employee, whether on or off the employment premises, or (ii) information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful.

**Section 4**

California: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement shall not apply to an invention that qualifies fully under the provisions of California Labor Code Section 2870, which provides as follows:

"Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
(2) Result from any work performed by the employee for the employer."

Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 2870 through 2872 of the California Labor Code.

Illinois: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement is intended to comply, and shall be construed in accordance with, 765 ILCS 1060/1 to 1060/3.

Utah: The following language shall be added to the end of Section 4:

Pursuant to Sections 34-39-1 to 34-39-3 of the Utah Code, the assignment of inventions as described in this Agreement shall not apply to an invention that is (i) created by Employee entirely on Employee's own time and (ii) not an Employment Invention. For this purpose, "Employment Invention" means any invention or part thereof conceived, developed, reduced to practice or created by Employee that is: (A) conceived, developed, reduced to practice or created by Employee: (x) within the scope of Employee's employment or service; (y) on the Company's time; or (z) with the aid, assistance or use of any of the Company's property, equipment, facilities, supplies, resources or intellectual property; (B) the result of any work, services or duties performed by Employee for the Company; (C) related to the industry or trade of the Company; or (D) related to the current or demonstrably anticipated business, research or development of the Company. Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 34-39-1 to 34-39-3 of the Utah Code.

**Section 8**

California, Connecticut, Wisconsin: Section 8 shall be deemed deleted.

**Section 21**

California: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

accordance with the internal laws of the State of California, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of California. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Colorado: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of Colorado. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Massachusetts: The following shall be added to the end of Section 21:

Notwithstanding anything to the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction and shall be brought solely in the business litigation session of the Superior Court of the Commonwealth of Massachusetts, in Suffolk County, Massachusetts.

Minnesota: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Minnesota, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Minnesota, and the parties agree to jurisdiction and venue therein.

Washington: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Washington, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Washington, and the parties agree to jurisdiction and venue therein.

**Section 24**

Colorado: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under Section 2. Employee acknowledges the Company's business success and competitive position in the industry are dependent on the Company's exclusive possession of trade secrets. Employee agrees that these restraints are (a) intended to protect and necessary for the reasonable and proper protection of the Company's trade secrets, (b) reasonable in respect of subject matter, length of time, and geographic area, and (c) supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, and that employment opportunities outside the scope of these restraints exist and remain available to Employee, and that Employee's skill sets are transferable to other industries and businesses not in competition with the Company. Employee acknowledges that each of these covenants has a unique, very substantial, and immeasurable value to the Company, and that Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force.

Employee acknowledges receipt of a separate notice that Firm has provided to Employee contemporaneously with this Agreement attached hereto as Exhibit A (if applicable), which identifies this Agreement by name, states that this Agreement contains non-competition and non-solicitation covenants that could restrict Employee's options for subsequent employment following the termination of Employee's employment or service with the Company, and directs Employee to the specific sections of this Agreement containing such covenants. If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges receipt of this Agreement and such separate notice from Firm before Employee accepted an offer of employment or service with the Company. If Employee is entering into

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


this Agreement as a current employee of Firm, Employee acknowledges receipt of this Agreement and such separate notice from Company at least fourteen (14) days before the earlier of the effective date of this Agreement, or the effective date of the consideration for this Agreement.

District of Columbia: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least 14 calendar days to review the restrictive covenants set forth in this Agreement. To the extent, for purposes of Section 2(b), the post-employment portion of the Referral Program Participation Restricted Period applies to Employee, Employee acknowledges receipt of the following notice: "The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. The Company has determined that Employee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendments Act of 2020, contact the District of Columbia Department of Employment Services (DOES)."

Illinois: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that (a) Employee has had at least fourteen (14) calendar days to review this Agreement, including the restrictive covenants set forth herein, (b) Employee has been advised of Employee's right to consult with counsel prior to agreeing to be bound by this Agreement, including the restrictive covenants set forth herein, and (c) the restrictions contained in this Agreement (including in Section 2) are supported by valid, sufficient, and mutually-agreed-upon consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers. The Company may, but is not required to, provide a bonus payment or other compensation or benefits to Employee as additional consideration for the restrictions contained in Section 2.

Maine: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least three (3) business days to consider the non-competition and other restrictive covenants set forth in this Agreement. Employee further understands that the non-competition provision set forth in Section 2(b) that applies following Employee's termination of employment shall not take effect until the later of the end of Employee's first year of employment with or service to the Company and six (6) months after Employee executes this Agreement.

Massachusetts: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has been advised of Employee's right to consult with counsel prior to executing this Agreement. Employee acknowledges that (i) if Employee is entering into this Agreement in connection with Employee's commencement of employment, Employee has received a copy of this Agreement on the earlier of (A) a formal offer of employment, and (B) ten (10) business days before commencement of Employee's employment, and (ii) if Employee is entering into this Agreement following commencement of employment, Employee has received this Agreement at least ten (10) business days before it becomes effective. Employee acknowledges and agrees that the restrictive covenants contained in Section 2 are supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers .

New Hampshire: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee has been provided a copy of this Agreement prior to Employee's acceptance of an offer of employment or service with the Company.

Oregon: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee was informed in a written offer from Firm that Employee received at least two weeks before the first day of Employee's employment or service with the Company that a non-competition agreement is required as a condition of employment or service.

Washington: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Company, Employee acknowledges and agrees that the terms of this Agreement, including the restrictive covenants in Sections 2 and 3, were disclosed in writing to Employee before Employee accepted an offer of employment or service with the Company.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Davis Wright Tremaine LLP

1251 Avenue of the Americas
42nd Floor
New York, New York 10020

**Michael V. Rella**
212.880.3973

MichaelRella@dwt.com

October 27, 2026

**VIA E-MAIL AND FEDERAL EXPRESS**

Brad Parsons
4440 Northcrest Road
Dallas, Texas 75229
Bparsons713@gmail.com

**Re: Violations of Restrictive Covenants**

Dear Mr. Parsons:

We have been retained as litigation counsel by Focus Financial Partners, LLC ("Focus") and SCS Capital Management LLC ("SCS" or the "Company") in connection with your abrupt departure from SCS. As you know, on October 26, 2026, the Company sent you a letter reminding you of your ongoing restrictive covenant obligations to Focus and the Company. Nonetheless, the Company has since learned that you have flagrantly violated a number of those covenants, including by misappropriating the Company's confidential information, affirmatively soliciting the Company's clients and employees, and openly competing with the Company. This egregious misconduct exposes you and your new employer (if any) to significant liability. To that end, if you do not immediately cease and desist from any further misconduct, Focus and the Company intend to seek all available relief, including but not limited to a temporary restraining order, preliminary and permanent injunctive relief, damages, costs, and attorneys' fees, without further notice.

As set forth in the Company's October 26, 2026 letter, you are bound by a number of ongoing restrictive covenants that you agreed to in connection with your sale to Edge Capital Group, LLC (as predecessor-in-interest to the Company) of the personal goodwill associated with the client relationships set forth on the client list attached to the APA.[1] In connection with that sale, you received $3 million in consideration and specifically agreed for a period of five-years from the closing of the sale transaction not to compete with the Company. Specifically, Section 8.1 of the APA provides that:

[1] Unless stated otherwise, capitalized terms have the meaning ascribed to them in the Company's October 26, 2026 letter.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

> (a) The Seller [i.e., Brad Parsons] hereby acknowledges and recognizes the highly competitive nature of the Business.[2] The Seller agrees, within the territory and for the period set forth in paragraph (b) below, not to, directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of, or have any interest, financial or otherwise, in, or act as a partner, manager, member, principal, executive, employee, agent, representative, consultant or independent contractor of, or licensor to, any business engaged in or competitive with the Business.
>
> (b) The covenant in paragraph (a) above shall apply to any activity conducted in or directed at clients or prospective clients of the Purchaser[3] in the United States of America during the period commencing on the Closing Date[4] and ending on the fifth anniversary of the Closing Date.

Moreover, you agreed in Section 8.1(c) of the APA not to solicit or service any of the Company's clients, and not to solicit any of the Company's employees, for the same five-year period:

> (c) The Seller hereby acknowledges and recognizes that the success of the Business is dependent on the maintenance of the Personal Client Relationships.[5] The Seller agrees, for the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date, not to (other than on behalf of or for the benefit of the Business): (i) directly or indirectly, solicit the sale of, market, sell or provide products or services, similar to those products or services sold or provided by the Business, to any existing, former or prospective client of the Business or its affiliates; or (ii) directly or indirectly: (1) initiate contact with or solicit any employee of the Purchaser or any of its affiliates or any person employed with the intent of hiring such employee, (2) hire or otherwise engage any such employee, (3) induce or otherwise counsel, advise or encourage any such employee to leave the employment of the Purchaser or any of its affiliates, or (4) induce any supplier, licensor, licensee, business relation, representative or agent of the Purchaser or any of its affiliates to terminate or modify its relationship with the Purchaser or any of its affiliates, or in any way interfere with the relationship between the Purchaser or any of its affiliates on the one hand, and such other party on the other hand (including, without limitation, making any negative or disparaging statements regarding the Purchaser or its affiliates).

---

[2] The "Business" is defined as "the investment advisory, wealth management, financial planning and related services" that you conducted as of the Closing Date (as defined below) of the transactions under the APA.

[3] The "Purchaser" is defined as Edge Capital Group, LLC, which is predecessor-in-interest to the Company.

[4] The "Closing Date" was August 26, 2022.

[5] "Personal Client Relationships" is defined as "the relationships with the Clients," and "Clients" is defined as "each of the client relationships of the Seller as of the Closing Date … ."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

You agreed to similar non-solicitation covenants in the RCA. Specifically, you agreed not to solicit, service, or accept business from any of the Company's clients, or solicit any of the Company's employees, for a period of 24 months[6] from your resignation, i.e., through and including October 23, 2028. You also agreed not to use or disclose any of the Company's "Confidential Information" (as defined in the RCA) except in the course of performing duties for the Company. And you agreed that, upon the termination of your employment, you would promptly deliver to the Company all Confidential Information.

Moreover, you agreed in the RCA to disclose the existence and terms of the RCA to any prospective employer prior to entering into an employment or business relationship with that entity, and you consented to the Company disclosing the RCA to any such prospective employer.

Furthermore, you agreed in the RCA that if you voluntarily separate from the Company, you "shall provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture."

Finally, you agreed in the RCA that if the Company brings any legal action to enforce its rights under that agreement, the Company may recover its costs and expenses (including reasonable attorneys' fees) incurred in connection with the action, in addition to any other relief to which the Company may be entitled.

While the Company is currently investigating the circumstances surrounding your departure, the information uncovered to date is deeply troubling and makes clear that you have already violated your contractual obligations and fiduciary duties to the Company in a number of ways.

First, our investigation has revealed that, *before* you resigned from the Company, you covertly emailed to your personal email address troves of the Company's highly confidential and sensitive Confidential Information. That Confidential Information includes (i) portfolio reports for Company clients showing the clients' investments, performance, and account values; (ii) the Company's Family Office and Shared Service Solutions Guide listing a number of the Company's internal and external resources and support services, including the contact information for those resources; (iii) an email with a Company prospect discussing a potential business relationship; (iv) notes from a Company presentation reflecting investment opportunities; and (v) a list of Company prospects showing the prospects' sensitive financial information, including net worth, liquidity, investments, and family-related information. Not surprisingly, you failed to return *any* of this Confidential Information to the Company upon your departure in violation of your contractual obligations.

Second, our investigation has shown that you violated your client non-solicit by soliciting at least one Company client over this past weekend by affirmatively contacting that client and

[6] You agreed in the RCA that these restrictions are automatically extended by the length of time during which you are in breach of the restrictions. Accordingly, the two-year restricted period is currently being extended as a result of your breaches.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

informing that client that you left the Company for the express purpose of encouraging the client to transfer such client's accounts from the Company to your new employer.

Third, our investigation has confirmed that you violated your employee non-solicit by affirmatively soliciting at least one Company employee to leave the Company and join you at your new firm.

Fourth, our investigation has uncovered evidence suggesting that you joined, or are planning to join, Thryve Wealth Management, another wealth management firm that directly competes with the Company.

Fifth, your abrupt departure, without *any* advance written notice, violates the RCA's provision that requires you to provide two weeks' advance written notice before your separation. *Accordingly, you are still an employee of the Company, still owe the Company fiduciary duties, and remain fully bound by your restrictive covenants with the Company. You therefore are precluded from affiliating with another company or holding yourself out as affiliated with another company during this two-week notice period. If you do, you and your new employer face additional exposure, and the Company intends to immediately seek a temporary restraining order to enforce this provision and recover all available relief.*

In light of this clear and significant misconduct, Focus and the Company demand that you immediately cease and desist from: (i) contacting, soliciting, marketing to, accepting business from, or providing services to any Company clients; (ii) using, disclosing, transmitting, or relying on any Confidential Information; and (iii) contacting, hiring, engaging, inducing, or encouraging any Company employee to leave the Company in violation of your non-solicitation obligations. You are also required to disclose the existence and terms of the RCA to any prospective employer, including but not limited to Thryve Wealth Management. We demand that you confirm that you have taken these steps.

In addition, you must immediately provide a complete inventory of all Confidential Information and other Company property in your possession, custody, or control and return it to the Company immediately, including all originals and copies on personal or Company devices, accounts, media, or cloud storage. Any copy that cannot be returned must be permanently deleted from every device, account, medium, and cloud location, with the deletion fully described in the certification described below.

If you contend that you do not possess any Confidential Information, you must instead provide a sworn certification under penalty of perjury confirming that fact, identifying whether any Confidential Information was destroyed, used, or disclosed to any third-party (including Thryve Wealth Management), and confirming your continuing compliance with the Agreements, including the prohibition on soliciting, servicing, or accepting business from any of the Company's clients. We demand that you provide this sworn certification by **5:00pm ET on October 28, 2026** and confirm that you will comply fully with these demands.

Finally, as with any anticipated litigation, you must preserve all materials potentially relevant to any actual or threatened breach or other misconduct, including documents concerning

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


the possession, access, use, transfer, or disclosure of Confidential Information; all communications with any of the Company's clients, former clients, prospective clients, and Company employees, including Shelby Potz-Nielsen; and all materials concerning your affiliation with any new employer, including but not limited to Thryve Wealth Management, including offer letters, compensation or incentive agreements, employment or contractor arrangements, and IAR agreements. The litigation hold must expressly cover ACAT forms, account-transfer forms, account-opening documents, onboarding materials, and any related records, and must suspend routine deletion, wiping, or auto-delete functions. You must also advise any new employer (including but not limited to Thryve Wealth Management) of these obligations and instruct it to preserve all responsive materials in its possession, custody, or control.

The Company takes these obligations extremely seriously. If you fail to cease and desist immediately, return and account for all Confidential Information, provide the sworn certification and written confirmation demanded above, or preserve the required materials, Focus and the Company will proceed without further notice to seek a temporary restraining order, preliminary and permanent injunctions, damages, costs, and attorneys' fees.

We look forward to your response. In the interim, Focus and the Company reserve all rights.

Sincerely,

Michael V. Rella

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Fisher & Phillips LLP**

**Philadelphia**
100 N. 18th Street
Two Logan Square
12th Floor
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-2159

**Writer's E-mail:**
jcsercsevits@fisherphillips.com

**October 28, 2026**

**BY EMAIL**

Michael V. Rella, Esquire
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
MichaelRella@dwt.com

**Re: Brad Parsons**

Dear Mr. Rella:

Fisher & Phillips LLP represents Brad Parsons. Please direct future correspondence to me.

We are in receipt of your October 27 letter (the "Letter"). Although we appreciate you generously providing us with a little over 24 hours to investigate and respond, we cannot say that we have completed our investigation at this point. Nevertheless, we wanted to respond where we could by the arbitrary, accelerated deadline in your letter.

The Letter misunderstands the facts and overstates the law. This response is intended to address the allegations (while ignoring the invective and adjectives) and productively work to resolve the parties' disputes, although this response should not be interpreted as an exhaustive rebuke of every falsehood and misunderstanding in the Letter.

To avoid doubt, Mr. Parsons expressly reserves, and does not waive, all rights, claims, defenses, and remedies available to him.

**The Factual Misunderstandings**

To start, the Letter asserts that when Mr. Parsons resigned from SPS he purportedly failed to return various information in his possession. Letter at p. 3 ("Not surprisingly, you failed to return *any* of this Confidential Information to the Company upon your departure in violation of your contractual obligations"). That is false. On October 23, 2026, Mr. Parsons sent a shipment to SCS by FedEx, containing his laptop and hard-copy materials that he had in his possession from the ordinary course of his employment at SCS. In his resignation letter, Mr. Parsons specifically

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

advised SCS of the FedEx shipment. To date, we have never heard that SCS failed to receive such shipment. Thus, we trust that your demand that Mr. Parsons return hard-copy information to SCS, Letter at p. 4, is satisfied.

Moreover, the five categories of information identified on page 3 of the Letter are so broad that Mr. Parsons is unable to understand what information Focus and SCS believe he has actually retained and/or not returned. Mr. Parsons does not need, and does not want, to retain any SCS or Focus information and is willing to address the Letter's concerns regarding retention of information. But without further information about what specific documents SCS and Focus believe Mr. Parsons has retained and not returned, we are at an impasse. As stated above, Mr. Parsons returned the SCS hard-copy information by FedEx when he resigned. He is not aware of having any of the five categories of information identified in your Letter. However, if you can provide specificity as to your allegations (*e.g.*, dates/times/document titles – any single piece of information that would help us understand what you believe Mr. Parsons has), we are happy to investigate. Otherwise, we presume this is just baseless and generalized speculation from many months ago about purported file use in the ordinary course of his employment. Ultimately, however, he did not take the information alleged.

We are working with Mr. Parsons to identify any information that he sent to his personal email account in the normal course of business. We can remove and delete that information, or we can return it to you – we are open to a discussion on that. But to address your client's concerns in the meantime, Mr. Parsons has not accessed, used, or forwarded the SCS material in his personal email address and has no intention of doing so.

But we also encourage you to speak with your clients about the why. Why did he email himself information? Because SCS/Focus/whoever failed to adequately provide him (and his colleagues) with basic technology to allow him to do his job. Among other things, there was a lengthy period where he could not print documents because SCS/Focus/whoever could not figure out how to connect a work printer to his work computer. So, he needed to email certain materials to himself so that he could print them from his home computer. This is not misappropriation. This is servicing clients. But in any event, he returned the hard-copy documents in his FedEx shipment.

**<u>The Legal Misunderstandings</u>**

The Letter also misunderstands (or misrepresents) the law. Mr. Parsons disputes that the various restrictive covenants contained in the APA and the RCA are enforceable because they are fatally overbroad and against public policy.

The Letter puzzlingly suggests that Mr. Parsons somehow remains employed by SCS. Letter at p. 4 (suggesting "you are still an employee of the Company"). Ignoring the enforceability of any notice provision, that is simply inaccurate. Mr. Parsons resigned effective October 23, 2026. And SCS/Focus accepted his immediate resignation. Among other things evidencing that acceptance:

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- His registration with SCS terminated on October 26;

- The October 26 letter from Karla Sullivan, SCS's general counsel, is specifically written "[o]n behalf of the Company, ***given your separation*** *. . . .*";

- Bert Rayle (SCS Managing Director) sent a mass text to SCS personnel (for some reason copying Mr. Parsons) to advise that Mr. Parsons has resigned "effective immediately."

Whatever Mr. Parsons' legal obligations to SCS (which remain contested), as a matter of fact and law Mr. Parsons is no longer an employee of SCS. We also remind you that the notice provision in the agreement provides that "[t]he Company may, in its sole discretion, waive such notice period (in whole or in part)." Based on its conduct, the Company waived any expectation of a two-week notice period.

* * *

We suggest SCS and Focus carefully review the hard-copy materials Mr. Parsons returned to them by FexEx on October 23. As stated above, we welcome a conversation to discuss the return/deletion of information that may reside in his personal email account. We further welcome you to provide specific information regarding any additional information SCS and Focus still believe are in Mr. Parsons's possession.

***If SCS and/or Focus seek emergency injunctive relief, Mr. Parsons requests notice and an opportunity to be heard.***

To the extent any pleadings or declarations submitted in support of those pleadings contain factual misstatements that Mr. Parsons has endeavored to correct or that SCS and Focus have failed to adequately investigate, Mr. Parsons reserves all rights, including the right to seek sanctions. *See* 22 NYCRR Part 130; Fed. R. Civ. P. 11(b)(3).

Sincerely,

[signature]

Jeffrey Csercsevits
For FISHER & PHILLIPS LLP

cc: Christopher J. Merken (cmerken@fisherphillips.com)

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Carvajal, Shanaye

**From:** Rella, Michael
**Sent:** Tuesday, November 3, 2026 1:52 PM
**To:** 'nicole.saragosa@thryvewm.com'
**Cc:** Carvajal, Shanaye; 'gary.dorfman@thryvewm.com'
**Subject:** Legal Demand Concerning Brad Parsons: Cease and Desist
**Attachments:** Parsons CD (006).pdf

Ms. Saragosa,

Our firm is litigation counsel to Focus Financial Partners, LLC ("Focus") and SCS Capital Management LLC ("SCS"). As you may know, Brad Parsons was previously an employee of SCS and abruptly resigned without any notice on October 26, 2026, thereby breaching his contractual obligation to provide SCS with two weeks' advance written notice before any separation. Mr. Parsons' contract with SCS also includes a non-compete, non-solicit, and confidentiality provision – each of which he is currently violating. Our prior letter to Mr. Parsons, which sets forth his ongoing contractual obligations and certain of his breaches, is attached for your convenience.

Focus and SCS have informed Mr. Parsons and his counsel numerous times of Mr. Parsons' breaches and his obligation to share his contractual restrictive covenants with any new employer, including Thryve Wealth Management ("Thryve"). We have also asked his counsel numerous times – including yesterday, when Mr. Parsons formally registered with Thryve – if Mr. Parsons planned on joining Thryve. Mr. Parsons' counsel failed to answer the question and instead obfuscated and attempted to hinder our investigation.

Thryve is hereby on notice of Mr. Parsons' ongoing violations of his contractual restrictive covenants. Thryve's ongoing employment of Mr. Parsons in the face of these violations directly exposes the company to significant liability for a number of tortious interference and aiding and abetting claims. Focus and SCS intend to vigorously pursue those claims and seek all available relief against Mr. Parsons, Thryve, and any of Thryve's officers, directors, or employees who aided, abetted, and facilitated Mr. Parsons' contractual breaches and tortious misconduct.

If Thryve is represented by counsel, please have counsel contact us immediately.

We look forward to hearing from you.

**Michael Rella**
**Partner** | Davis Wright Tremaine LLP
**P** 212.880.3973 **C** 914.525.1916 **E** michaelrella@dwt.com
**A** 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020-1104
DWT.COM in



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Carvajal, Shanaye**

**From:** Merken, Christopher <cmerken@fisherphillips.com>
**Sent:** Tuesday, November 3, 2026 9:04 PM
**To:** Rella, Michael; Carvajal, Shanaye
**Cc:** Csercsevits, Jeff
**Subject:** RE: Brad Parsons

**[EXTERNAL]**

Good Evening, Michael,

Responses to the second set of questions you sent us are below:

1. Is your client in possession of any confidential information, of which we are not aware and will he provide an affidavit, under penalty of perjury, affirming that he does not intend to use any such information to solicit clients or to compete with SCS?

*As we addressed in our October 28 letter and during our October 29 Teams video call, Mr. Parsons returned hard-copy information via FedEx when he resigned (along with his laptop). After receiving your letter, Mr. Parsons found some old emails pertaining to his work at SCS. He also found text messages with clients (mostly of a personal nature) that occurred while he was with SCS/Focus. However, he has been instructed not to use any of that information and has no intention of using any of that information. As we mentioned in our October 28 letter and on our October 29 Teams video call, we can have a discussion on returning or deleting that electronic information. But to address your clients' concerns, since his resignation he has not used any information which may be deemed SCS/Focus confidential information, and he has no intention of using any such information.*

2. Brad is currently not registered. Does he intend to register with Thryve Wealth Management or any other wealth management company?

*Mr. Parsons is now registered with Thryve Wealth Management.*

3. Does your client intend to call or service any SCS clients?

*Mr. Parsons announced his new employment to his clients. If clients choose to open accounts at Thryve Wealth Management, that is the clients' decision. We safely assume that SCS and Focus do not intend to prevent clients from exercising their right to keep their accounts where they choose or holding clients hostage.*

* * *

We understand you contacted Thryve Wealth Management regarding Mr. Parsons today. Please be advised our firm represents Thryve Wealth Management. Please direct future communications to us.

We remain available to further discuss your clients concerns. In our October 28 letter, during our October 29 Teams video call, and in my November 2 email, we repeatedly your clients to provide more specificity on allegations in the October 27 letter and remain open to further investigation should you provide more information.

Sincerely,

Chris Merken



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

| | |
|---|---|
| SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC<br><br>Plaintiffs,<br><br>– against –<br><br>BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC,<br><br>Defendants. | Index No.: ____________ |

## AFFIRMATION OF WILL SKEEAN

Will Skeean, under penalties of perjury under the laws of New York, states and affirms as follows:

1. I am a legal adult and fully competent to make the statements contained within this Affirmation, which are based upon my personal knowledge.

2. I submit this Affirmation made on personal knowledge in support of the Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery filed by Plaintiffs SCS Capital Management LLC ("SCS") and Focus Financial Partners, LLC ("Focus") in the above-captioned matter.

3. I am currently employed as the President of SCS, where I have worked since February 2025.

4. SCS is a Delaware limited liability company with its principal place of business at 888 Boylston Street, Boston, Massachusetts 02199. SCS is an investment adviser registered with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940 and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

is a wholly-owned subsidiary of Focus. SCS is the successor-in-interest to Edge under the Asset Purchase Agreement, dated August 26, 2022 ("APA").

5. Focus is a Delaware limited liability company with its principal place of business at 1325 Avenue of the Americas, 11th Floor, New York, NY 10019. Focus invests in SEC-registered investment advisors and other fiduciary wealth management firms. Focus is the ultimate corporate parent of SCS, and was the ultimate corporate parent of SCS's predecessor-in-interest, Edge.

6. SCS is an SEC-registered investment adviser that provides discretionary and non-discretionary investment management, wealth planning, private investment access, and client-aligned investment advice to high-net-worth families and institutional investors. SCS is a wholly-owned indirect subsidiary of Focus.

7. As a registered investment adviser, SCS owes its clients fiduciary duties of care and loyalty under the Investment Advisers Act of 1940. SCS's clients entrust it with intimate, non-public financial information—including holdings, account values, performance, liquidity needs, estate and tax plans, and family circumstances—so that SCS can design and implement investment strategies tailored to each client. SCS and its advisors like Parsons are in turn obligated to safeguard that information.

8. SCS's client relationships are typically long-term and are compensated through asset-based advisory fees. A single relationship can generate hundreds of thousands of dollars in annual revenue, and SCS's clients are a principal source of referrals for new business. SCS invests substantial resources in developing and supporting those relationships, including through its investment team, its proprietary private-investment and co-investment platform, and its Family Office & Shared Service Solutions platform, which offers clients coordinated trust and estate, tax, trustee, insurance, private banking, aviation, family governance, philanthropy, and lifestyle services through internal SCS resources, Focus shared services, and vetted outside providers



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

9. The wealth management industry is intensely competitive. Advisory firms compete for a limited universe of high-net-worth clients, and the identity of those clients, their contact information, their financial profiles, and the details of their portfolios are not publicly available and could be duplicated only through extraordinary effort. Protecting the confidentiality of that information and the goodwill of its client relationships is essential to SCS's business.

**Parsons Sold Client Goodwill to SCS's Predecessor-Interest and to Focus in 2022**

10. On August 26, 2022, Parsons, Edge Capital Group, LLC ("Edge"), and Focus entered into the Asset Purchase Agreement ("APA"), a true and correct copy of which is attached hereto as **Exhibit 1**. Under the APA, Parsons sold to Edge "personal goodwill associated with relationships with the clients set forth on the Client List" (the "Assets"), free and clear of all liens. APA, Recitals & § 2.1. The APA defines the "Clients" as "each of the client relationships of the Seller as of the Closing Date," and the "Personal Client Relationships" as "the relationships with the Clients." APA § 1.1. Parsons delivered the list of the Clients (the "Client List") to Edge pursuant to Section 3.2(c) of the APA.

11. In consideration for the Assets, Edge agreed to pay Parsons a Basic Purchase Price of $3 million in cash on November 7, 2022. APA § 2.4(a). Parsons was also eligible to receive two Additional Purchase Price Payments of $4 million and $8 million, respectively, if trailing-twelve-month revenue from the Clients reached $3 million and $5 million during the sixty months following closing. APA § 2.5(a).

**SCS Acquired Edge and Employs Parsons as a Managing Director; Parsons Executes the RCA with SCS**

12. On February 1, 2025, pursuant to the Edge-SCS Assignment Agreement, the Edge business was transferred and assigned to SCS (the "Transaction").



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

13. In connection with the Transaction, and prior to its consummation, SCS extended to Parsons an offer of employment dated January 10, 2025 (the "Offer Letter"), which Parsons accepted. A true and correct copy of the Offer Letter is attached hereto as **Exhibit 2**. Under the Offer Letter, Parsons became a Managing Director of SCS on February 1, 2025, based principally in SCS's Dallas office, with a base salary equal to 40% of the first $3 million, and 45% of all amounts in excess of $3 million, of "Annual Client Revenue"—a term defined to include revenue from the very "Clients" whose goodwill Parsons had sold under the APA. Offer Letter §§ 1, 2(a).

14. The Offer Letter expressly preserved the APA: "nothing herein shall impact or modify the respective rights or obligations of you or the other applicable parties under the APA and the other Related Agreements, each of which shall continue in full force and effect in accordance with their terms." Offer Letter § 10.

15. As a condition of his employment, Parsons voluntarily executed the Restrictive Covenant Agreement ("RCA"), a true and correct copy of the which attached hereto as **Exhibit 3**. Parsons acknowledged that he had been advised to, and had the opportunity to, review the RCA with counsel of his choosing. RCA § 10; Offer Letter § 6.

**Parsons Agreed to Not Solicit Cornerstone Clients and Employees, or to Misappropriate SCS' Confidential Information**

16. Section 8.1(c) of the APA (the "APA Non-Solicitation and Non-Service Covenant") provides that, for the period beginning on the Closing Date (August 26, 2022) and ending on the fifth anniversary of the Closing Date (August 26, 2027), Parsons will not:

> "(other than on behalf of or for the benefit of the Business): (i) directly or indirectly, solicit the sale of, market, sell or provide products or services, similar to those products or services sold or provided by the Business, to any existing, former or prospective client of the Business or its affiliates; or (ii) directly or indirectly: . . . (4) induce any supplier, licensor, licensee, business relation, representative or agent of the Purchaser or any of its affiliates to terminate or modify its relationship with the Purchaser or any of its affiliates, or in any way interfere with the relationship between the Purchaser or any of its affiliates on the one hand, and such other party on the other hand (including,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

> without limitation, making any negative or disparaging statements regarding the Purchaser or its affiliates)."

17. Section 8.1(a) of the APA further provides that, for the same five-year period and as to "any activity conducted in or directed at clients or prospective clients of the Purchaser in the United States of America," Parsons will not "act as a partner, manager, member, principal, executive, employee, agent, representative, consultant or independent contractor of . . . any business engaged in or competitive with the Business." APA §§ 8.1(a)–(b). Plaintiffs, by this action, seek only monetary relief for the breach of this non-compete provision and do not seek to enjoin Parsons's employment with Thryve.

18. Section 2(a) of the RCA (the "RCA Non-Solicitation, No-Service, and No-Accept Covenant") provides that, during Parsons's employment and "for a period of twenty-four (24) months after termination of [his] employment or service with the Company for any reason (the 'Restricted Period')," Parsons "shall not, directly or indirectly, except in the course of performing duties assigned to [him] by the Company":

> "i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual or Prospective clients (each as defined below) of the Company;
>
> ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual or Prospective clients of the Company;
>
> iii. solicit, recruit, or take away, or attempt to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company, either for Employee's own business or for any other person or entity; . . . or
>
> v. solicit, recruit, or otherwise induce or influence any . . . client . . . or any other person that has a business relationship with the Company, and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, to discontinue, reduce, or modify such business relationship with the Company."



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

19. In Section 3 of the RCA, Parsons acknowledged that he would acquire SCS's Confidential Information; that "the misuse, misappropriation, or disclosure of such Confidential Information would constitute a breach of trust and could cause irreparable injury to the Company"; and that he "shall not, either during or following [his] employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself . . . or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company)." RCA §§ 3(a)–(b). "Confidential Information" includes "client information," "financial data," "client and supplier lists," "contacts at or knowledge of Actual clients or prospective clients of the Company," and "business, marketing, and strategic plans." RCA § 3(c). Parsons further agreed that, upon termination, he would "deliver promptly to the Company all paper and/or electronic documents and files concerning the Company . . . and any and all Confidential Information." RCA § 3(g).

20. Parsons also agreed (a) to "disclose the existence and terms of [the RCA] to any prospective employer . . . prior to entering into an employment . . . relationship with such person or entity" (RCA § 7); and (b) if he voluntarily separated, to "provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture" (RCA § 11).

**Parsons Services the Subject Client Relationships at SCS and Gains Access to SCS and Focus Confidential Information**

21. From February 2025 until October 23, 2026, Parsons served as a Managing Director and Senior Wealth Advisor in SCS's Private Client Group, where his "primary focus [was] delivering holistic wealth management services to a select group of entrepreneurs, business owners, and family offices." He was registered as an investment adviser representative of SCS.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

22. In that role, Parsons was the primary relationship manager for the Clients whose goodwill SCS's predecessor had purchased (the "APA Clients"), as well as for other SCS clients and prospects. Before his resignation, Parsons serviced approximately 10 client households, representing approximately $230 million in assets under management and $1.3 million in annual advisory revenue. Parsons was compensated with a substantial percentage of the revenue those relationships generated.

23. By virtue of his position, Parsons had access to, and regularly used, SCS's most sensitive Confidential Information, including client portfolio reports, account values, holdings, and performance data; SCS's pipeline of prospective clients and their financial profiles; SCS's Family Office & Shared Service Solutions Guide; and confidential information regarding private co-investment opportunities made available to SCS clients.

**<u>Parsons Misappropriates Confidential Information</u>**

24. In the months preceding his resignation, and while still employed by and owing a duty of loyalty to SCS, Parsons forwarded SCS Confidential Information from his SCS email account (bparsons@scsfinancial.com) to his personal email account (bparsons713@gmail.com), including, without limitation:

- On July 29, 2026, a communication from a Dallas-based private equity firm seeking to discuss a potential investment relationship and separate-account arrangement with SCS's alternative investments platform;
- On September 4, 2026, confidential notes of a September 3, 2026 call between SCS professionals and a venture capital sponsor regarding allocations in a current co-investment round available only to SCS client families who had invested in a prior round, the funding timeline, and other expected co-investment opportunities the sponsor intended to show SCS; and



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- On October 6, 2026—just seventeen days before he resigned—a confidential 2026 portfolio report for an SCS client family showing the family's investments, performance, and account values.

25. Parsons also appears to have forwarded himself and retained additional Confidential Information, including client portfolio reports reflecting account holdings and a list of at least seven ultra-high-net-worth client prospects Parsons was cultivating on behalf of SCS, including each prospect's estimated liquidity and net worth, the source of the referral, the anticipated timing and probability of conversion, and sensitive family and business information.

26. Parsons had no legitimate business reason to send this information to his personal email account. Through counsel, Parsons has conceded that he emailed SCS information to his personal account and that he has located "old emails pertaining to his work at SCS" and "text messages with clients" from his time at SCS. Yet despite our numerous requests, Parsons has not returned that information, has not provided the sworn certification SCS requested, and has not identified to whom, if anyone, it has been disclosed.

**Parsons Resigns Without Notice and Immediately Solicit SCS Clients and Employees**

27. On Friday, October 23, 2026, Parsons resigned from SCS effective immediately, without providing the two weeks' written notice contractually required by Section 11 of the RCA. The same day, he shipped his SCS laptop and certain hard-copy materials to SCS by FedEx.

28. Over the weekend of October 24–25, 2026—within forty-eight hours of resigning—Parsons affirmatively contacted at least one SCS client, informed that client that he had left SCS, and encouraged the client to transfer its accounts from SCS to his new firm.

29. During the same period, Parsons solicited at least one SCS employee to leave SCS and join him at his new firm, in violation of Section 2(a)(iii) of the RCA and Section 8.1(c)(ii) of the APA.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

30. Specifically, on October 23, 2026, Parsons solicited an SCS employee to leave SCS and join him at Thryve. Parsons asked the employee what her current salary at SCS was and informed her that Thryve would "make it worth your while" if she were to leave SCS for Thryve. Parsons also informed the employee that he believed Thryve would offer her equity if she followed him there.

31. On or about November 2, 2026, SCS learned that Parsons had affirmatively reached out to another SCS client to solicit that client's business. That same day, Parsons registered with Thryve.

32. On November 3, 2026 – the day *after* Parsons joined Thryve – Parsons's counsel finally confirmed that Parsons "is now registered with Thryve Wealth Management" and that "Mr. Parsons announced his new employment to his clients." Counsel further stated, ignoring the non-accept and non-service provisions to which Parsons agreed, that "If clients choose to open accounts at Thryve Wealth Management, that is the clients' decision."

33. On or about Friday, November 6, 2026, an SCS client family whose relationship Parsons serviced at SCS terminated its relationship with SCS and transferred its accounts to Thryve to be serviced by Parsons.

34. On or about November 11, 2026, SCS learned of the potential loss of another large client relationship serviced by Parsons, representing approximately $300,000 in annual revenue to SCS.

35. SCS has identified additional client relationships serviced by Parsons that remain at risk of departure as a result of Parsons' solicitations, collectively representing approximately $1 million in annual revenue

36. Each of these clients is an "Actual" client of SCS within the meaning of the RCA: SCS provided services to each within the twelve months before Parsons's termination, and Parsons had material contact with and learned Confidential Information about each.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

37. Parsons' and Thryve's conduct is causing SCS irreparable harm, including the loss of client relationships and goodwill for which SCS's predecessor paid $3 million; the loss of future referrals from those clients; the disclosure and misuse of confidential client information that SCS is obligated to protect; and disruption of SCS's business and workforce. The precise duration of each lost relationship and the stream of referrals each would have generated are impossible to calculate with certainty.

**SCS and Focus Will Suffer Imminent And Irreparable Harm As A Result Of Parsons's Actions**

38. Parsons serviced SCS clients worth approximately $1.3 million in annual revenue to SCS. The ongoing threat of losing such customers stands to threaten its relationships with those customers and the ability to achieve organic growth through those relationships. Accordingly, Parsons threatens the viability of SCS's business.

39. Parsons both acknowledged as much when he voluntarily signed the RCA, which contains provisions stipulating that any breach of his restrictive covenants would cause "substantial and irrevocable harm" to SCS.

40. Indeed, the going forward revenue attributable to each individual client subject to solicitation by Parsons is not calculable. SCS has no way to determine the going forward tenure of any such relationship, or to determine whether such clients might otherwise increase their assets under management with SCS or otherwise refer new clients to SCS.

41. Moreover though, Parsons's actions pose an ongoing threaten to SCS's goodwill, reputation with actual and prospective clients, and to the morale of SCS's other advisors and employees.

42. Pursuant to Rule 2106 of the New York Civil Practice Law and Rules, I affirm this 17th day of November, 2026, under the penalties of perjury under the laws of New York, which may



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed on November 17, 2026 in Atlanta, Georgia.

Will Skeean



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## ATTORNEY CERTIFICATION PURSUANT TO COMMERCIAL DIVISION RULE 17

I, Michael V. Rella, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Affirmation of William Skeean in Support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery complies with the word count limit set forth in Rule 17 of the Commercial Division of the Supreme Court (22 NYCRR 202.70(g)) because it contains 2,969 words, excluding the parts of the affirmation exempted by Rule 17 of the Commercial Division of the Supreme Court (22 NYCRR 202.70(g)). In preparing this certification, I have relied on the word count function of the word-processing system (Microsoft Word) that was used to prepare this affirmation.

Dated: November 17, 2026
New York, NY

/s/ Michael V. Rella
Michael V. Rella



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


EXECUTION COPY

**ASSET PURCHASE AGREEMENT**

**by and among**

**FOCUS FINANCIAL PARTNERS, LLC**

**and**

**EDGE CAPITAL GROUP, LLC**

**as Purchaser**

**and**

**BRAD PARSONS**

**as Seller**

**dated as of**

**August 26, 2022**



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

Section 1.1 Definitions....1
Section 1.2 Interpretation....4

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1 Assets....5
Section 2.2 Excluded Assets....5
Section 2.3 Excluded Liabilities....5
Section 2.4 Basic Purchase Price....5
Section 2.5 Additional Purchase Price Payments....5
Section 2.6 Allocation of Purchase Price....7

## ARTICLE III
## THE CLOSING

Section 3.1 The Closing....7
Section 3.2 Deliveries by the Seller....7

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Section 4.1 Authorization; Execution; Validity of Agreement....8
Section 4.2 Consents and Approvals; No Violations....8
Section 4.3 Litigation....8
Section 4.4 Compliance with Laws....8
Section 4.5 Tax Matters....8
Section 4.6 Governmental Approvals....10
Section 4.7 Permits....10
Section 4.8 Title to Assets....10
Section 4.9 Current Confidentiality, Non-Solicitation and Non-Competition Agreements....10
Section 4.10 Business; Registrations; Clients, Etc....10
Section 4.11 Brokers or Finders....12

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF FOCUS AND THE PURCHASER

Section 5.1 Organization....12
Section 5.2 Authorization; Validity of Agreement....12
Section 5.3 Consents and Approvals; No Violations....12
Section 5.4 Brokers or Finders....13
Section 5.5 Litigation....13

## ARTICLE VI

{00078923;5}



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


## COVENANTS

Section 6.1 Tax Matters. .....13
Section 6.2 Further Assurances.....13
Section 6.3 Transition of Assets. .....13
Section 6.4 Certain Other Covenants.....14

## ARTICLE VII
## INDEMNIFICATION

Section 7.1 Survival of Representations and Warranties.....14
Section 7.2 Indemnification by the Seller.....14
Section 7.3 Indemnification by Focus and the Purchaser. .....14
Section 7.4 Limitations. .....15
Section 7.5 Notice of Claim; Defense.....15

## ARTICLE VIII
## NON-COMPETITION AND NON-SOLICITATION

Section 8.1 Covenant Not to Compete and Not to Solicit. .....16
Section 8.2 Potential Unenforceability of Section 8.1 .....17

## ARTICLE IX
## MISCELLANEOUS

Section 9.1 Fees and Expenses .....17
Section 9.2 Arbitration.....17
Section 9.3 Amendment and Modification .....18
Section 9.4 Notices .....18
Section 9.5 Counterparts.....19
Section 9.6 Entire Agreement; No Third Party Beneficiaries.....19
Section 9.7 Severability .....19
Section 9.8 Governing Law; Jurisdiction.....19
Section 9.9 Extension; Waiver.....19
Section 9.10 Election of Remedies .....19
Section 9.11 Assignment .....20
Section 9.12 Restriction on Publicity.....20


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of August 26, 2022 (this "Agreement"), is made by and among FOCUS FINANCIAL PARTNERS, LLC, a Delaware limited liability company ("Focus"), EDGE CAPITAL GROUP, LLC, a Delaware limited liability company (including any successor thereto, whether by merger or otherwise, the "Purchaser"), and BRAD PARSONS (the "Seller"). Except as otherwise provided herein, capitalized terms used in this Agreement shall have the meanings assigned to them in ARTICLE I.

WHEREAS, the Seller is the owner of personal goodwill associated with relationships with the clients set forth on the Client List (as defined herein) (the "Assets");

WHEREAS, other than as set forth in this Agreement, the Seller is not subject to any agreement relating to the Assets, as hereinafter provided; and

WHEREAS, the Purchaser, a wholly-owned subsidiary of Focus, desires to purchase from the Seller and the Seller desires to sell to the Purchaser the Assets, in each case upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.1 Definitions**. For all purposes of this Agreement, except as otherwise expressly provided or unless the context clearly requires otherwise:

"Additional Purchase Price Payment" shall have the meaning set forth in Section 2.5(a).

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended.

"Affiliate" shall have the meaning set forth in Rule 12b-2 of the Exchange Act.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and schedules hereto, and including without limitation the Client List, which is hereby incorporated herein by reference and made a part hereof, when it is delivered to the Purchaser pursuant to Section 3.2(b).

"APPP Milestone" shall have the meaning set forth in Section 2.5(b).

"APPP Period" shall have the meaning set forth in Section 2.5(a).

"Assets" shall have the meaning set forth in the Recitals to this Agreement.

"Basic Purchase Price" shall have the meaning set forth in Section 2.4(a).

{00078923;5}

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

"BPP Payment Date" shall have the meaning set forth in Section 2.4(a).

"Business" shall mean the investment advisory, wealth management, financial planning and related services of the Seller as conducted as of the Closing Date.

"Calculated Payout" shall have the meaning set forth in Section 2.5(d).

"Client Revenue" shall have the meaning set forth in Section 2.5(c).

"Client List" shall have the meaning set forth in Section 3.2(b).

"Clients" shall mean each of the client relationships of the Seller as of the Closing Date, as described in and subject to the representations and warranties contained in Section 4.10(f) and the other provisions of this Agreement.

"Closing" shall have the meaning set forth in Section 3.1.

"Closing Date" shall mean the date hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"End Date" shall have the meaning set forth in Section 2.5(d).

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Liabilities" shall have the meaning set forth in Section 2.3.

"Final Allocation" shall have the meaning set forth in Section 2.6.

"First APPP Milestone" shall have the meaning set forth in Section 2.5(a)(i).

"Focus" shall have the meaning set forth in the Recitals to this Agreement.

"Focus Indemnified Parties" shall have the meaning set forth in Section 7.2(a).

"GAAP" shall mean United States generally accepted accounting principles consistently applied.

"Governmental Entity" shall mean a court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency.

"GS" shall mean Goldman, Sachs & Co., together with its Affiliates.

"GS Agreements" shall mean, collectively, each agreement, contract or other commitment, plan, policy, arrangement or understanding between the Seller, on the one hand, and GS, on the other, including without limitation the GS CNSA.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

"GS CNSA" shall mean that certain Employee Agreement Regarding Confidential and Proprietary Information and Materials and Non-Solicitation, dated October 14, 2008, between the Seller and GS.

"Indemnification Cap" shall mean an amount equal to the Basic Purchase Price.

"Indemnified Party" shall have the meaning set forth in Section 7.5.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge" of a party shall mean the actual knowledge of such party, and the knowledge that could have been obtained after appropriate due inquiry by such party.

"Liens" shall mean any mortgage, pledge, security interest, encumbrance, lien, claim or charge of any kind.

"Losses" shall have the meaning set forth in Section 7.2(a).

"Material Adverse Effect" shall mean any material adverse change in, or material adverse effect on, the Assets, the Business, or the financial condition, prospects, or operations of the Seller, Focus or the Purchaser, as the case may be.

"Notice Period" shall have the meaning set forth in Section 2.5(d).

"Permits" shall have the meaning set forth in Section 4.7.

"Person" shall mean a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Personal Client Relationships" shall mean the relationships with the Clients.

"Purchaser" shall have the meaning set forth in the Recitals to this Agreement.

"Resolution Period" shall have the meaning set forth in Section 2.5(d).

"Second APPP Milestone" shall have the meaning set forth in Section 2.5(a)(ii).

"Seller" shall have the meaning ascribed thereto in the Recitals to this Agreement.

"Survival Period" shall have the meaning set forth in Section 7.1.

"Tax" or "Taxes" shall mean (i) all taxes, unclaimed property and escheat obligations, charges, fees, duties, or levies, imposed by any federal, state, local or foreign Governmental Entity, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, and shall include interest, penalties or additions attributable thereto and (ii) any liability for the payment of any amount of the type described in clause (i) above as a result of (A) being a "transferee" (within the meaning of Section 6901 of the Code or any other applicable law) or successor of another Person, (B) being a member of an affiliated, combined, or consolidated group, or (C) a contractual arrangement or otherwise.

"Tax Return" shall mean any return, declaration, report, information return or statement required to be filed with respect to Taxes, including any schedule or attachment thereto.

"Transactions" shall mean all the transactions provided for or contemplated by this Agreement.

"TTM Client Revenue" shall have the meaning set forth in Section 2.5(a)(i).

**Section 1.2 Interpretation**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(a) Whenever the words "include", "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b) The words "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d) A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e) A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or re-enactment thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto.

(f) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

## ARTICLE II



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## PURCHASE AND SALE OF ASSETS

**Section 2.1 Assets**. Subject to Section 2.2, and on the terms and subject to the conditions contained in this Agreement, at the Closing, the Seller shall sell, convey, contribute, transfer, assign and deliver to the Purchaser and the Purchaser shall purchase and accept from the Seller, the Assets, free and clear of all Liens.

**Section 2.2 Excluded Assets**. The Purchaser is not acquiring any property of the Seller other than the Assets.

**Section 2.3 Excluded Liabilities**. The Purchaser shall not assume or be liable for any liabilities of the Seller, including but not limited to any liability arising out of, under or in connection with the Assets (collectively, the "Excluded Liabilities").

**Section 2.4 Basic Purchase Price.**

(a) On the terms and subject to the conditions contained in this Agreement, as consideration for the Assets, the Purchaser shall pay to the Seller $3,000,000 in cash (the "Basic Purchase Price") on November 7, 2022 (the "BPP Payment Date") by wire transfer in immediately available funds to a bank account designated by the Seller.

(b) The parties agree to treat the Transactions as a taxable sale and purchase. No party hereto (nor any of such party's Affiliates) shall take any position inconsistent with the foregoing tax treatment characterizations.

**Section 2.5 Additional Purchase Price Payments**

(a) The Seller shall also be entitled to up to two additional purchase price payments (each, an "Additional Purchase Price Payment") based on the achievement of milestones for Client Revenue (as defined below) during the first 60-month period immediately following the Closing Date (the "APPP Period"), as set forth below:

(i) the first Additional Purchase Price Payment shall be a single payment equal to $4,000,000 if and when Client Revenue on a trailing twelve-month basis ("TTM Client Revenue") as of the end of any calendar quarter during the APPP Period first equals $3,000,000 or more (the "First APPP Milestone"); and

(ii) the second Additional Purchase Price Payment shall be a single payment equal to $8,000,000 if and when TTM Client Revenue as of the end of any calendar quarter during the APPP Period first equals $5,000,000 or more (the "Second APPP Milestone").

(b) For avoidance of doubt, (x) if the First APPP Milestone and/or the Second APPP Milestone (each, an "APPP Milestone") is not achieved during the APPP Period, then the associated Additional Purchase Price Payment shall not be payable as described above, and (y) if both APPP Milestones are achieved for the same calendar quarter during the APPP Period, then both Additional Purchase Price Payments shall be paid for such quarter. For example, if the TTM Client Revenue for the first calendar quarter following the first anniversary of the Closing Date equals $5,000,000, then both the first and second Additional Purchase Price Payments


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

described above (i.e., an aggregate total of $12,000,000) would be paid after such calendar quarter as described above. Alternatively, for avoidance of doubt, if the First APPP Milestone has not been achieved prior to the end of the APPP Period, then no Additional Purchase Price Payments shall be payable.

(c) As used herein, "Client Revenue" shall mean, with respect to each relevant period, (x) the Purchaser's revenue on an accrual basis under GAAP, as applied consistently with its past practices and as audited by Focus' independent auditors, from the Clients, as collectively reduced by (y) the sum of (i) any rebates, refunds, or bad debt reserves associated with the Clients, and (ii) any fees payable to any referral sources, or fees that the Purchaser might collect on behalf of and then pay to a sub-advisor or other third party, in each case associated with the Clients.

(d) Each Additional Purchase Price Payment shall be payable by the Purchaser to the Seller after the last day of the applicable APPP Period (in each case, an "End Date") in accordance with the following procedure. Within thirty (30) days after the applicable End Date, the Purchaser shall deliver to the Seller its calculation of the applicable Additional Purchase Price Payment (the "Calculated Payout"). The Seller shall have the right to dispute in writing the Calculated Payout within fifteen (15) days following receipt of the calculation of the Calculated Payout (such 15-day period, the "Notice Period"), and prior to the end of the Notice Period, shall deliver to the Purchaser either (1) a written notice of any such dispute or (2) a written authorization letter (in the form to be provided by the Purchaser) agreeing to, and authorizing and directing the Purchaser to pay to the Seller, the Calculated Payout. If the Purchaser does not receive a notice of such a dispute within the Notice Period, the Calculated Payout shall be paid to the Seller no later than five (5) business days after the end of the Notice Period (subject to the Purchaser's receipt of a signed authorization letter from the Seller as described in the foregoing clause (2) above prior to the end of the Notice Period). If the Purchaser receives a notice of such a dispute within the Notice Period, then the Purchaser and the Seller shall, for an additional thirty (30) days following the Purchaser's receipt of such notice of dispute (such additional 30-day period, the "Resolution Period"), attempt to reach agreement on the Calculated Payout. If no resolution of this dispute is finalized within the Resolution Period, undisputed amounts shall be paid to the Seller and only the disputed items or amounts shall be submitted for review and final determination by an Independent Accounting Firm. If the Seller and the Purchaser are unable to agree upon the selection of the Independent Accounting Firm within thirty (30) days following the end of the Resolution Period, each of the Seller, on the one hand, and the Purchaser, on the other, shall select one independent accounting firm within ten (10) days following the end of such thirty (30) day period. Such accounting firms shall jointly select a third independent accounting firm and such firm shall be the Independent Accounting Firm. The Independent Accounting Firm shall review all relevant data, including any necessary books and records of the Purchaser, to determine the changes to the Calculated Payout, if any, necessary to resolve only the disputed items or amounts. The determination by the Independent Accounting Firm shall be made as promptly as practical, but in no event, beyond thirty (30) days, and shall be final and binding on the parties hereto. In the event that the final Additional Purchase Price Payment differs from the Calculated Payout by fifteen percent (15%) or less, the costs of the Independent Accounting Firm shall be borne by the Seller. In the event that the final Additional Purchase Price Payment differs from the Calculated Payout by more than fifteen percent (15%), the costs of the Independent Accounting Firm shall be borne by the Purchaser. Upon such final



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

determination, the Purchaser shall pay to the Seller within ten (10) business days any additional amount of the finally determined Additional Purchase Price Payment.

(e) For the avoidance of doubt, no employment or management services are required by the Seller to earn the Basic Purchase Price or any Additional Purchase Price Payments.

**Section 2.6 Allocation of Purchase Price**. The Seller and the Purchaser recognize their mutual obligations pursuant to Section 1060 of the Code to file IRS Forms 8594 with their respective federal income tax returns as a result of the Transactions. The parties intend that the Basic Purchase Price will be allocated to the Assets that fall within Classes I through VII under the Treasury Regulation Section 1.338-6(b) and the Additional Purchase Price Payments will be allocated to the Assets that fall within Classes VI and VII under such regulation. The Seller acknowledges that, after the Closing, the Purchaser may engage an independent valuation firm to assist the Purchaser with the allocation of the Basic Purchase Price among the Assets treated as purchased under this Agreement for federal tax purposes and will deliver the allocation of the Basic Purchase Price as adjusted to the date of delivery to the Seller (the "Final Allocation"). The Seller and the Purchaser shall file their respective IRS Forms 8594 and all other Tax Returns in a manner consistent with the Final Allocation (as adjusted to take into account the Additional Purchase Price Payments, which shall be allocated consistent with the requirements of Section 1060 of the Code and thus are expected to be allocated solely to Classes VI and VII under the Treasury Regulation Section 1.338-6(b)). Neither the Seller nor the Purchaser (nor their respective Affiliates) shall take any position in any Tax Return, tax proceeding or audit that is inconsistent with the foregoing or with the Final Allocation, except as may be required by law.

## ARTICLE III
## THE CLOSING

**Section 3.1 The Closing**. The closing of the Transactions (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement, by exchange of documentation electronically, with original documents to follow, or at such time or place as the Seller, the Purchaser and Focus shall mutually agree.

**Section 3.2 Deliveries by the Seller**. In connection with the Closing, the Seller shall deliver to the Purchaser:

(a) a true, complete and correct copy of the Form U5 filed by GS in connection with the termination of the Seller's employment with GS effective August 6, 2022;

(b) a Form W-9 for the Seller, which the Seller shall deliver to the Purchaser at least five (5) business days prior to the BPP Payment Date;

(c) the list of the Clients (the "Client List"), which the Seller shall deliver to the Purchaser on (and not earlier than) the BPP Payment Date; and

(d) promptly following the BPP Payment Date, such new investment advisory or investment management agreements between each of the Clients and the Purchaser as may be necessary to transfer the Assets to the Purchaser, free and clear of all Liens, as reasonably requested by the Purchaser.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser as follows:

**Section 4.1 Authorization; Execution; Validity of Agreement.**

(a) The Seller has full power and authority to execute and deliver this Agreement and to consummate the Transactions.

(b) This Agreement has been duly executed and delivered by the Seller. This Agreement is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**Section 4.2 Consents and Approvals; No Violations**. None of the execution, delivery or performance of this Agreement by the Seller, the consummation by the Seller of the Transactions or the compliance by the Seller with any of the provisions hereof will (a) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which the Seller is a party or by which the Seller or any of its properties or assets may be bound, (b) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller or any of its properties or assets, or (c) require any filing with, or permit, authorization, consent or approval of, any Governmental Entity.

**Section 4.3 Litigation**. There is no action, suit, arbitration, inquiry, proceeding or investigation, by or before any court, arbitrator, self-regulatory organization or Governmental Entity pending or, to the Seller's Knowledge, threatened against or involving the Seller.

**Section 4.4 Compliance with Laws**. The Seller has complied in a timely manner with all laws, rules and regulations, ordinances, judgments, decrees, orders, writs and injunctions of all federal, state, local and foreign Governmental Entities and agencies and other instrumentalities thereof, including any self-regulatory organizations, that apply to the properties or assets of the Seller, including, without limitation, all applicable rules and regulations under the Advisers Act and Regulation S-P and all applicable rules and regulations relating to the withholding of Taxes and the reporting of income and assets for Tax purposes.

**Section 4.5 Tax Matters.**

(a) The Seller (i) has duly and timely filed (or has caused to be duly and timely filed on the Seller's behalf) all income and other Tax Returns required to be filed by the Seller and relating in any manner to the Assets, and all such Tax Returns are true, complete and correct in all material respects and (ii) has timely paid or caused to be timely paid all Taxes required to be paid by the Seller through and as of the Closing Date (including any Taxes shown due on any Tax Return).

(b) The Seller has not received any written notice from any Governmental Entity either raising any issues in connection with any Tax Return filed by or on behalf of the Seller or

{00078923;5}



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

indicating any pending or proposed action, suit, investigation, audit, claim, deficiency or assessment with respect to Taxes of the Seller, and no unresolved deficiencies or additions to Taxes have been proposed, asserted, or assessed against the Seller.

(c) There are no extensions or waivers of the statute of limitations in effect with respect to Taxes of the Seller and no such extensions or waivers have been requested.

(d) There are no Liens for Taxes upon any of the Assets, except for Liens for Taxes not yet due and payable or Liens for Taxes being contested in good faith.

(e) The Seller has not agreed to make, and no Governmental Entity has notified the Seller that the Seller is required to make, any adjustment under Section 481(a) of the Code (or any comparable provision under state, local or foreign Tax laws) by reason of a change in accounting method or otherwise.

(f) The Seller has complied in all respects with all applicable laws relating to the collection or withholding of Taxes (including sales Taxes) or the reporting of income or assets to taxing authorities and has duly and timely withheld and paid over to the appropriate Governmental Entity all amounts required to be withheld and paid over under all applicable Tax laws.

(g) No claim has been made by any taxing authority in a jurisdiction in which the Seller does not file Tax Returns that the Seller is or may be subject to taxation by that jurisdiction relating to the Assets.

(h) The Seller is not a party to, nor does the Seller have any liability under, any agreement or arrangement to allocate, share or indemnify another party for Taxes.

(i) The Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(j) No issue has been raised by written inquiry of any Governmental Entity which would reasonably be expected to affect the Tax treatment of the Assets for any taxable period (or portion thereof) ending after the Closing Date.

(k) No power of attorney with respect to any Tax matter is currently in force with respect to the Assets that would, in any manner, bind, obligate or restrict the Purchaser.

(l) The Seller has not executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Entity, nor is the Seller subject to any ruling guidance specific to the Seller, that would be binding on the Purchaser for any taxable period (or portion thereof), ending after the Closing Date.

(m) None of the Assets is an interest in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for federal income tax purposes.

(n) The Seller has not participated in any "reportable transaction" within the meaning of section 6011 of the Code and is not (and has not been) a "promoter" or "material advisor" within the meaning of sections 6111 and 6112 of the Code.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Section 4.6 Governmental Approvals**. No consent, approval, or authorization of, or designation, declaration, notification, or filing with any Governmental Entity on the part of the Seller is required in connection with the valid execution, delivery and performance of this Agreement or the consummation of the Transactions.

**Section 4.7 Permits**. The Seller has all franchises, permits, licenses, authorizations, approvals and any similar authority (collectively, the "Permits") necessary for the conduct of the Seller's business as now being conducted by the Seller. The Seller is not in default or violation, and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation, of any term, condition or provision of any Permit and, to the Seller's Knowledge, there are no facts or circumstances which could form the basis for any such default or violation. There are no legal proceedings pending or, to the Seller's Knowledge, threatened, relating to the suspension, revocation or modification of any of the Permits. None of the Permits will be impaired or in any other way affected by the consummation of the Transactions.

**Section 4.8 Title to Assets**. The Seller has good and valid title to the Assets, free and clear of Liens and any contracts, including but not limited to any restrictive covenant obligations relating to any previous employment or affiliations of the Seller.

**Section 4.9 Current Confidentiality, Non-Solicitation and Non-Competition Agreements**. There are no confidentiality, non-solicitation, non-competition and/or similar agreements signed by the Seller, other than the GS CNSA, a true, complete and correct copy of which has previously been provided by the Seller to the Purchaser.

**Section 4.10 Business; Registrations; Clients, Etc.**

(a) The Seller has at all times since the inception of the Seller's business been engaged solely in the business of providing financial planning, investment advisory, investment management and related services.

(b) The Seller has filed all applicable notices in all jurisdictions where any such notice or any individual registration, personal license or personal qualification is required in order to conduct the Seller's business.

(c) The Seller is not a "broker" or "dealer" within the meaning of the Exchange Act.

(d) The Seller has not been convicted of any crime, is not and does not have any status, and is not and has not engaged in any conduct that would be a basis for (i) denial, suspension or revocation of registration of an investment adviser under Section 203(e) of the Advisers Act or Rule 206(4)-4(b) thereunder, or ineligibility to serve as an associated person of an investment adviser, (ii) ineligibility to serve as an investment adviser (or in any other capacity contemplated by the Investment Company Act) to a registered investment company pursuant to Section 9(a) or 9(b) of the Investment Company Act or (iii) ineligibility to serve as a broker dealer or an associated person of a broker dealer pursuant to Section 15(b) of the Exchange Act, and to the Seller's Knowledge, there is no proceeding or investigation that is reasonably likely to become the basis for any such ineligibility, disqualification, denial, suspension or revocation.

(e) To the Seller's Knowledge, no material controversy or disagreement exists between


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


the Seller and any Client.

(f) When the Client List is delivered to the Purchaser as contemplated under Section 3.2(b), the Client List will set forth a true, complete and correct list of Persons with whom the Seller has a client or prospective client relationship with contact information. The Seller has been in contact (phone, e-mail, U.S. postage or office meeting) with each person on the Client List at least once in the last twelve months. All information pertaining to Persons listed on the Client List is true, complete and correct. To the Seller's Knowledge, none of the Persons on the Client List intends to terminate his, her or its relationship with the Seller, nor has made any claim, or to the Seller's Knowledge threatened any action, against the Seller based on the Seller's services or otherwise.

(g) The Form U5 delivered by the Seller to the Purchaser pursuant to Section 3.2(a) is a true, complete and correct copy of the Form U5 filed by GS on August 11, 2022 in connection with the termination of the Seller's employment with GS on August 6, 2022.

(h) In the course of the discussions between the Seller, on the one hand, and Focus and the Purchaser, on the other hand, the Seller has not provided, and Focus and the Purchaser have not asked the Seller to provide, any proprietary or confidential information, or any information that the Seller is not permitted to disclose to third parties under the terms of any applicable contract (including without limitation any GS Agreement) or any applicable law, rule or regulation, including, but not limited to, confidential client-related materials. The Seller has not removed from the premises or the control of any former employer or any other Person (including without limitation GS), or copied or duplicated in any format, any proprietary or confidential information, or any information that the Seller is not permitted to remove, copy or duplicate under the terms of any applicable contract (including without limitation any GS Agreement) or any applicable law or regulation.

(i) The Seller is not a party to any employment contract or other agreement (including without limitation any GS Agreement) which purports to limit the Seller's ability (1) to leave a former employer or terminate an independent contractor relationship with any other Person (including without limitation GS), (2) to become affiliated with Focus or the Purchaser, or (3) to serve those individuals or entities who were the clients of the Seller when the Seller was employed by a former employer or had an independent contractor relationship with any other Person (including without limitation GS), including, but not limited to, any non-competition, non-solicitation or confidentiality agreement or undertaking (including without limitation any GS Agreement), subject, however, in the case of the foregoing clause (3), to the terms and conditions of the GS CNSA. The Seller has, prior to the Closing Date, provided the Purchaser with a true, complete and correct copy of the GS CNSA, which is the only employment, non-competition, non-solicitation and/or confidentiality agreement or undertaking that the Seller has entered into with or for the benefit of GS, and is not subject to any other employment, independent contractor, non-competition, non-solicitation and/or confidentiality agreement or undertaking that the Seller has entered into with or for the benefit of any other former employer for whom the Seller has worked within the past six years, as the case may be, other than GS, or any other Person with whom the Seller has had an independent contractor relationship within the past six years, other than GS or its Affiliates.


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

(j) While the Seller was employed by any former employer or had an independent contractor relationship with any other Person (including without limitation GS), the Seller did not (1) take any steps with respect to the potential recruitment or solicitation of any other employees or independent contractors of such former employer for possible employment by Focus or the Purchaser, in each case in violation of any GS Agreement, any other employment, non-competition, non-solicitation or confidentiality agreement or undertaking, or any other agreement, or (2) solicit or communicate with any clients regarding a potential change of employer or affiliation to Focus or the Purchaser.

**Section 4.11 Brokers or Finders.** The Seller has not retained any agent, broker, investment banker, financial advisor or other firm or Person who will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF FOCUS AND THE PURCHASER

Focus and the Purchaser, jointly and severally, represent and warrant to the Seller as follows:

**Section 5.1 Organization.** Focus and the Purchaser are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Delaware and have all requisite limited liability company power and authority to own, lease and operate their properties and to carry on their businesses as now being conducted, except where the failure to be so organized, existing and in good standing or to have such power and authority, would not have, individually or in the aggregate, a material adverse effect on the ability of Focus or the Purchaser to consummate the Transactions.

**Section 5.2 Authorization; Validity of Agreement.** Each of Focus and the Purchaser has full limited liability company power and authority to execute and deliver this Agreement and to consummate the Transactions. The execution, delivery and performance by Focus and the Purchaser of this Agreement and the consummation of the Transactions by Focus and the Purchaser have been duly authorized by Focus and the Purchaser, and no other action on the part of Focus and the Purchaser is necessary to authorize the execution and delivery by Focus or the Purchaser of this Agreement or the consummation of the Transactions by Focus and the Purchaser. This Agreement has been duly executed and delivered by Focus and the Purchaser. This Agreement is a valid and binding obligation of Focus and the Purchaser, enforceable against Focus and the Purchaser in accordance with its terms except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally.

**Section 5.3 Consents and Approvals; No Violations.** None of the execution, delivery or performance of this Agreement by Focus and the Purchaser, the consummation by Focus and the Purchaser of the Transactions or the compliance by Focus and the Purchaser with any of the provisions hereof will (i) conflict with or result in any breach of any provision of the organizational documents of Focus or the Purchaser, (ii) require any filing with, or permit, authorization, consent or approval of, any Governmental Entity, other than those that have been made or obtained or will be made or obtained after the Closing to transfer or succeed to Permits of the Seller, (iii) result in a violation or breach of, or constitute (with or without due notice or


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Focus or the Purchaser is a party or by which any of its properties or assets may be bound, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Focus or the Purchaser or any of their respective properties or assets, excluding from the foregoing clauses (ii), (iii) and (iv) such violations, breaches or defaults which would not, individually or in the aggregate, have a material adverse effect on the ability of Focus and the Purchaser to consummate the Transactions.

**Section 5.4 Brokers or Finders**. Neither Focus nor the Purchaser has retained any agent, broker, investment banker, financial advisor or other firm or Person who will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions that would be the responsibility of the Seller.

**Section 5.5 Litigation**. There is no action, suit, arbitration, inquiry, proceeding or investigation by or before any court, arbitrator, self-regulatory organization or Governmental Entity pending or, to Focus' Knowledge, threatened against or involving Focus or the Purchaser that would result in a Material Adverse Effect.

## ARTICLE VI
## COVENANTS

**Section 6.1 Tax Matters.**

(a) Tax Returns. The Seller shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to the Seller for taxable years or periods ending on, before or including the Closing Date and the Seller shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns.

(b) Tax Claims. The Seller shall notify the Purchaser in writing within five days of receipt by the Seller of written notice of any pending or threatened audits, notice of deficiency, proposed adjustment, assessment, examination or other administrative or court proceeding, suit, dispute or other claim which could affect the Seller's liability for Taxes as a direct result of the transaction described herein.

**Section 6.2 Further Assurances.**

(a) The parties hereto shall cooperate fully with one another, and shall execute such further documents and shall take such additional actions as are reasonably required by any such party to fully realize and accomplish the intent and purposes of this Agreement.

(b) The Seller shall execute and deliver such additional instruments, documents, conveyances or assurances and promptly take any such actions as may be necessary, or as may be reasonably requested by Focus or the Purchaser, to convey, assign or transfer to the Purchaser the Assets, and to confirm the right, title and interest of the Purchaser in respect thereof.

**Section 6.3 Transition of Assets.** The Seller shall cooperate with the Purchaser in



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

connection with all reasonable actions deemed necessary by the Purchaser to transition the Assets and all rights associated therewith to the Purchaser in accordance with the terms and conditions of this Agreement.

**Section 6.4 Certain Other Covenants.** The Seller shall comply with all of his continuing obligations under each applicable GS Agreement from and after the Closing in accordance with the terms and conditions thereof.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.1 Survival of Representations and Warranties.** The representations and warranties of the parties contained in this Agreement, any exhibit or schedule hereto, and any certificate delivered hereunder, shall survive the Closing through and including the sixth anniversary of the Closing (the "Survival Period"). Notwithstanding the foregoing, any obligations under Section 7.2(a)(i) and Section 7.3(a)(i) shall not terminate with respect to any Losses as to which the Person to be indemnified shall have given notice (stating in reasonable detail the basis of the claim for indemnification) to the indemnifying party in accordance with Section 7.5 during the Survival Period.

**Section 7.2 Indemnification by the Seller.**

(a) Subject to the procedures outlined in Section 9.2, the Seller shall indemnify, defend and hold harmless the Purchaser and Focus and their respective Affiliates, and their respective officers, directors, members, managers and employees (collectively, the "Focus Indemnified Parties") from and against any loss, liability, damage, deficiency, cost and expense, whether direct or indirect (including, without limitation, diminution of value and reasonable expenses of investigation and reasonable attorneys' fees and disbursements incurred in connection with any pending or threatened claim, suit, proceeding, regulatory audit or investigation) (collectively, "Losses") arising, directly or indirectly, from or in connection with (x) any breach by the Seller of (i) the Seller's representations and warranties, or (ii) the Seller's covenants, in each case contained in this Agreement, the exhibits and the schedules hereto, or any certificate or instrument delivered pursuant hereto or (y) unless otherwise mutually agreed by Focus, the Seller and the Purchaser, any Losses arising, directly or indirectly, from or in connection with any pending or threatened claim, suit or proceeding by GS arising, directly or indirectly, from or in connection with this Agreement or the Transactions, including without limitation arising, directly or indirectly, from, under or in connection with any of the GS Agreements, notwithstanding any exception or disclosure relating to any GS Agreements contained in any representations and warranties of the Seller in this Agreement.

(b) The Seller shall indemnify, defend and hold harmless the Focus Indemnified Parties from and against any Losses arising, directly or indirectly, from or in connection with any Excluded Liability.

**Section 7.3 Indemnification by Focus and the Purchaser.**

(a) Focus and the Purchaser shall, jointly and severally, indemnify, defend and hold harmless the Seller from and against any Losses arising, directly or indirectly, from or in


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

connection with any breach by the Purchaser or Focus of (i) their representations and warranties, or (ii) their covenants, in each case contained in this Agreement, the exhibits, and the schedules hereto, or any certificate or instrument delivered pursuant hereto.

(b) Focus and the Purchaser shall, jointly and severally, indemnify, defend and hold harmless the Seller from and against any Losses arising, directly or indirectly, from or in connection with the ownership or use of the Assets by Focus, the Purchaser or their Affiliates after the Closing.

**Section 7.4 Limitations.**

(a) Neither the Seller on the one hand, nor Focus and the Purchaser (as a group) on the other hand, shall be required to indemnify any Person pursuant to Section 7.2(a)(i) (with respect to the Seller) or Section 7.3(a)(i) (with respect to Focus and the Purchaser) for an aggregate amount exceeding the Indemnification Cap.

(b) The right to indemnification or any other remedy based on representations, warranties, covenants and agreements in this Agreement shall not be affected by any investigation conducted at any time, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

**Section 7.5 Notice of Claim; Defense**. Promptly after receipt by the Seller, or a Focus Indemnified Party (each in such capacity, an "Indemnified Party") of notice of the commencement of any action or proceeding involving a claim for which such party is entitled to indemnification under Section 7.2 or Section 7.3, such Indemnified Party shall, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; provided, however, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the indemnifying party of its indemnification obligations hereunder, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against any Indemnified Party and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it may wish, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party; provided, further, that any Indemnified Party may, at its own expense, retain separate counsel to participate in such defense. Notwithstanding the foregoing, in any action or proceeding in which both the indemnifying party and the Indemnified Party are parties, or are reasonably likely to become parties, the Indemnified Party shall have the right to employ separate counsel at the indemnifying party's expense and to control its own defense of such action or proceeding if, in the reasonable opinion of counsel to the Indemnified Party, (i) there are or may be legal defenses available to the Indemnified Party or to other Indemnified Parties that are different from or additional to those available to the indemnifying party or (ii) any conflict or potential conflict exists between the indemnifying party and the Indemnified Party such that the Indemnified Party could be materially prejudiced without separate representation; and provided, further, that in no event shall the indemnifying party be required to pay fees and expenses under this ARTICLE VII for more than one firm of attorneys in any jurisdiction in any one legal action or group of related legal actions for each Indemnified


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Party indemnified hereunder. No indemnifying party shall be liable for any settlement of any action or proceeding affected without its written consent, which consent shall not be unreasonably withheld. No indemnifying party shall, without the consent of the Indemnified Party, consent to entry of any judgment or enter into any settlement (i) that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation or (ii) which requires action by any party other than the payment of money by the indemnifying party. Each Indemnified Party shall furnish such documents, records and other information regarding itself and the claim in question as an indemnifying party may reasonably request in writing and as shall be reasonably required in connection with the defense of such claim and any litigation resulting therefrom.

## ARTICLE VIII
## NON-COMPETITION AND NON-SOLICITATION

**Section 8.1 Covenant Not to Compete and Not to Solicit.**

(a) The Seller hereby acknowledges and recognizes the highly competitive nature of the Business. The Seller agrees, within the territory and for the period set forth in paragraph (b) below, not to, directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of, or have any interest, financial or otherwise, in, or act as a partner, manager, member, principal, executive, employee, agent, representative, consultant or independent contractor of, or licensor to, any business engaged in or competitive with the Business.

(b) The covenant in paragraph (a) above shall apply to any activity conducted in or directed at clients or prospective clients of the Purchaser in the United States of America during the period commencing on the Closing Date and ending on the fifth anniversary of the Closing Date.

(c) The Seller hereby acknowledges and recognizes that the success of the Business is dependent on the maintenance of the Personal Client Relationships. The Seller agrees, for the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date, not to (other than on behalf of or for the benefit of the Business): (i) directly or indirectly, solicit the sale of, market, sell or provide products or services, similar to those products or services sold or provided by the Business, to any existing, former or prospective client of the Business or its affiliates; or (ii) directly or indirectly: (1) initiate contact with or solicit any employee of the Purchaser or any of its affiliates or any person employed with the intent of hiring such employee, (2) hire or otherwise engage any such employee, (3) induce or otherwise counsel, advise or encourage any such employee to leave the employment of the Purchaser or any of its affiliates, or (4) induce any supplier, licensor, licensee, business relation, representative or agent of the Purchaser or any of its affiliates to terminate or modify its relationship with the Purchaser or any of its affiliates, or in any way interfere with the relationship between the Purchaser or any of its affiliates on the one hand, and such other party on the other hand (including, without limitation, making any negative or disparaging statements regarding the Purchaser or its affiliates).

(d) Notwithstanding anything in this Section 8.1 to the contrary, the Seller may own up to 1% of the outstanding equity securities of any entity listed on a national stock exchange or actively traded in the over-the-counter market.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**Section 8.2 Potential Unenforceability of Section 8.1**. Although the Seller and the Purchaser consider the restrictions contained in Section 8.1 to be fair and reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in Section 8.1 is an unreasonable or otherwise unenforceable restriction against any Seller, neither this Agreement nor the provisions of Section 8.1 will be rendered void, but will be deemed amended as to such restriction as such court may judicially determine or indicate to be reasonable or, if such court does not so determine or indicate, to the maximum extent that any pertinent statute or judicial decision may indicate to be a reasonable restriction under the circumstances.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1 Fees and Expenses**. All costs and expenses incurred in connection with this Agreement and the consummation of the Transactions, including fees and disbursements of counsel, accountants, bankers and other professionals, shall be paid by the party incurring such expenses. Subject entirely to the procedures outlined in Section 9.2, if a party hereto seeks to enforce any of its rights hereunder, in court, and if such action results in a judgment substantially in favor of either party (a dismissal, with prejudice, by the party commencing such action, shall be deemed to be a judgment in favor of the other party for the purpose of this section), then and in such event the prevailing party shall be entitled to recover from the other party, in addition to the relief awarded the prevailing party in or by judgment, all court costs, reasonable investigation expenses, and reasonable attorneys' fees and disbursements incurred by the prevailing party in such action.

**Section 9.2 Arbitration.**

(a) Except as set forth below in Section 9.2(f), any claim, dispute or controversy arising out of or relating to the interpretation, application or enforcement of this Agreement, or any breach of this Agreement shall be settled by arbitration to be held in New York, New York, in accordance with the commercial arbitration rules then in effect of the American Arbitration Association or its successor (the "AAA"). Discovery shall be allowed as if the action were brought in a court in the State of New York. A party wishing to submit a dispute to arbitration shall give written notice to such effect to the other parties hereto and to the AAA. The parties shall have 15 days from a party's notice of such a request for arbitration to designate the arbitrators for the dispute in accordance with Section 9.2(b).

(b) Each of Focus and the Seller shall designate one arbitrator and the two designated arbitrators shall in turn choose a third arbitrator, who shall also be the chairman of the panel. If one of the two parties appoints an arbitrator but the other party fails to nominate its arbitrator within the 15-day period specified in Section 9.2(a), then the appointment of such second arbitrator shall be made by the AAA upon request by either party, and if the appointed arbitrators fail to appoint the third arbitrator within 10 days after the date of appointment of the most recently appointed arbitrator, the third arbitrator shall be appointed by the AAA at the request of either party.

(c) The arbitration proceeding shall not be public, and no party shall disclose any of the evidence in the proceeding to any person other than the parties to the proceeding and their



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


counsel, except in a proceeding to enforce the award. The decision of the arbitrator panel shall be rendered within 60 days from the appointment of the last arbitrator. Such decision shall be final, conclusive, and binding on the parties to the arbitration and no party shall institute any suit with regard to the dispute or controversy except to enforce the award. Any award shall be in writing and shall state the reasons and contain reference to the legal grounds upon which it is based. The arbitrators shall have the power to grant injunctive or other equitable relief in addition to money damages.

(d) The parties waive personal service of any process or other papers in the arbitration proceeding, and agree that service may be made in accordance with Section 9.4. Each party shall pay its pro rata share of the costs and expenses of the arbitration proceeding, and each shall separately pay its own attorneys' fees and expenses, unless, in the opinion of the arbitrator panel the attorneys' fees should be allocated or awarded as part of the arbitration award.

(e) Nothing contained herein shall preclude any party from seeking emergency or preliminary injunctive or other equitable relief in any court of competent jurisdiction to avoid irreparable harm, maintain the status quo or preserve the subject matter of the dispute.

(f) Notwithstanding anything in this Section 9.2 to the contrary, in the event that there is a claim, dispute or controversy arising out of or relating to a breach of any of the covenants and obligations contained in ARTICLE VIII, the parties hereby acknowledge and agree that (i) the Purchaser and Focus and any of their successors and permitted assigns, in addition to such other remedies as may be available to them at law or equity, are entitled to seek an injunction, including a mandatory injunction, to be issued by any court of competent jurisdiction ordering compliance with this Agreement by the Seller or enjoining and restraining the Seller from breaching ARTICLE VIII, and each and every person or entity acting in concert or participation with such breaching party, from the commencement or continuation of such breach, and (ii) in addition, the Seller will pay to the Purchaser and Focus all ascertainable damages, including the posting of any necessary bond and any other costs and reasonable attorneys' fees.

**Section 9.3 Amendment and Modification**. This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by all of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

**Section 9.4 Notices**. All notices and other communications hereunder shall be in writing and shall be deemed given if mailed, delivered personally, telecopied (in the case of notices to Focus or the Purchaser), emailed (in the case of notices to the Seller), or sent by an overnight courier service, such as FedEx, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to Focus or to the Purchaser, to:

Focus Financial Partners, LLC
875 Third Avenue, 28th Floor
New York, NY 10022
Attention: General Counsel

{00078923;5}



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Telecopy: (646) 219-3521

If to the Seller, to:

Brad Parsons
4440 Northcrest Road
Dallas, Texas 75229
Email: bparsons713@gmail.com

**Section 9.5 Counterparts**. This Agreement may be executed in one or more counterparts, including by facsimile signature, portable document format (.pdf) signature or similar electronic signature delivery, all of which shall be considered originals and taken together shall constitute one and the same Agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other parties.

**Section 9.6 Entire Agreement; No Third Party Beneficiaries**. This Agreement (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof and (b) is not intended to confer upon any Person other than the parties hereto (other than any successor to the Purchaser) any rights or remedies hereunder, except that the Focus Indemnified Parties are intended third party beneficiaries of Section 7.2.

**Section 9.7 Severability**. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

**Section 9.8 Governing Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard for any conflict of law rules or principles that would require the application of the laws of any other jurisdiction. The parties hereby irrevocably submit to the jurisdiction of any state court or federal court in the County of New York, State of New York, in any suit, action or proceeding arising out of or relating to this Agreement.

**Section 9.9 Extension; Waiver**. Any agreement on the part of a party to extension or waiver shall be valid only if set forth in an instrument in writing signed by or on behalf of such party. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights.

**Section 9.10 Election of Remedies**. Neither the exercise of nor the failure to exercise a right


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Purchaser or Seller in any manner in the enforcement of any other remedies that may be available to it, whether at law or in equity.

**Section 9.11 Assignment**. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties; provided, however, that each of Focus or the Purchaser may transfer and assign all or any portion of its rights hereunder (i) to any Affiliate; or (ii) to any successor to Focus or the Purchaser in connection with any merger, consolidation or conversion of Focus or the Purchaser or any sale of all or a significant portion of the assets of Focus or the Purchaser. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns. Any assignment in violation of this Section 9.11 will be null and void.

**Section 9.12 Restriction on Publicity**. The Seller agrees to not issue any press release or make any other public statement regarding this Agreement or the Transactions without the prior written consent of Focus and the Purchaser. Focus and the Purchaser agree that prior to the Closing Date they shall not issue any press release or make any other public statement regarding this Agreement or the Transactions without the written consent of the Seller, except as required by law, rule or regulation (including, without limitation, the rules of any stock exchange on which the securities of Focus or its Affiliates is quoted or listed), or as otherwise set forth herein. This Agreement and the terms and conditions set forth herein are confidential and may not be disclosed to any third party (other than to the attorneys and other professionals employed by the parties or as may be required in connection with any financing undertaken by such party, or as may be required for the performance or enforcement by any party hereto of its rights or obligations hereunder or required by applicable laws or regulations). Notwithstanding anything to the contrary contained herein, the Seller hereby consents to the dissemination by Focus or its Affiliates of a press release relating to the Transactions following the Closing Date.

*Signature Pages Follow.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**FOCUS F[redacted]C**

By: [redacted]
Name: R[redacted]
Title: C[redacted]

**EDGE CA[redacted]**

By: [redacted]
Name: R[redacted]
Title: A[redacted]

*Signatures Continue on Next Page*


This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


**SELLER:**

By: ______________________ 8/26/22
Name: Brad Parsons



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SCS FINANCIAL
Strategic Capital Solutions

January 10, 2025

Brad Parsons

Re: Offer of Employment

Dear Brad:

As you know, SCS Capital Management LLC (together with its subsidiaries as the context dictates, "***SCS***" or the "***Company***"), Edge Capital Group, LLC ("***Edge***"), ECG Management Holdings, LLC ("***Edge Manco***"), Focus Financial Partners, LLC ("***Focus***"), Ferdinand FFP Ultimate Holdings, LP ("***Ferdinand FFP Ultimate***") and certain other parties are expected to consummate the transactions contemplated by that certain Contribution and Purchase Agreement (as amended, supplemented and/or otherwise modified and in effect from time to time, the "***Purchase Agreement***"), dated as of January 10, 2025, among SCS, Focus, Edge Manco, Ferdinand FFP Ultimate, and the other parties thereto (the "***Transaction***"), on or about February 1, 2025 (the date of such consummation being the "***Closing Date***").

In connection with the completion of the Transaction, on behalf of SCS, I am pleased to set forth below in this letter (this "***Agreement***") the terms and conditions of your employment with the Company, commencing as of the Closing Date. For avoidance of doubt, your employment with the Company will only be effective upon, and is subject to, the closing of the Transaction on the Closing Date. If for any reason the Transaction is not completed, this Agreement shall automatically be void and of no further force or effect, with no further action required. The provisions of this Agreement relating to your employment with the Company shall only be effective in respect of the period from and after the Closing Date as set forth herein. In addition, unless and until the Transaction is completed on the Closing Date, nothing herein shall modify or impact any existing rights, obligations or duties that you may have to Edge and/or any of its affiliates, including without limitation under that certain Employment Agreement, dated as of August 26, 2022 (as in effect immediately prior to the Closing Date, the "***Existing Employment Agreement***"), between you and Edge.

You shall serve as Managing Director, and you shall perform such duties and responsibilities as assigned by your manager that are consistent with your position. You shall perform your duties hereunder principally at the Company's office located in Dallas.

1. You will be paid a base salary at a rate of $100,000 ("***Base Salary***"), when annualized (prorated for partial years), for the first calendar year of your employment with the Company (i.e., the year ending December 31, 2025), subject to adjustment as described in the last sentence of this paragraph. All payments will be made net of all applicable deductions and withholding taxes and in accordance with the Company's then-current payroll practices (currently, two times per month). The base salary is to be paid only for services actually rendered while you are actually employed by the Company. Your base salary may be adjusted from time to time by the Company in its sole discretion with respect to any period after August 26, 2027.

2.

   a. In addition, you shall also be entitled receive from the Company, with respect to each calendar year, beginning with the calendar year ending December 31, 2025 (but subject in all respects to the last paragraph of this Section 2(a)), an amount equal to the following, less all applicable federal, state and local taxes and other applicable withholdings as required by law or the policies of the Company (the "***Gross Payout Compensation***"), to be payable to you subject to the provisions of this paragraph below (and provided, for avoidance of doubt, that the Net Payout Compensation (as defined below) ultimately payable to you as set forth below shall be net of the Base Salary paid to you for the relevant periods, as described below):

   = ({the first $3,000,000 of Annual Client Revenue * 40%} *plus* {all Annual Client Revenue in excess of $3,000,000 * 45%}), *less* (the sum of all Gross Payout Compensation in respect of each prior calendar quarter during such Annual Period)

   As used herein, "***Annual Client Revenue***" means, with respect to (x) the period from the Closing Date until December 31, 2025 and (y) the 12-month period commencing January 1, 2026 and ending December 31, 2027, and each 12-month period thereafter (each, an "***Annual Period***"), (A) the Company's revenue on an accrual basis under U.S. GAAP, as applied consistently with its past practices and as audited by the independent auditors of Focus, from all clients solely sourced and primarily serviced by you (including any "Clients" that comprise the "Assets" under the APA (as defined below) as of the "Closing Date" (as such terms are defined in the APA), as well as any new clients that you solely source and primarily service during your employment) (provided, that if any such clients are jointly serviced by you and another payout-based professional of the Company, then a percentage of the associated revenue (i.e., less than 100%) shall be included for purposes of the foregoing calculations, with the specific percentage in each case to be mutually agreed upon in advance by you and the Company), as collectively reduced by (B) the sum of (i) any rebates, refunds, or bad debt reserves associated with the clients referenced in the foregoing clause (A), and (ii) any fees payable to any referral sources, or fees that the Company might collect on behalf of and then pay to a sub-advisor or other third party, in each case associated with such clients. As used herein, "***APA***" means that certain Asset Purchase Agreement, dated as of August 26, 2022 (as amended, supplemented and/or otherwise modified and in effect from time to time), among you, the Company (as

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

successor-in-interest to Edge) and Focus.

The Company shall calculate the total Annual Client Revenue for each Annual Period following the end of each calendar quarter during such Annual Period for purposes of the foregoing on a cumulative basis, and shall pay to you the Gross Payout Compensation so calculated *less* the Base Salary earned and payable for such calendar quarter (the "***Net Payout Compensation***"), if a positive number, during the first month following such calendar quarter, with such Net Payout Compensation to be paid on a normal Company payroll date as soon as practicable during such month. For the avoidance of doubt, if the amount of any Net Payout Compensation so calculated is equal to $0 or a negative number, no Net Payout Compensation shall be payable to you pursuant to this Section 2(a) in respect of the applicable quarter, and in no event shall the Total Employment Compensation for any calendar year during the Specified Term (as defined in Section 3 below) be less than the Base Salary (prorated for any partial-year periods); provided, however, that if the Net Payout Compensation for any of the first three calendar quarters of an Annual Period is otherwise a negative number, then such negative number shall be applied as a further reduction in calculating the Net Payout Compensation as described above for any subsequent calendar quarter(s) during such Annual Period until the resulting calculation of Net Payout Compensation results in $0 or a positive number.

For example, if Annual Client Revenue following: (1) the end of the first calendar quarter of 2025 is $1,000,000; (2) the end of the second quarter is $2,250,000; (3) the end of the third quarter is $3,250,000; and (4) the end of the fourth quarter is $4,000,000, the applicable Gross Payout Compensation would be (i) $375,000 (i.e., $400,000 *less* the Base Salary of $25,000) for the first quarter (and the Total Employment Compensation for the first quarter would be $400,000), (ii) $475,000 (i.e., $500,000 *less* the Base Salary of $25,000) for the second quarter (or $850,000 on a cumulative basis for 2025) (and the Total Employment Compensation for the second quarter would be $500,000, and the Total Employment Compensation on a cumulative basis for 2023 would be $900,000), (iii) $387,500 (i.e., $412,500 *less* the Base Salary of $25,000) for the third quarter (or $1,237,500 on a cumulative basis for 2023) (and the Total Employment Compensation on a cumulative basis for 2023 would be $1,312,500), and (iv) $312,500 (i.e., $337,500 *less* the Base Salary of $25,000) for the fourth quarter (or $1,550,000 on a cumulative basis for 2023) (and the Total Employment Compensation on a cumulative basis for 2025 would be $1,650,000).

Notwithstanding anything herein to the contrary, no Gross Payout Compensation or Net Payout Compensation to the extent based on Annual Client Revenue as described herein shall be paid or payable to you in respect of any period during which you are not registered as an investment adviser representative of the Company, and for avoidance of doubt, no such payments or any other amounts shall be paid or payable by the Company to you hereunder if the Company otherwise determines that any such payments to you would constitute a violation of any applicable law, rule or regulation.

b. While you are employed by the Company, you will be eligible to participate in the Company's employee benefit plans in effect from time to time in accordance with and subject to the eligibility requirements and other terms and conditions thereof as set forth in the plan documents governing the benefit plans. The Company reserves the right to amend or terminate each of its employee benefit plans, programs and arrangements at any time and for any reason.

c. You may be eligible for a maximum of 30 days of vacation per calendar year (prorated for partial years) to be taken at such times as may be approved by your manager. Unused, accrued vacation time may not be carried over from year to year.

d. All compensation payable under this Agreement shall be subject to all legally required deductions and withholdings.

3. You shall faithfully devote your full business time and your best efforts, business judgment, skill and knowledge to the advancement of the business and interests of SCS and to the discharge of your duties and responsibilities hereunder. Nothing in this Agreement shall be construed as an agreement, either express or implied, to pay you any compensation or grant you any benefit beyond the end of your employment with the Company, except as expressly set forth herein.

You understand and agree that this Agreement is not and shall not be construed as an agreement, either express or implied, to employ you for a definite term or any specific or particular period of time, your employment with SCS is on an "at-will" basis, and both you and the Company remain free to terminate your employment relationship at any time, for any reason, or for no reason at all, with or without Cause (as defined in Exhibit C attached hereto), and with or without notice, in each case as determined by the Company in its sole discretion. If you are terminated for Cause, and/or if you die, become permanently disabled or voluntarily retire or resign your employment with the Company prior to August 26, 2027 (the "***Specified Term***"), the Company's obligations to pay any amounts as described in Section 2(a) above shall immediately cease and be of no further force and effect, and the Company shall only be obligated to pay the ratable portion of the Base Salary through your termination date.

If the Company terminates your employment prior to the end of the Specified Term without Cause, the Company shall remain obligated to pay you the Base Salary and the Net Payout Compensation as and when otherwise due and payable pursuant to Section 2(a) until the end of the Specified Term as a severance obligation, and the Company shall have no other obligation to pay compensation or provide benefits to you following your termination date. Payment of such severance is conditioned on (i) you executing and delivering to the Company a customary separation agreement and release of claims in favor of the Company, Focus and its affiliates (in the form to be provided by the Company), and such release remaining in full force and effect, and having not been revoked or no longer subject to revocation, within sixty (60) days after the date of your termination of employment, and (ii) you not breaching the RCA (as defined in Section 6), the APA or any other agreement or arrangement entered into in connection therewith (collectively, the "***Related Agreements***"), or any other written agreements between you and the Company or its affiliates. Payment of such severance shall commence with the first payroll period following the sixtieth (60th) day following the date of your termination of employment, with the first such payment including any payments that would otherwise have been made during such 60-day period.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


4. You acknowledge and agree that you will maintain and/or obtain all licenses necessary for the performance of your duties, and will be subject to, and will abide by and comply with, all applicable federal, state, and local laws, rules, and regulations, and all policies and procedures of SCS and its affiliates applicable to you or your employment as in effect from time to time during your employment, including, without limitation, any policies and procedures set forth in any compliance manuals, codes of ethics or employee handbooks. Such policies and procedures include a personal trading policy that restricts certain equity trading and requires you to pre-clear other transactions as further described in such policy and in the Company's code of ethics.You acknowledge that SCS may not carry or sponsor all professional licenses, including but not limited to broker/dealer licenses such as the Series 7 or 24, etc., and therefore such licenses may lapse if they require firm sponsorship.

5. The Company shall reimburse you for all reasonable travel, entertainment and other expenses incurred or paid by you in connection with, or related to, the performance of your duties and responsibilities to the Company, in accordance with and subject to the Company's policies and procedures for reimbursement of expenses, including but not limited to the limitations set forth therein, as adopted by the Company and in effect from time to time.

6. As a condition of your employment, you are required to execute the Company's Restrictive Covenant Agreement (the " ***RCA***"), attached hereto as Exhibit A. You represent and affirm that you are not subject to any restrictive covenants, non-competition or similar agreements that in any way restrict your ability to accept this offer, commence employment with the Company, perform your duties and obligations hereunder, or engage in or service any business of any type engaged in by the Company, that you are not required to obtain the consent of any person, firm, corporation or entity of any kind whatsoever in order to accept this offer and commence employment with the Company, and that your agreement to the terms set forth in this Agreement and your performance of all of the obligations hereunder do not and will not breach any agreement or obligation to which you are party or by which you are bound. If you are subject to any such covenants, you will disclose and provide copies of them to the Company prior to accepting the Company's offer (except for any covenants entered into by you in connection with the Transaction). You agree that during your employment you will not improperly use or disclose any proprietary information or trade secrets of any former employer, or any other person or entity with whom you have an agreement or to whom you owe a duty to keep such information in confidence.

The Company advises you to review and discuss fully the terms of the attached RCA with an attorney of your choosing prior to executing it.

7. You hereby acknowledge that SCS may perform certain background checks on you, which may be conducted by a third party and which may relate to, among other things, SEC and/or FINRA or other regulatory matters, employment history, credit history, federal and state income tax filings history, social security number verification, educational history and/or criminal history, to the extent permitted by applicable law, and that this Agreement is contingent upon satisfactory results of such background checks as determined by SCS in its sole discretion. You will be provided with certain forms for such background checks under separate cover. As a condition of your employment, you will be required to complete a federal government Form I-9, Evidence of Employment Eligibility. The Form I-9 rules require that you present acceptable evidence of your identity and eligibility to work for SCS in the United States within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

8. You represent and warrant that you have not acted as a lobbyist in any state or municipality during the past two years and that the only contributions (including gifts, loans or anything of value) that you have made to an "Official" during the past two years are those disclosed in writing to the Company upon your hire. For purposes of this Section 8, (i) "Official" means any person (including any election committee for the person) who was, at the time of the contribution, an incumbent, candidate or successful candidate for elective office of a Government Entity, if the office: (a) is directly or indirectly responsible for, or can influence the outcome of, the hiring of an investment adviser by a government entity, or (b) has authority to appoint any person who is directly or indirectly responsible for, or can influence the outcome of, the hiring of an investment adviser by a Government Entity and (ii) "Government Entity" includes all state and local governments, their agencies and instrumentalities, as well as all public pension plans and other collective government funds established by the state or local governments (including their agencies and instrumentalities). For purposes of this Section 8, the term "Official" also includes participant-elected board members of state or local pension plans that benefit public employees, even if the plans are separate legal entities from state and local governments.

9. Any dispute or claim between you and the Company (including any of its former, existing, or future subsidiaries, predecessors, or successors, or any of the Company's or their respective officers, directors, employees, representatives, or agents), based on, arising out of or relating in any way to this Agreement, the enforceability of this Agreement, or the parties' respective rights and obligations under this Agreement or any Covered Claims (as defined in the Arbitration Agreement annexed hereto), shall be resolved by final and binding arbitration in accordance with and subject to the terms of the parties' Arbitration Agreement, a copy of which is annexed hereto as Exhibit B, except that (1) either party may seek temporary or preliminary injunctive relief from a court in aid of arbitration or for the maintenance of the status quo pending arbitration, and (2) for the avoidance of doubt, the Company may seek any form of relief from a court (including without limitation temporary or preliminary injunctive relief or monetary damages) in connection with any breach or alleged breach by you of any of your obligations under the RCA. This Agreement may be specifically enforced and may be used as evidence in any proceeding in which any of the parties allege a breach of this Agreement.

10. It is understood and agreed that no failure or delay by SCS in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder, and that the failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. This Agreement and the Arbitration Agreement annexed hereto together constitute the entire agreement between you and SCS pertaining to the subject matter hereof and thereof and supersede any and all prior agreements, written or oral, or

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

understandings between you and the Company with respect to the subject matter hereof or thereof; provided, however, that, (i) notwithstanding the foregoing or anything herein to the contrary, your covenants and obligations hereunder are in addition to and not in lieu of or exclusive of any other continuing obligations and duties that you may have to any of the Company, Focus and/or any of their respective affiliates, successors and/or assigns, including without limitation under the RCA, and (ii) nothing herein shall impact or modify the respective rights or obligations of you or the other applicable parties under the APA and the other Related Agreements, each of which shall continue in full force and effect in accordance with their terms; provided, however, that notwithstanding the foregoing or anything herein to the contrary, you and SCS acknowledge and agree that the Existing Employment Agreement is being terminated by the mutual written agreement of you and Edge, effective as of the Closing Date.[1] This Agreement may not be amended or modified except by the mutual consent of the parties hereto in a written and signed instrument explicitly referencing that it is an amendment to this Agreement. You and the Company further agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied to the construction or interpretation of this Agreement. This Agreement may be specifically enforced and may be used as evidence in any proceeding in which any of the parties allege a breach of this Agreement.

11. This Agreement, and the rights and obligations arising hereunder, shall inure to the benefit of, and shall be binding upon and enforceable by, both parties and their respective heirs, representatives, successors and assigns, as applicable; provided, however, that your obligations hereunder are personal and may not be assigned by you and you acknowledge that SCS's rights hereunder may be assigned by SCS.

12. Sections 9 through 11 and this Section 12 shall survive the termination of your employment with SCS. In the event that any one or more of the provisions of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the enforceability of the remainder of such provision or of any other provision of this Agreement, and all such provisions shall remain in full force and effect and be binding and enforceable to the maximum extent permitted by law as though such terms, clauses and provisions had been written in such a manner and to such an extent as to be enforceable under the circumstance. If any of the provisions of this Agreement is held to be excessively broad, it shall be reformed and construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by law. You agree and acknowledge that you have had a full and complete opportunity to consult with counsel of your own choosing concerning the terms, enforceability and implications of this Agreement and that none of SCS, any of its affiliates, or any of their representatives, has made any representations or warranties to you concerning the terms, enforceability or implications of this Agreement. You further acknowledge that you have read and fully understand this Agreement and enter into it freely and without coercion.

*Signature pages follow.*

If you are in agreement with the foregoing, please print your name and sign this Agreement where indicated on the following page and return your executed Agreement to us. This Agreement shall be of no force and effect until it is countersigned by SCS and a fully executed copy is provided to you.

Sincerely,

**SCS CAPITAL MANAGEMENT LLC**

[redacted]

Melissa Schneberger
Chief Talent Officer

THE EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

[redacted]

Brad Parsons

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SCS FINANCIAL
Strategic Capital Solutions

**RESTRICTIVE COVENANT AGREEMENT**

This RESTRICTIVE COVENANT AGREEMENT (this "Agreement") is made by the undersigned individual ("Employee") and SCS CAPITAL MANAGEMENT LLC, a Delaware limited liability company (together with any subsidiary, direct predecessor, predecessor of any previous predecessor, or subsidiary through purchase, merger or other business combination, including without limitation a transfer of assets, "Firm"), and effective as of Employee's first day of employment with the Firm (the "Effective Date"). In the event that Employee does not commence employment with Firm, this Agreement shall be null and void.

**WHEREAS**, Employee desires to be employed and/or continue to be employed by the Company (as defined below); and

**WHEREAS**, Firm's willingness to employ and/or continue the employment of Employee is conditioned upon Employee entering into this Agreement.

**NOW, THEREFORE**, in consideration of Employee's current and/or future employment and service with the Company, the opportunity to progress at the Company, professional training related to the Company's business, access to and acquisition of trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers, Employee and Firm agree as follows (unless otherwise provided in **Appendix A** hereto):

1. Third-Party Beneficiaries. The parties hereto agree that any subsidiaries or other associated affiliates of Firm comprising the SCS group of companies (collectively, "Firm Group Members"), and Focus Financial Partners, LLC ("Focus"), Focus Financial Partners Inc., Focus Operating, LLC and each other direct or indirect parent of Firm, including the respective successors and assigns of Firm, any such Firm Group Members, Focus and any such other parent entities, are each express third-party beneficiaries of the rights of Firm hereunder. For the purposes of this Agreement, all references to the "Company" shall include Firm and each Firm Group Member, including any add-on acquisitions of any of the foregoing; provided, however, that for avoidance of doubt, references to the "Company" shall not include any affiliates of Firm that are not Firm Group Members (as defined above), but are affiliates of Firm solely by virtue of common ownership by Focus or Focus Operating, LLC.

2. Non-Solicitation and Referral Program Participation Restrictions.

a. Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, except in the course of performing duties assigned to Employee by the Company:

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual clients (as defined below) of the Company;

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual clients of the Company;

iii. solicit, recruit, or take away, or attempt to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company, either for Employee's own business or for any other person or entity;

iv. hire or attempt to hire any officer, employee, partner, principal or member of the Company, except any former officer, employee, partner, principal or member of the Company whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire; or

v. solicit, recruit, or otherwise induce or influence any proprietor, stockholder, lender, director, sales agent, independent contractor, business partner, joint venturer, investor, lessor, supplier, client, agent, representative, or any other person that has a business relationship with the Company, and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, to discontinue, reduce, or modify such business relationship with the Company.

For purposes of this Agreement, (i) an "Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives provided services within twelve (12) months prior to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the date of such termination of Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company; and (ii) "Competing Service" means any service or process of any person or entity other than the Company, in existence or under development, which is competitive with, or an alternative or substitute for, any process or service of the Company, in existence or under development, at or any time during the period of Employee's employment with or service to the Company or about which Employee acquires Confidential Information (as defined below).

Additionally, for purposes of this Section 2, the term "solicit" shall include, but not be limited to, initiation of contact with Actual clients to the extent such contact concerns Competing Services.

b. If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

3. Confidential and Proprietary Information.

a. Employee recognizes, acknowledges, and agrees that (i) Employee has acquired and/or will acquire Confidential Information from the Company, Focus and their affiliates, (ii) such Confidential Information is the property of the Company, Focus and their affiliates, (iii) the misuse, misappropriation, or disclosure of such Confidential Information would constitute a breach of trust and could cause irreparable injury to the Company, Focus and their affiliates, and (iv) it is essential to the protection of the Company's goodwill and competitive position that such Confidential Information be kept secret and that Employee not disclose the Confidential Information to others or use the Confidential Information to Employee's own advantage or the advantage of others, except as required in the performance of Employee's duties to the Company, both during and after Employee's employment.

b. Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, either during or following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

c. Employee understands that "Confidential Information" means any of the Company's, Focus' or any of their affiliate's confidential or proprietary information, technical data, know-how, client information, or other business information disclosed to Employee, whether directly or indirectly, in writing or orally, by the Company, Focus, any of their affiliates or a third party, including, without limitation:

i. formulas; research and development techniques or projects; processes; products and/or services; computer programs (including, without limitation, software used pursuant to a license agreement); software (including, without limitation, all programs, specifications, applications, routines, subroutines, techniques, and ideas for formulas); discoveries; inventions; innovations; creations; writings; and other works of authorship;

ii. financial data (including, without limitation, all information about costs, profits, markets, sales, budgets, projections, contracts, and clients, partners, officers, employees, distributors, and pricing methods); client and supplier lists; and contacts at or knowledge of Actual clients or prospective clients of the Company; business, marketing, and strategic plans; negotiation strategies; and

iii. personnel files and compensation information, except to the extent disclosure is protected by applicable law.

d. Employee understands that Confidential Information does not include any information that (i) arises from Employee's general training, knowledge, skill, or experience, whether gained on the job or otherwise; (ii) has become publicly known or been made generally available to the public through no wrongful act of Employee; or (iii) has been developed by Employee independently of his or her employment or service with the Company (and not in violation of this Agreement or any other agreement). Employee further agrees

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

that all Confidential Information at all times shall remain the property of the Company, Focus and their respective affiliates.

e. Employee recognizes, acknowledges, and agrees to be bound by the Privacy Statement, Privacy Notice, Privacy Policy and/or the applicable equivalent thereof and all other policies of the Company governing the handling or use of Confidential Information or other information or property of the Company as are in effect from time to time.

f. Employee recognizes, acknowledges, and agrees that the investment performance record of any client accounts with which Employee is associated while employed at the Company is attributable to a team of professionals of the Company and not solely to the efforts of any single individual, and that, therefore, the performance records of the accounts managed by the Company are and shall be the exclusive property of the Company.

g. Upon the termination of Employee's employment, Employee agrees to deliver promptly to the Company all paper and/or electronic documents and files concerning the Company, Focus and their respective affiliates and any and all Confidential Information, provided, however, that Employee may retain a copy of documents relating solely to the employee-employer relationship (*i.e.*, offer letter, this Agreement, profit sharing statements, benefit statements, and other similar documents) between Employee and the Company.

h. In the event that Employee is ordered to disclose Confidential Information pursuant to a judicial request, requirement, or order, Employee shall, prior to disclosure, promptly notify the Company and take all reasonable steps to assist the Company in protecting the rights of the Company. In addition, notwithstanding anything herein to the contrary, this Agreement and Company policies shall not be enforced in such a way as to impede Employee from communicating directly with, cooperating with, or providing information (including with respect to possible violations of law) to, or receiving financial awards from, any federal, state or local government agency, including without limitation the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission, or the U.S. National Labor Relations Board, or any self-regulatory organization, without notifying or seeking permission from the Company. Furthermore, nothing in this Agreement or any Company policy prohibits or restricts Employee from (i) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful, (ii) speaking with law enforcement, the Equal Employment Opportunity Commission, the state division of human rights, the attorney general, a local commission on human rights, or an attorney retained by Employee, or (iii) exercising any right Employee has under Section 7 of the National Labor Relations Act.

i. In addition, and notwithstanding anything herein to the contrary, Employee hereby acknowledges, understands and agrees that (i) the Confidential Information may contain or constitute material non-public information concerning Focus, the Company or their affiliates and (ii) trading in the securities of any of the foregoing while in possession of material nonpublic information or communicating that information to any other person or entity who trades in such securities could subject Employee or his or her affiliates to liability under the U.S. federal and state securities laws, and the rules and regulations promulgated thereunder, including Section 10(b) of the U.S. Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. Employee agrees that he or she and his or her affiliates will not trade in the securities of Focus, the Company or their affiliates while in possession of material nonpublic information or at all until Employee or such affiliates can do so in compliance with all applicable laws and without breach of the terms hereof.

4. Invention Ideas. "Inventions" and "Invention Ideas" are understood to include all contributions, inventions, ideas, formulae, works, modifications, processes, discoveries, techniques, designs, methods, trade secrets, technical specifications and data, know-how, show-how, concepts, expressions, creations, improvements, works of authorship, ideas and other developments, whether or not they are patentable or copyrightable or subject to analogous protection and regardless of their form or state of development, and whether or not Employee have made them alone or with others, developed during Employee's employment that relates in any manner to the business of the Company. Employee covenants and agrees (a) to disclose promptly to the Company or its nominee any and all Invention Ideas authored, conceived, or made by Employee during the period of Employee's employment and related to the business or activities of the Company; (b) that all Invention Ideas will belong solely to the Company from conception as "works made for hire" (as that term is used under U.S. copyright law) or otherwise; (c) to the extent that title to any such Invention Ideas do not, by operation of law, vest in the Company, Employee hereby irrevocably assigns to the Company all right, title and interest, including, without limitation, tangible and intangible rights such as patent rights, trademarks, copyrights, trade secrets rights and mask work rights, that Employee may have or may acquire in and to all such contributions and Inventions, benefits and/or rights resulting therefrom, and agrees to promptly execute any further specific assignments related to such contributions or Inventions, benefits and/or rights at the request of the Company; and (d) in the event any Invention Idea shall be deemed by the Company to be patentable or otherwise registrable, to do all things necessary or proper to obtain letters of patent or other applicable registrations thereon and to vest the Company with full title thereto. Notwithstanding the foregoing, any provision in this Agreement which provides that Employee shall assign, or offer to assign, any of his or her rights in an invention to the Company shall not apply to an invention that Employee developed entirely on his or her own time without using the Company's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by Employee for the Company.

5. Professionalism. Employee covenants and agrees that during Employee's employment or service with the Company and after the termination of such employment and service for any reason, subject to Section 3(h) above, Employee will not make any malicious, false, offensive or hostile statements regarding the Company, Focus or their affiliates (or any of its or their members, managers, directors,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

officers, employees, agents, or representatives) or any statements regarding the business affairs or financial condition of the Company, Focus or their affiliates to any media outlet, industry, group, financial institution, current or former employee, consultant, or client of the Company.

6. Photography and Video Authorization and Release. Employee grants to the Company, Focus and their affiliates the irrevocable right and permission concerning photographs or videos that were or may be taken of him or her, or in which he or she may be included with others, in connection with Employee's employment or service with the Company (collectively, the "Photographs and Videos"), to use and publish the Photographs and Videos in whole or in part, individually or in connection with other material, without restriction as to alteration, in any and all media, including the internet, that the Company, Focus and their affiliates employ including illustration, promotion, and marketing of the Company, Focus and their affiliates. Employee releases and discharges the Company, Focus and their affiliates from any and all claims and demands that may arise out of or in connection with said use of the Photographs and Videos. This authorization and release shall inure to the benefit of the legal representative, licensees, and assigns of the Company, Focus and their affiliates. This release shall be binding upon Employee's heirs, legal representative, and assigns.

7. Disclosure to Prospective Employers. Employee covenants and agrees to disclose the existence and terms of this Agreement to any prospective employer, partner, or co-venturer prior to entering into an employment, partnership, or other business relationship with such person or entity. In addition, Employee expressly consents to the Company's right and authority to disclose the existence and terms of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee, and Employee indemnifies and holds harmless the Company and its affiliates, representatives, members, managers, employees, and attorneys from and against any and all losses, claims, damages, liabilities, costs, and expenses, actual or threatened, relating to, or arising directly or indirectly out of or in connection with the Company's disclosure of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee.

8. Tolling Period. The restrictions contained in Section 2 of this Agreement automatically shall, unless prohibited by applicable law, be extended by the length of time during which Employee shall have been in breach of such restrictions.

9. No Prior Agreements. Employee represents and warrants to the Company that: (a) the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound; (b) except as Employee has disclosed in writing to the Company, Employee is not bound by the terms of any agreement with any previous employer, current employer, client/customer or other person or entity (i) to refrain from soliciting, directly or indirectly, the employees or current or prospective clients, customers, accounts or investors of such previous employer or other party, (ii) to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, (iii) to refrain from using or disclosing any trade secret or other confidential or proprietary information of such previous employer or other party in the course of Employee's employment or service with the Company, or (iv) to assign any invention ideas to such previous employer or other party; and (c) Employee has complied with the terms of each agreement, if any, that Employee has disclosed to the Company pursuant to this Section 9 through the date hereof. The Company has not requested or been provided with (and the Company prohibits Employee from obtaining for or disclosing to the Company) information that may be considered confidential under the terms of each agreement, if any, that Employee has disclosed pursuant to clause (b) of this Section 9.

10. Review by Counsel. Employee represents and warrants that Employee has been advised by the Company, and offered the opportunity, to review and discuss fully the terms of this Agreement with an attorney of Employee's own choosing. Employee represents and warrants that Employee received a copy of this Agreement with the offer letter of employment or service with the Company, and prior to the commencement of employment or service with the Company.

11. Not an Employment Contract. Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue Employee's employment or service for any period of time, and does not change the at-will nature of Employee's employment. Notwithstanding the foregoing, if Employee voluntarily separates employment or service with the Company, Employee shall provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture. The Company may, in its sole discretion, waive such notice period (in whole or in part).

12. Interpretation. If any restriction set forth in this Agreement is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable.

13. Severability. Any restrictive covenants in this Agreement shall only apply to the extent not prohibited by applicable law. The invalidity of any portion hereof shall not affect the validity, force, or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law.

14. Waiver of Rights. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

15. Company Violation Not a Defense. In an action by the Company to enforce this Agreement, any claims asserted by Employee against the Company, other than claims arising under or pertaining to this Agreement, shall not constitute a defense to the Company's action.

16. Equitable Remedies. The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by Employee to be reasonable for such purpose. Employee agrees that any breach of this Agreement may cause the Company substantial and irrevocable harm and therefore, in the event of any such breach, Employee agrees that the Company, in addition to such other remedies which may be available, may be entitled to specific performance and other injunctive relief.

17. Attorney's Fees. If the Company brings any legal action or other proceeding to enforce its rights under this Agreement and obtains any enforceable judgment or injunction, the Company may recover its costs and expenses (including reasonable attorneys' fees) incurred in connection with the action and any appeal from Employee, in addition to any other relief to which the Company may be entitled.

18. Assignability; Binding Effect. This Agreement shall be binding on and inure to the benefit of the successors in interest of the parties; provided, however, that Employee's obligations under this Agreement are personal and may not be assigned by Employee except with the written consent of the Company. Firm may assign this Agreement and its rights and obligations hereunder to Focus or any of its affiliates, including any of the third-party beneficiaries set forth in Section 1, or to any successor to all or substantially all of the business and/or assets of Firm.

19. Entire Agreement, Etc. This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and, except as otherwise provided in Section 23, may be amended only by a writing signed by each of them. Notwithstanding the foregoing or anything herein to the contrary, and for the avoidance of doubt, Employee's covenants and obligations hereunder are in addition to and not in lieu of or exclusive of any other continuing obligations and duties that Employee may have to any of the Company, Focus, and/or any of their respective affiliates, predecessors, successors and/or assigns, including without limitation under any agreement Employee entered into prior to the Effective Date with any predecessor or affiliate of the Company, in Employee's capacity as an officer, employee, partner, principal or member of such predecessor or affiliate, containing confidentiality, non-solicitation, non-competition and/or any similar covenants or obligations.

20. Counterparts; Transmission. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument. The signature of a party on any counterpart that is transmitted by facsimile or via .pdf file to another party or legal counsel for another party shall be deemed an original signature binding upon the executing party and acceptable to all other parties.

21. Governing Law; Choice of Forum. Unless otherwise provided in Appendix A hereto: This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles; provided, however, that if the State of New York enacts a law that bans any restriction set forth in Section 2 of this Agreement, and if Employee primarily resides and provides services to the Company outside of the State of New York, then this Agreement shall be governed by, and construed in accordance with, the laws of the state in which Employee primarily provides services to the Company without regard to conflict of laws principles. The parties hereto hereby irrevocably agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this Agreement shall be brought solely in the appropriate federal or state court in the County of New York, State of New York. By their execution of this Agreement, the parties hereby covenant and irrevocably submit to the in personam jurisdiction of any such federal or state court, and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail upon them or their agent, return receipt requested, with the same full force and effect as if personally served upon them in the State of New York. The parties hereto waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense based on lack of in personam jurisdiction with respect thereto.

22. Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement to the contrary: (a) Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made: (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and (b) if Employee files a lawsuit for retaliation by the Company or its affiliates for reporting a suspected violation of law, Employee may disclose the trade secrets of the Company or its affiliates to Employee's attorney and use the trade secret information in the court proceeding if Employee (i) files any document containing the trade secret under seal and (ii) does not disclose the trade secret, except pursuant to court order.

23. State Law Modifications. If Employee primarily resides and provides services to the Company in a state listed on Appendix A hereto, or if otherwise required with respect to Employee by the applicable law of a particular state, the modifications set forth on Appendix A for that state shall apply to Employee. Employee acknowledges and agrees that the Company may issue updates to Appendix A from time to time (including the addition of states) to either narrow the scope of a particular restriction or to comply with applicable state or federal law, and Employee hereby consents to any such updates.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates below written, to be effective as of the Effective Date (as defined herein).

SCS CAPITAL MANAGEMENT LLC

By: [redacted] Date: January 10, 2025
Name: Melissa Schneberger
Title: Chief Talent Officer

**EMPLOYEE:**

By: [redacted] Date: January 28, 2025

Name:Brad Parsons

**APPENDIX A**
**CERTAIN MODIFICATIONS OF RESTRICTIVE COVENANTS**

If Employee primarily resides and provides services to the Company in a state listed below, or if otherwise required with respect to Employee by the applicable law of a state below, the modifications set forth below for that state shall apply.

For purposes of this **Appendix A**, the "post-employment portion" of the Restricted Period or the Referral Program Participation Restricted Period means the period remaining in the Restricted Period or Referral Program Participation Restricted Period, as applicable, following Employee's last day of employment and service with the Company.

**Sections 2(a)(i) and 2(a)(ii)**

All States other than Colorado, Illinois, Indiana, Maryland, New Hampshire, New Jersey, New York, Oklahoma, and Oregon:

The following shall replace Section 2(a)(i):

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual or Prospective clients (each as defined below) of the Company;

The following shall replace Section 2(a)(ii):

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual or Prospective clients of the Company;

The following shall be added as a definition of "Prospective" client:

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company.

Arizona: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's last day of employment or service with the Company. Additionally, following Employee's last day of employment or service with the Company, the terms Actual and Prospective client shall not include any person or entity who has terminated its contract, account or relationship with the Company prior to Employee's last day of employment or service, without any solicitation or interference by Employee.

California: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or diversion described in Sections 2(a)(i) or 2(a)(ii).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

Georgia; Missouri: The following definitions of Actual and Prospective clients shall apply:

"Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provided services within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company.

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company.

In addition, nothing in Sections 2(a)(i) or 2(a)(ii) shall restrict Employee from soliciting any Actual or Prospective client for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(i) and 2(a)(ii) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

Nevada: The following shall be added to the end of Section 2(a)(i):

Notwithstanding the foregoing, during the post-employment portion of the Restricted Period, this Section 2(a)(i) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Oklahoma: Sections 2(a)(i) and 2(a)(ii) shall be replaced with the following:

> directly solicit the sale of goods, services, or a combination of goods and services from the established customers of the Company;

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(i) and 2(a)(ii), the "Restricted Period" shall be the term of Employee's employment or service with the Company and for a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(a)(iii)**

Alabama: The restriction contained in Section 2(a)(iii) will apply only with respect to officers, employees, partners, principals or members who hold or held a position uniquely essential to the management, organization or service of the Company.

Arizona: The restrictions set forth in Section 2(a)(iii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(iii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or recruitment described in Section 2(a)(iii).

Georgia: The restrictions set forth in Section 2(a)(iii) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iii) shall apply only with respect to soliciting, recruiting, or taking away, or attempting to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company who possess or have access to Confidential Information that would give an unfair advantage to a business in competition with the Company.

**Section 2(a)(iv)**

Alabama: The restriction contained in Section 2(a)(iv) will apply only to officers, employees, partners, principals, or members who hold or held a position uniquely essential to the management, organization or service of the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

Arizona: The restrictions set forth in Section 2(a)(iv) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: Section 2(a)(iv) shall be deemed deleted.

Georgia: The restrictions set forth in Section 2(a)(iv) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iv) shall apply only with respect to hiring or attempting to hire any officers, employees, partners, principals or members of the Company who possess or have (or possessed or had) access to Confidential Information that would give an unfair advantage to a business in competition with the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

**Section 2(a)(v)**

Arizona: The restrictions set forth in Section 2(a)(v) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(v) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to violate Section 2(a)(v).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% of the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Georgia: The restrictions set forth in Section 2(a)(v) shall apply only with respect to those business relations of the Company with whom Employee had material contact during Employee's employment or service with the Company. Nothing in Sections 2(a)(v) shall restrict Employee from soliciting any business relation of the Company for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Section 2(a)(v) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(v) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(v), the "Restricted Period" shall be the term of Employee's employment or service with the Company and a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(b)**

California; Minnesota; Montana; North Dakota; Oklahoma: The restrictions set forth in Section 2(b) shall apply only during Employee's employment or services with the Company.

Colorado: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns annualized cash compensation at or above the threshold amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., $123,750 in annual compensation for 2024), as set forth in CO Rev. Stat. 8-2-113.

District of Columbia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns or is reasonably expected to earn at or above the minimum qualifying annual compensation ($154,200 in 2024) per year (which amount shall increase each year in proportion to the annual average increase, if any, in the Consumer Price Index for All Urban Consumers in the Washington Metropolitan Statistical Area published by the Bureau of Labor Statistics of the United States Department of Labor for the previous calendar year adjusted to the nearest whole dollar).

District of Columbia; Georgia; Idaho; Illinois; Indiana; Maryland; Michigan; North Carolina; Pennsylvania; South Carolina; Texas; Virginia; Wisconsin: The following sentence shall be added to the end of Section 2(b):

> Notwithstanding the foregoing, nothing in this Section 2(b) shall prohibit Employee from being employed or engaged, during the post-employment portion of the Referral Program Participation Restricted Period, by any person or entity in a role that does not have responsibility for, or require performance of, any of the same or similar functions, duties or activities that Employee performed or had oversight for on behalf of the Company.

Georgia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee (a) customarily and regularly solicits for Company customers or prospective customers; or (b) customarily and regularly engages in making sales or obtaining orders or contracts for products or services to be performed by others; or (c) performs the following duties: (i) has a primary duty of managing the enterprise in which Employee is employed or of a customarily recognized department or subdivision thereof; (ii) customarily and regularly directs the work of two or more other employees; and (iii) has the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (d) performs the duties of a key employee or of a professional.

Idaho: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is a "key employee," which means any employee or independent contractor who (i) has, by reason of the Company's investment of time, money, trust, exposure to the public or exposure to technologies, intellectual property, business plans, business processes and methods of operation, customers, vendors or other business relationships during the course of employment or service, gained a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company and, as a result, has the ability to harm or threaten the Company's legitimate business interests, and/or (ii) is among the highest paid five percent (5%) of the Company's employees and independent contractors.

Illinois: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee has actual or

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($75,000 per year in 2024, increasing to $80,000 starting in 2027).

Louisiana: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the Referral Program Participation Restricted Territory (as defined below), that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes hereof, "Referral Program Participation Restricted Territory" shall mean (A) each of the following parishes and municipalities for so long as the Company carries on business in such parish or municipality: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana and Winn; and (B) any other state, municipality or locale in the United States in which the Company carries on business for so long as the Company continues to carry on business therein.

Maine: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee, at the time Employee enters into this Agreement, earns wages in excess of four hundred percent (400%) of the federal poverty level.

Massachusetts: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason except as set forth in this Section 2(b) below (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, own, be employed in a Restricted Capacity by, or perform services in a Restricted Capacity for, any advisory firm, anywhere in the United States in which Employee, during the last two (2) years of Employee's employment or service with the Company provided services or had a material presence or influence, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes of this Section 2(b), "Restricted Capacity" means any capacity (whether as an owner, partner, employee, officer, director, independent contractor, consultant, advisor or in any other capacity calling for the rendition of services, advice, or acts of management, operation or control) in which Employee would provide or engage in services that are the same as or substantially similar to the services Employee provided to the Company during the then most-recent two (2) years of Employee's employment with or service to the Company. Notwithstanding anything to the contrary in this Section 2(b), the post-employment portion of the restrictions contained in this Section 2(b) will not apply if (A) the Company terminates Employee's employment and services without Cause (as defined below) or because of a layoff, (B) Employee is classified as a non-exempt employee under the Fair Labor Standards Act, (C) Employee is an undergraduate or graduate student enrolled in a full-time or part-time undergraduate or graduate

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

educational institution, or (D) Employee is age 18 or younger ("Disqualifying Reason"). For purposes of this Section 2(b), "Cause" means, in addition to "Cause" as defined in any other agreement between Employee and the Company, a reasonable and good faith basis for the Company to be dissatisfied with Employee's job performance, conduct, or behavior. As additional consideration for Employee's obligations under this Section 2(b), unless there is a Disqualifying Reason, the Company shall pay Employee during the post-employment portion of the Referral Program Participation Restricted Period at a rate equal to 50% of Employee's highest annualized base salary within the two years immediately preceding Employee's last day of employment (with such payments to be paid to Employee in equal installments over the course of the Referral Program Participation Restricted Period, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard payroll practices) (the "Garden Leave Payments"); provided, however, in the event that the Company, in its discretion, waives Employee's obligations under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to Employee shall cease. Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with Employee's obligations under this Section 2(b). Any Garden Leave Payments paid by the Company will be payable as salary continuation in accordance with its standard payroll practices as described above. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Nevada: The following shall be added to the end of Section 2(b):

Notwithstanding the foregoing, during the post-employment portion of the Referral Program Participation Restricted Period, this Section 2(b) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

New Hampshire: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns above 200% of the federal minimum wage.

Idaho; Nebraska; North Carolina; South Carolina; Pennsylvania; Texas; Wisconsin: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States in which Employee provided services or had a material presence or influence during Employee's employment or service with the Company, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

Oregon: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if (i) (A) Firm informs Employee in a written employment offer received by Employee at least two (2) weeks before the first day of Employee's employment that a non-competition agreement is required as a condition of employment or (B) Employee executes this Agreement upon a *bona fide* advancement, (ii) Employee is classified as exempt under state wage and hour law, (iii) Employee has access to trade secrets of the Company or competitively sensitive Confidential Information, and (iv) as of the date of Employee's termination of employment, the total amount of Employee's annual gross salary and commissions, calculated on an annual basis, exceeds $108,581 (adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the date of Employee's termination of employment); provided, however, that if Employee does not satisfy prongs (ii) or (iv) of the foregoing, in order for the restrictions set forth in Section 2(b) to apply to such Employee during the post-employment portion of the Referral Program Participation Restricted Period, the Company agrees to pay such Employee, during the post-employment portion of the Referral Program Participation Restricted Period, the greater of compensation equal to at least fifty percent (50%) of (X) Employee's annual gross base salary and commissions at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

the time of Employee's termination of employment or (y) $108,581, adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the termination of Employee's employment (the "Garden Leave Payments"); provided, further, that (1) in the event that the Company, in its discretion, waives such obligations of Employee under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to such Employee shall cease, (2) Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with such Employee's obligations under this Section 2(b), and (3) any Garden Leave Payments paid by the Company will be payable as salary continuation, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard regular payroll practices. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Rhode Island: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has annual earnings at or below two hundred fifty percent (250%) of the federal poverty level as established by the United States Department of Health and Human Services federal poverty guidelines (excluding overtime), (ii) is 18 years of age or younger, (iii) is an undergraduate or graduate student or (iv) is an employee who is nonexempt under the Fair Labor Standards Act.

South Dakota: The post-employment portion of the Referral Program Participation Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has average weekly earnings less than the average weekly wage of the Commonwealth as determined by the Virginia Employment Commission, (ii) is an intern, student, apprentice or trainee employed, with or without pay, at a trade or occupation in order to gain work or educational experience or (iii) is an independent contractor compensated at an hourly rate that is less than Virginia's median hourly wage for all occupations for the preceding year, as reported by the U.S. Bureau of Labor Statistics. Notwithstanding the foregoing, Section 2(b) shall apply if Employee's compensation is derived in whole or in predominant part from sales commissions, incentives or bonuses.

Washington: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is (i) an employee of the Company whose earnings from the Company exceed the threshold set forth in RCW 49.62.020 when annualized ($120,559.99 in 2024) or (ii) an independent contractor of the Company or any of its Subsidiaries whose earnings from the Company exceed the threshold set forth in RCW 49.62.030 per year ($301,399.98 in 2024), each amount to be adjusted annually for inflation as calculated by the Washington Department of Labor and Industries pursuant to RCW 49.62.040; provided, however, in the event that at any time Employee's compensation level exceeds such thresholds, as of such time the full Referral Program Participation Restricted Period shall be in place. Further, to the extent Employee's employment or service is terminated by the Company as part of a layoff, then the post-employment portion of the Referral Program Participation Restricted Period shall be enforced only to the extent that Firm, at its option, continues to pay Employee his or her base salary, at the annual rate in effect as of the date of Employee's termination of employment, in accordance with Firm's regular payroll practices, and subject to deduction for any compensation earned through subsequent employment during the period of enforcement ("Garden Leave Payments"). Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise. Furthermore, if Employee earns less than twice the applicable state minimum hourly wage, Section 2(b) shall not restrict, restrain or prohibit Employee from having an additional job, supplementing Employee's income by working for another employer, working as an independent contractor or being self-employed, provided that such additional services do not raise issues of safety for Employee, coworkers or the public, or interfere with the reasonable and normal scheduling expectations of the Company. Nothing in the foregoing sentence alters the obligations of Employee to the Company under existing law, including the common law duty of loyalty and laws preventing conflicts of interest and any corresponding policies addressing such obligations.

**Section 3(b)**

Arizona; Florida; Georgia; Illinois; New Jersey; South Carolina; Virginia: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

Wisconsin: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or Prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company. As applied to Confidential Information that does not constitute a trade secret under applicable law, the nondisclosure provision shall apply only in geographic areas where the unauthorized disclosure or use of Confidential Information would be competitively damaging to the Company.

**Section 3(h)**

Washington: The following language shall be added to the end of Section 3(h):

Nothing in this Agreement shall prohibit or is intended to restrict or impede Employee from exercising Employee's rights under Washington's Silenced No More Act or from disclosing or discussing (i) illegal acts of discrimination, harassment, retaliation, wage and hour violations, sexual assault, or other conduct recognized as being against a clear mandate of public policy occurring in the workplace, at work-related events, between employees, or between an employer and an employee, whether on or off the employment premises, or (ii) information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful.

**Section 4**

California: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement shall not apply to an invention that qualifies fully under the provisions of California Labor Code Section 2870, which provides as follows:

"Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer."

Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 2870 through 2872 of the California Labor Code.

Illinois: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement is intended to comply, and shall be construed in accordance with, 765 ILCS 1060/1 to 1060/3.

Utah: The following language shall be added to the end of Section 4:

Pursuant to Sections 34-39-1 to 34-39-3 of the Utah Code, the assignment of inventions as described in this Agreement shall not apply to an invention that is (i) created by Employee entirely on Employee's own time and (ii) not an Employment Invention. For this purpose, "Employment Invention" means any invention or part thereof conceived, developed, reduced to practice or created by Employee that is: (A) conceived, developed, reduced to practice or created by Employee: (x) within the scope of Employee's employment or service; (y) on the Company's time; or (z) with the aid, assistance or use of any of the Company's property, equipment, facilities, supplies, resources or intellectual property; (B) the result of any work, services or duties performed by Employee for the Company; (C) related to the industry or trade of the Company; or (D) related to the current or demonstrably anticipated business, research or development of the Company. Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 34-39-1 to 34-39-3 of the Utah Code.

**Section 8**

California, Connecticut, Wisconsin: Section 8 shall be deemed deleted.

**Section 21**

California: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

accordance with the internal laws of the State of California, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of California. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Colorado: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of Colorado. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Massachusetts: The following shall be added to the end of Section 21:

Notwithstanding anything to the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction and shall be brought solely in the business litigation session of the Superior Court of the Commonwealth of Massachusetts, in Suffolk County, Massachusetts.

Minnesota: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Minnesota, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Minnesota, and the parties agree to jurisdiction and venue therein.

Washington: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Washington, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Washington, and the parties agree to jurisdiction and venue therein.

**Section 24**

Colorado: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under Section 2. Employee acknowledges the Company's business success and competitive position in the industry are dependent on the Company's exclusive possession of trade secrets. Employee agrees that these restraints are (a) intended to protect and necessary for the reasonable and proper protection of the Company's trade secrets, (b) reasonable in respect of subject matter, length of time, and geographic area, and (c) supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, and that employment opportunities outside the scope of these restraints exist and remain available to Employee, and that Employee's skill sets are transferable to other industries and businesses not in competition with the Company. Employee acknowledges that each of these covenants has a unique, very substantial, and immeasurable value to the Company, and that Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force.

Employee acknowledges receipt of a separate notice that Firm has provided to Employee contemporaneously with this Agreement attached hereto as Exhibit A (if applicable), which identifies this Agreement by name, states that this Agreement contains non-competition and non-solicitation covenants that could restrict Employee's options for subsequent employment following the termination of Employee's employment or service with the Company, and directs Employee to the specific sections of this Agreement containing such covenants. If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges receipt of this Agreement and such separate notice from Firm before Employee accepted an offer of employment or service with the Company. If Employee is entering into

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

this Agreement as a current employee of Firm, Employee acknowledges receipt of this Agreement and such separate notice from Company at least fourteen (14) days before the earlier of the effective date of this Agreement, or the effective date of the consideration for this Agreement.

District of Columbia: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least 14 calendar days to review the restrictive covenants set forth in this Agreement. To the extent, for purposes of Section 2(b), the post-employment portion of the Referral Program Participation Restricted Period applies to Employee, Employee acknowledges receipt of the following notice: "The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. The Company has determined that Employee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendments Act of 2020, contact the District of Columbia Department of Employment Services (DOES)."

Illinois: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that (a) Employee has had at least fourteen (14) calendar days to review this Agreement, including the restrictive covenants set forth herein, (b) Employee has been advised of Employee's right to consult with counsel prior to agreeing to be bound by this Agreement, including the restrictive covenants set forth herein, and (c) the restrictions contained in this Agreement (including in Section 2) are supported by valid, sufficient, and mutually-agreed-upon consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers. The Company may, but is not required to, provide a bonus payment or other compensation or benefits to Employee as additional consideration for the restrictions contained in Section 2.

Maine: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least three (3) business days to consider the non-competition and other restrictive covenants set forth in this Agreement. Employee further understands that the non-competition provision set forth in Section 2(b) that applies following Employee's termination of employment shall not take effect until the later of the end of Employee's first year of employment with or service to the Company and six (6) months after Employee executes this Agreement.

Massachusetts: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has been advised of Employee's right to consult with counsel prior to executing this Agreement. Employee acknowledges that (i) if Employee is entering into this Agreement in connection with Employee's commencement of employment, Employee has received a copy of this Agreement on the earlier of (A) a formal offer of employment, and (B) ten (10) business days before commencement of Employee's employment, and (ii) if Employee is entering into this Agreement following commencement of employment, Employee has received this Agreement at least ten (10) business days before it becomes effective. Employee acknowledges and agrees that the restrictive covenants contained in Section 2 are supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers .

New Hampshire: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee has been provided a copy of this Agreement prior to Employee's acceptance of an offer of employment or service with the Company.

Oregon: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee was informed in a written offer from Firm that Employee received at least two weeks before the first day of Employee's employment or service with the Company that a non-competition agreement is required as a condition of employment or service.

Washington: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Company, Employee acknowledges and agrees that the terms of this Agreement, including the restrictive covenants in Sections 2 and 3, were disclosed in writing to Employee before Employee accepted an offer of employment or service with the Company.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

**Exhibit A**

**RESTRICTIVE COVENANT AGREEMENT**

*Attached hereto.*

**Exhibit B**

**ARBITRATION AGREEMENT**

By entering into this Arbitration Agreement, you and SCS Capital Management LLC (" ***SCS***" or the "***Company***") agree as set forth below. For purposes of this Arbitration Agreement, "***SCS***" and the "***Company***" shall include SCS Capital Management LLC and any and all of its former, existing, and future subsidiaries, predecessors, and successors.

1. **Binding Mutual Arbitration**. You and SCS agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement. This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by you or SCS, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims. By entering into this Arbitration Agreement, you and SCS each acknowledge and agree that, to the fullest extent permitted by law, you and SCS are giving up your and its right to a jury trial in any forum.

2. **Covered Claims**. Except for Excluded Claims (defined below), and to the fullest extent permitted by law, " ***Covered Claims***" include any and all claims or disputes between you and SCS or any of its officers, directors, employees, representatives, or agents, including but not limited to all claims and disputes based on arising out of, or which arose out of or in any way relate to your employment, compensation, or terms and conditions of employment with SCS, or the termination thereof, including but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination and retaliation claims, and claims arising under, based on, or relating to any federal, state or local constitution, statute or regulation, including, but not limited to, the Fair Labor Standards Act ("***FLSA***"), Title VII of the Civil Rights Act of 1964 ("***Title VII***"), the Age Discrimination in Employment Act ("***ADEA***"), the Older Workers Benefit Protection Act (" ***OWBPA***"), the Worker Adjustment and Retraining Notification Act ("***WARN***"), the Equal Pay Act ("***EPA***"), the Americans With Disabilities Act (" ***ADA***"), the Family and Medical Leave Act ("***FMLA***"), Sections 1981 through 1988 of Title 42 of the United States Code, the Vocational Rehabilitation Act of 1973, the Occupational Safety and Health Act of 1970, the Civil Rights Act of 1866, the Civil Rights Act of 1991 and the Pregnancy Discrimination Act of 1978, all as amended, and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized. This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and SCS entered into this Arbitration Agreement.

3. **Excluded Claims**. The following claims and disputes (collectively, " ***Excluded Claims***") are not subject to this Arbitration Agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim that is expressly precluded from arbitration by a federal, state or local statute or regulation; and (vi) any claim relating to any breach or alleged breach of your confidentiality or non-disclosure obligations, non-solicitation obligations or any other restrictive covenants or similar obligations under any agreement between you and the Company or any of its affiliates. Nothing in this Arbitration Agreement shall prohibit you from filing a charge, claim, or complaint or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency or other government entity. You also have the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and SCS shall not discipline, discharge, or engage in any retaliatory actions against you in the event you choose to do so or engage in other protected legal activity. SCS, however, reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

4. **WAIVERS**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND SCS AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION. You further agree that if you are included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this Arbitration Agreement (" ***Waivers***") shall be governed by and determined under and in accordance with the Federal Arbitration Act ("***FAA***"), and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

action Waivers) must be resolved by the arbitrator(s), not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so only in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. Nothing in this Arbitration Agreement shall preclude you from pursuing or participating in a class action, collective action, or representative action in court where your claim is based solely on your status as a customer or an investor and does not arise out of or in any way relate to your employment relationship with SCS.

5. **Forum and Rules**. Except as specified herein, any Covered Claims will be submitted to JAMS, or its successor, and resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("***JAMS Arbitration Rules***"),[2] or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum. Any arbitration of Covered Claims shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators. The arbitration shall be conducted in the county of your current or last principal place of employment with SCS or, if not practicable, in the county closest to your current or last principal place of employment with SCS where the arbitration can be held. The parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court. To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the JAMS Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.

6. **Filing and Forum Fees**. Subject to any applicable fee-shifting provisions and except as provided by law, you shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any you would have incurred had you filed such claims in court, and SCS shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

7. **Arbitration Awards**. The arbitrator(s) in any arbitration hereunder are required to issue a written award, which shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law and, subject to the parties' rights to appeal and seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any other issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

8. **Remedies**. Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. As part of your costs, you may recover expert fees incurred by you to the same extent as you could in court.

9. **Attorney's Fees**: Subject to any applicable fee-shifting provisions and except as provided by law, the arbitrator may award any prevailing party attorney's fees and costs (including expert fees) and, if you initiate arbitration of statutory claims or assert any statutory claims as counterclaims, you shall be entitled to recover attorney's fees and costs (including reasonable expert fees) in any such arbitration in which you prevail on your statutory claims to the same extent as you could in court.

10. **Severability**. The provisions of this Arbitration Agreement shall be severable and, if any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the Waivers set forth in this Arbitration Agreement are determined to be invalid, unenforceable or void with respect to any Covered Claim, that Covered Claim and only that Covered Claim shall proceed in court and the Waivers shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

11. **Employment at will**. The Arbitration Agreement does not constitute, and may not be construed by you, as a guarantee of employment for any length of time. Your employment with SCS is on an "at will" basis. Accordingly, your employment can be terminated with or without cause and with or without notice at any time at the option of either you or SCS.

12. **Governing Law**. This Arbitration Agreement, including the class action, collective action, and representative action Waivers set forth in Paragraph 4 of this Arbitration Agreement, shall be governed by and interpreted in accordance with the Federal Arbitration Act.

13. **Acknowledgement**. You acknowledge and agree that, before agreeing to this Arbitration Agreement, you have had the opportunity and a reasonable period of time to review and consider this Arbitration Agreement, to review and discuss this Arbitration Agreement with counsel of your choice, and to raise any questions you wish of SCS.

**SCS CAPITAL MANAGEMENT LLC**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

By: [redacted]
Melissa Schneberger
Chief Talent Officer

ACKNOWLEDGED AND AGREED:

By: [redacted]
Name: Brad Parsons
Date: January 28, 2025

**Exhibit C**

For purposes of this Agreement, "***Cause***" shall mean any of the following:

(a) You are convicted of, or plead guilty or nolo contendere ("no contest") to, a felony or other crime involving dishonesty or moral turpitude (under the laws and regulations of the United States, any state or locality thereof or any reasonably equivalent foreign laws or regulations);

(b) You are convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor*, as defined in the instructions to the SEC's Form ADV ("***Form ADV***"), involving investments or an investment-related, as defined in Form ADV, business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses;

(c) You are *found*, as defined in Form ADV, to be in violation or *involved*, as defined in Form ADV, in any violation of any federal or state statute or any rule or regulation of the Securities and Exchange Commission or any other federal agency, state agency or self-regulatory organization;

(d) You engage in fraudulent conduct in connection with the business or other affairs of the Company or any affiliate of the Company or the theft, embezzlement or other criminal misappropriation of funds by you from the Company or any affiliate of the Company; provided, however, that if any of the foregoing is the result of your inadvertent or unintentional violation of the Company's expense reimbursement policies that is curable, you have not cured such violation within thirty (30) days after the Company gives you written notice of such violation;

(e) You fail, refuse or demonstrate an inability to perform your duties as an employee of the Company, and, if curable, you have not cured your failure to perform within thirty (30) days after the Company gives you written notice of such failure(s) (except that a cure opportunity will not exist for any willful or intentional misconduct or any act or omission otherwise constituting Cause under any other item of this definition of "Cause" which does not require an opportunity to cure);

(f) You commit an act of gross negligence or willful misconduct, including, without limitation, theft, misuse or unauthorized disclosure of the Company's Confidential Information (as defined in the RCA); provided, however, that if any of the foregoing is the result of your inadvertent or unintentional violation of the Company's expense reimbursement policies that is curable, you have not cured such violation within thirty (30) days after the Company gives you written notice of such violation;

(g) You engage in conduct which, in the good faith and reasonable determination of the Company, demonstrates that you are grossly unfit to serve in your position with the Company;

(h) You otherwise breach any material term of this Agreement, the RCA or any other written agreement between you and the Company or any affiliate of the Company and, if such breach is curable, you have not cured such breach within thirty (30) days after the Company gives you written notice of such breach (except that a cure opportunity will not exist for (i) repeated breaches of a similar nature after prior notice, (ii) any willful or intentional misconduct, or (iii) any act or omission otherwise constituting Cause under any other item of this definition of "Cause" which does not require an

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

opportunity to cure); or

(i) You: (x) otherwise violate any material term of any internal compliance or other policy of the Company or any affiliate of the Company and, if such violation is curable, you have not cured such violation within thirty (30) days after the Company gives you written notice of such violation (except that a cure opportunity will not exist for (i) repeated violations of a similar nature after prior notice, (ii) any willful or intentional misconduct, or (iii) any act or omission otherwise constituting Cause under any other item of this definition of "Cause" which does not require an opportunity to cure); or (y) commits or engages in any act of harassment or other inappropriate behavior.

---

[1] Termination Agreement to be provided separately by Edge/Focus.

[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

# Exhibit 3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SCS FINANCIAL
Strategic Capital Solutions

**RESTRICTIVE COVENANT AGREEMENT**

This RESTRICTIVE COVENANT AGREEMENT (this "Agreement") is made by the undersigned individual ("Employee") and SCS CAPITAL MANAGEMENT LLC, a Delaware limited liability company (together with any subsidiary, direct predecessor, predecessor of any previous predecessor, or subsidiary through purchase, merger or other business combination, including without limitation a transfer of assets, "Firm"), and effective as of Employee's first day of employment with the Firm (the "Effective Date"). In the event that Employee does not commence employment with Firm, this Agreement shall be null and void.

**WHEREAS**, Employee desires to be employed and/or continue to be employed by the Company (as defined below); and

**WHEREAS**, Firm's willingness to employ and/or continue the employment of Employee is conditioned upon Employee entering into this Agreement.

**NOW, THEREFORE**, in consideration of Employee's current and/or future employment and service with the Company, the opportunity to progress at the Company, professional training related to the Company's business, access to and acquisition of trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers, Employee and Firm agree as follows (unless otherwise provided in **Appendix A** hereto):

1. Third-Party Beneficiaries. The parties hereto agree that any subsidiaries or other associated affiliates of Firm comprising the SCS group of companies (collectively, "Firm Group Members"), and Focus Financial Partners, LLC ("Focus"), Focus Financial Partners Inc., Focus Operating, LLC and each other direct or indirect parent of Firm, including the respective successors and assigns of Firm, any such Firm Group Members, Focus and any such other parent entities, are each express third-party beneficiaries of the rights of Firm hereunder. For the purposes of this Agreement, all references to the "Company" shall include Firm and each Firm Group Member, including any add-on acquisitions of any of the foregoing; provided, however, that for avoidance of doubt, references to the "Company" shall not include any affiliates of Firm that are not Firm Group Members (as defined above), but are affiliates of Firm solely by virtue of common ownership by Focus or Focus Operating, LLC.

2. Non-Solicitation and Referral Program Participation Restrictions.

a. Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason (the "Restricted Period"), Employee shall not, directly or indirectly, except in the course of performing duties assigned to Employee by the Company:

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual clients (as defined below) of the Company;

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual clients of the Company;

iii. solicit, recruit, or take away, or attempt to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company, either for Employee's own business or for any other person or entity;

iv. hire or attempt to hire any officer, employee, partner, principal or member of the Company, except any former officer, employee, partner, principal or member of the Company whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire; or

v. solicit, recruit, or otherwise induce or influence any proprietor, stockholder, lender, director, sales agent, independent contractor, business partner, joint venturer, investor, lessor, supplier, client, agent, representative, or any other person that has a business relationship with the Company, and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, to discontinue, reduce, or modify such business relationship with the Company.

For purposes of this Agreement, (i) an "Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives provided services within twelve (12) months prior to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the date of such termination of Employee's employment or service with the Company and with whom Employee had material contact or about whom Employee learned Confidential Information during Employee's employment or service with the Company; and (ii) "Competing Service" means any service or process of any person or entity other than the Company, in existence or under development, which is competitive with, or an alternative or substitute for, any process or service of the Company, in existence or under development, at or any time during the period of Employee's employment with or service to the Company or about which Employee acquires Confidential Information (as defined below).

Additionally, for purposes of this Section 2, the term "solicit" shall include, but not be limited to, initiation of contact with Actual clients to the extent such contact concerns Competing Services.

b. If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

3. Confidential and Proprietary Information.

a. Employee recognizes, acknowledges, and agrees that (i) Employee has acquired and/or will acquire Confidential Information from the Company, Focus and their affiliates, (ii) such Confidential Information is the property of the Company, Focus and their affiliates, (iii) the misuse, misappropriation, or disclosure of such Confidential Information would constitute a breach of trust and could cause irreparable injury to the Company, Focus and their affiliates, and (iv) it is essential to the protection of the Company's goodwill and competitive position that such Confidential Information be kept secret and that Employee not disclose the Confidential Information to others or use the Confidential Information to Employee's own advantage or the advantage of others, except as required in the performance of Employee's duties to the Company, both during and after Employee's employment.

b. Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, either during or following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual clients or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

c. Employee understands that "Confidential Information" means any of the Company's, Focus' or any of their affiliate's confidential or proprietary information, technical data, know-how, client information, or other business information disclosed to Employee, whether directly or indirectly, in writing or orally, by the Company, Focus, any of their affiliates or a third party, including, without limitation:

i. formulas; research and development techniques or projects; processes; products and/or services; computer programs (including, without limitation, software used pursuant to a license agreement); software (including, without limitation, all programs, specifications, applications, routines, subroutines, techniques, and ideas for formulas); discoveries; inventions; innovations; creations; writings; and other works of authorship;

ii. financial data (including, without limitation, all information about costs, profits, markets, sales, budgets, projections, contracts, and clients, partners, officers, employees, distributors, and pricing methods); client and supplier lists; and contacts at or knowledge of Actual clients or prospective clients of the Company; business, marketing, and strategic plans; negotiation strategies; and

iii. personnel files and compensation information, except to the extent disclosure is protected by applicable law.

d. Employee understands that Confidential Information does not include any information that (i) arises from Employee's general training, knowledge, skill, or experience, whether gained on the job or otherwise; (ii) has become publicly known or been made generally available to the public through no wrongful act of Employee; or (iii) has been developed by Employee independently of his or her employment or service with the Company (and not in violation of this Agreement or any other agreement). Employee further agrees

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

that all Confidential Information at all times shall remain the property of the Company, Focus and their respective affiliates.

e. Employee recognizes, acknowledges, and agrees to be bound by the Privacy Statement, Privacy Notice, Privacy Policy and/or the applicable equivalent thereof and all other policies of the Company governing the handling or use of Confidential Information or other information or property of the Company as are in effect from time to time.

f. Employee recognizes, acknowledges, and agrees that the investment performance record of any client accounts with which Employee is associated while employed at the Company is attributable to a team of professionals of the Company and not solely to the efforts of any single individual, and that, therefore, the performance records of the accounts managed by the Company are and shall be the exclusive property of the Company.

g. Upon the termination of Employee's employment, Employee agrees to deliver promptly to the Company all paper and/or electronic documents and files concerning the Company, Focus and their respective affiliates and any and all Confidential Information, provided, however, that Employee may retain a copy of documents relating solely to the employee-employer relationship (*i.e.*, offer letter, this Agreement, profit sharing statements, benefit statements, and other similar documents) between Employee and the Company.

h. In the event that Employee is ordered to disclose Confidential Information pursuant to a judicial request, requirement, or order, Employee shall, prior to disclosure, promptly notify the Company and take all reasonable steps to assist the Company in protecting the rights of the Company. In addition, notwithstanding anything herein to the contrary, this Agreement and Company policies shall not be enforced in such a way as to impede Employee from communicating directly with, cooperating with, or providing information (including with respect to possible violations of law) to, or receiving financial awards from, any federal, state or local government agency, including without limitation the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice, the U.S. Equal Employment Opportunity Commission, or the U.S. National Labor Relations Board, or any self-regulatory organization, without notifying or seeking permission from the Company. Furthermore, nothing in this Agreement or any Company policy prohibits or restricts Employee from (i) discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful, (ii) speaking with law enforcement, the Equal Employment Opportunity Commission, the state division of human rights, the attorney general, a local commission on human rights, or an attorney retained by Employee, or (iii) exercising any right Employee has under Section 7 of the National Labor Relations Act.

i. In addition, and notwithstanding anything herein to the contrary, Employee hereby acknowledges, understands and agrees that (i) the Confidential Information may contain or constitute material non-public information concerning Focus, the Company or their affiliates and (ii) trading in the securities of any of the foregoing while in possession of material nonpublic information or communicating that information to any other person or entity who trades in such securities could subject Employee or his or her affiliates to liability under the U.S. federal and state securities laws, and the rules and regulations promulgated thereunder, including Section 10(b) of the U.S. Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. Employee agrees that he or she and his or her affiliates will not trade in the securities of Focus, the Company or their affiliates while in possession of material nonpublic information or at all until Employee or such affiliates can do so in compliance with all applicable laws and without breach of the terms hereof.

4. Invention Ideas. "Inventions" and "Invention Ideas" are understood to include all contributions, inventions, ideas, formulae, works, modifications, processes, discoveries, techniques, designs, methods, trade secrets, technical specifications and data, know-how, show-how, concepts, expressions, creations, improvements, works of authorship, ideas and other developments, whether or not they are patentable or copyrightable or subject to analogous protection and regardless of their form or state of development, and whether or not Employee have made them alone or with others, developed during Employee's employment that relates in any manner to the business of the Company. Employee covenants and agrees (a) to disclose promptly to the Company or its nominee any and all Invention Ideas authored, conceived, or made by Employee during the period of Employee's employment and related to the business or activities of the Company; (b) that all Invention Ideas will belong solely to the Company from conception as "works made for hire" (as that term is used under U.S. copyright law) or otherwise; (c) to the extent that title to any such Invention Ideas do not, by operation of law, vest in the Company, Employee hereby irrevocably assigns to the Company all right, title and interest, including, without limitation, tangible and intangible rights such as patent rights, trademarks, copyrights, trade secrets rights and mask work rights, that Employee may have or may acquire in and to all such contributions and Inventions, benefits and/or rights resulting therefrom, and agrees to promptly execute any further specific assignments related to such contributions or Inventions, benefits and/or rights at the request of the Company; and (d) in the event any Invention Idea shall be deemed by the Company to be patentable or otherwise registrable, to do all things necessary or proper to obtain letters of patent or other applicable registrations thereon and to vest the Company with full title thereto. Notwithstanding the foregoing, any provision in this Agreement which provides that Employee shall assign, or offer to assign, any of his or her rights in an invention to the Company shall not apply to an invention that Employee developed entirely on his or her own time without using the Company's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by Employee for the Company.

5. Professionalism. Employee covenants and agrees that during Employee's employment or service with the Company and after the termination of such employment and service for any reason, subject to Section 3(h) above, Employee will not make any malicious, false, offensive or hostile statements regarding the Company, Focus or their affiliates (or any of its or their members, managers, directors,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


officers, employees, agents, or representatives) or any statements regarding the business affairs or financial condition of the Company, Focus or their affiliates to any media outlet, industry, group, financial institution, current or former employee, consultant, or client of the Company.

6. Photography and Video Authorization and Release. Employee grants to the Company, Focus and their affiliates the irrevocable right and permission concerning photographs or videos that were or may be taken of him or her, or in which he or she may be included with others, in connection with Employee's employment or service with the Company (collectively, the "Photographs and Videos"), to use and publish the Photographs and Videos in whole or in part, individually or in connection with other material, without restriction as to alteration, in any and all media, including the internet, that the Company, Focus and their affiliates employ including illustration, promotion, and marketing of the Company, Focus and their affiliates. Employee releases and discharges the Company, Focus and their affiliates from any and all claims and demands that may arise out of or in connection with said use of the Photographs and Videos. This authorization and release shall inure to the benefit of the legal representative, licensees, and assigns of the Company, Focus and their affiliates. This release shall be binding upon Employee's heirs, legal representative, and assigns.

7. Disclosure to Prospective Employers. Employee covenants and agrees to disclose the existence and terms of this Agreement to any prospective employer, partner, or co-venturer prior to entering into an employment, partnership, or other business relationship with such person or entity. In addition, Employee expressly consents to the Company's right and authority to disclose the existence and terms of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee, and Employee indemnifies and holds harmless the Company and its affiliates, representatives, members, managers, employees, and attorneys from and against any and all losses, claims, damages, liabilities, costs, and expenses, actual or threatened, relating to, or arising directly or indirectly out of or in connection with the Company's disclosure of this Agreement to any subsequent actual or prospective employer, partner, or co-venturer of Employee.

8. Tolling Period. The restrictions contained in Section 2 of this Agreement automatically shall, unless prohibited by applicable law, be extended by the length of time during which Employee shall have been in breach of such restrictions.

9. No Prior Agreements. Employee represents and warrants to the Company that: (a) the execution and performance by Employee of this Agreement does not and will not conflict with or breach the terms of any other agreement by which Employee is bound; (b) except as Employee has disclosed in writing to the Company, Employee is not bound by the terms of any agreement with any previous employer, current employer, client/customer or other person or entity (i) to refrain from soliciting, directly or indirectly, the employees or current or prospective clients, customers, accounts or investors of such previous employer or other party, (ii) to refrain from competing, directly or indirectly, with the business of such previous employer or any other party, (iii) to refrain from using or disclosing any trade secret or other confidential or proprietary information of such previous employer or other party in the course of Employee's employment or service with the Company, or (iv) to assign any invention ideas to such previous employer or other party; and (c) Employee has complied with the terms of each agreement, if any, that Employee has disclosed to the Company pursuant to this Section 9 through the date hereof. The Company has not requested or been provided with (and the Company prohibits Employee from obtaining for or disclosing to the Company) information that may be considered confidential under the terms of each agreement, if any, that Employee has disclosed pursuant to clause (b) of this Section 9.

10. Review by Counsel. Employee represents and warrants that Employee has been advised by the Company, and offered the opportunity, to review and discuss fully the terms of this Agreement with an attorney of Employee's own choosing. Employee represents and warrants that Employee received a copy of this Agreement with the offer letter of employment or service with the Company, and prior to the commencement of employment or service with the Company.

11. Not an Employment Contract. Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue Employee's employment or service for any period of time, and does not change the at-will nature of Employee's employment. Notwithstanding the foregoing, if Employee voluntarily separates employment or service with the Company, Employee shall provide no less than two (2) weeks' notice of such separation, with such notice to be provided in writing (email being sufficient) to Firm's Managing Director – People & Culture. The Company may, in its sole discretion, waive such notice period (in whole or in part).

12. Interpretation. If any restriction set forth in this Agreement is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable.

13. Severability. Any restrictive covenants in this Agreement shall only apply to the extent not prohibited by applicable law. The invalidity of any portion hereof shall not affect the validity, force, or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, each party agrees that a court of competent jurisdiction may enforce such restriction to the maximum extent permitted by law.

14. Waiver of Rights. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15. Company Violation Not a Defense. In an action by the Company to enforce this Agreement, any claims asserted by Employee against the Company, other than claims arising under or pertaining to this Agreement, shall not constitute a defense to the Company's action.

16. Equitable Remedies. The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by Employee to be reasonable for such purpose. Employee agrees that any breach of this Agreement may cause the Company substantial and irrevocable harm and therefore, in the event of any such breach, Employee agrees that the Company, in addition to such other remedies which may be available, may be entitled to specific performance and other injunctive relief.

17. Attorney's Fees. If the Company brings any legal action or other proceeding to enforce its rights under this Agreement and obtains any enforceable judgment or injunction, the Company may recover its costs and expenses (including reasonable attorneys' fees) incurred in connection with the action and any appeal from Employee, in addition to any other relief to which the Company may be entitled.

18. Assignability; Binding Effect. This Agreement shall be binding on and inure to the benefit of the successors in interest of the parties; provided, however, that Employee's obligations under this Agreement are personal and may not be assigned by Employee except with the written consent of the Company. Firm may assign this Agreement and its rights and obligations hereunder to Focus or any of its affiliates, including any of the third-party beneficiaries set forth in Section 1, or to any successor to all or substantially all of the business and/or assets of Firm.

19. Entire Agreement, Etc. This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and, except as otherwise provided in Section 23, may be amended only by a writing signed by each of them. Notwithstanding the foregoing or anything herein to the contrary, and for the avoidance of doubt, Employee's covenants and obligations hereunder are in addition to and not in lieu of or exclusive of any other continuing obligations and duties that Employee may have to any of the Company, Focus, and/or any of their respective affiliates, predecessors, successors and/or assigns, including without limitation under any agreement Employee entered into prior to the Effective Date with any predecessor or affiliate of the Company, in Employee's capacity as an officer, employee, partner, principal or member of such predecessor or affiliate, containing confidentiality, non-solicitation, non-competition and/or any similar covenants or obligations.

20. Counterparts; Transmission. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument. The signature of a party on any counterpart that is transmitted by facsimile or via .pdf file to another party or legal counsel for another party shall be deemed an original signature binding upon the executing party and acceptable to all other parties.

21. Governing Law; Choice of Forum. Unless otherwise provided in Appendix A hereto: This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles; provided, however, that if the State of New York enacts a law that bans any restriction set forth in Section 2 of this Agreement, and if Employee primarily resides and provides services to the Company outside of the State of New York, then this Agreement shall be governed by, and construed in accordance with, the laws of the state in which Employee primarily provides services to the Company without regard to conflict of laws principles. The parties hereto hereby irrevocably agree that any suit or proceeding arising directly and/or indirectly pursuant to or under this Agreement shall be brought solely in the appropriate federal or state court in the County of New York, State of New York. By their execution of this Agreement, the parties hereby covenant and irrevocably submit to the in personam jurisdiction of any such federal or state court, and agree that any process in any such action may be served upon any of them personally, or by certified mail or registered mail upon them or their agent, return receipt requested, with the same full force and effect as if personally served upon them in the State of New York. The parties hereto waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense based on lack of in personam jurisdiction with respect thereto.

22. Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement to the contrary: (a) Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made: (A) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and (b) if Employee files a lawsuit for retaliation by the Company or its affiliates for reporting a suspected violation of law, Employee may disclose the trade secrets of the Company or its affiliates to Employee's attorney and use the trade secret information in the court proceeding if Employee (i) files any document containing the trade secret under seal and (ii) does not disclose the trade secret, except pursuant to court order.

23. State Law Modifications. If Employee primarily resides and provides services to the Company in a state listed on Appendix A hereto, or if otherwise required with respect to Employee by the applicable law of a particular state, the modifications set forth on Appendix A for that state shall apply to Employee. Employee acknowledges and agrees that the Company may issue updates to Appendix A from time to time (including the addition of states) to either narrow the scope of a particular restriction or to comply with applicable state or federal law, and Employee hereby consents to any such updates.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates below written, to be effective as of the Effective Date (as defined herein).

SCS CAPITAL MANAGEMENT LLC

By: [redacted] Date: January 10, 2025
Name: Melissa Schneberger
Title: Chief Talent Officer

**EMPLOYEE:**

By: [redacted] Date: January 28, 2025

Name:Brad Parsons

**APPENDIX A**
**CERTAIN MODIFICATIONS OF RESTRICTIVE COVENANTS**

If Employee primarily resides and provides services to the Company in a state listed below, or if otherwise required with respect to Employee by the applicable law of a state below, the modifications set forth below for that state shall apply.

For purposes of this **Appendix A**, the "post-employment portion" of the Restricted Period or the Referral Program Participation Restricted Period means the period remaining in the Restricted Period or Referral Program Participation Restricted Period, as applicable, following Employee's last day of employment and service with the Company.

**Sections 2(a)(i) and 2(a)(ii)**

All States other than Colorado, Illinois, Indiana, Maryland, New Hampshire, New Jersey, New York, Oklahoma, and Oregon:

The following shall replace Section 2(a)(i):

i. perform services for, deal with, solicit, divert, or accept business from, in each case of the foregoing relating in any manner to Competing Services (as defined below), any of the Actual or Prospective clients (each as defined below) of the Company;

The following shall replace Section 2(a)(ii):

ii. solicit, divert, or take away, or attempt to solicit, divert, or take away, or permit any entity directly or indirectly controlled by Employee to solicit, divert, or take away, or attempt to solicit, divert, or take away, the business or patronage of any of the Actual or Prospective clients of the Company;

The following shall be added as a definition of "Prospective" client:

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise obtained Confidential Information about such prospective or potential client during Employee's employment or service with the Company, and only if Employee had material contact with such person or entity during Employee's employment or service with the Company.

Arizona: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's last day of employment or service with the Company. Additionally, following Employee's last day of employment or service with the Company, the terms Actual and Prospective client shall not include any person or entity who has terminated its contract, account or relationship with the Company prior to Employee's last day of employment or service, without any solicitation or interference by Employee.

California: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or diversion described in Sections 2(a)(i) or 2(a)(ii).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

Georgia; Missouri: The following definitions of Actual and Prospective clients shall apply:

"Actual" client shall mean (A) during Employee's employment or service with the Company, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provides services at any time during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity with whom Employee had material contact during Employee's employment or service with the Company and to whom the Company or any of its representatives provided services within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company.

"Prospective" client shall mean (A) during Employee's employment or service with the Company, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company at any time during Employee's employment or service with the Company, but only if Employee has a relationship with, is involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company, and (B) after Employee's employment or service with the Company has terminated, any person or entity to whom the Company or any of its representatives sent or provided any written or electronic communication from the Company within twelve (12) months prior to the date of such termination of Employee's employment or service with the Company, but only if Employee had a relationship with, was involved with, or otherwise had material contact with such person or entity during Employee's employment or service with the Company.

In addition, nothing in Sections 2(a)(i) or 2(a)(ii) shall restrict Employee from soliciting any Actual or Prospective client for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Sections 2(a)(i) and 2(a)(ii) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(i) and 2(a)(ii) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

Nevada: The following shall be added to the end of Section 2(a)(i):

Notwithstanding the foregoing, during the post-employment portion of the Restricted Period, this Section 2(a)(i) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Oklahoma: Sections 2(a)(i) and 2(a)(ii) shall be replaced with the following:

> directly solicit the sale of goods, services, or a combination of goods and services from the established customers of the Company;

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(i) and 2(a)(ii), the "Restricted Period" shall be the term of Employee's employment or service with the Company and for a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(a)(iii)**

Alabama: The restriction contained in Section 2(a)(iii) will apply only with respect to officers, employees, partners, principals or members who hold or held a position uniquely essential to the management, organization or service of the Company.

Arizona: The restrictions set forth in Section 2(a)(iii) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(iii) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to engage in any solicitation or recruitment described in Section 2(a)(iii).

Georgia: The restrictions set forth in Section 2(a)(iii) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iii) shall apply only with respect to soliciting, recruiting, or taking away, or attempting to solicit, recruit, or take away, any officers, employees, partners, principals or members of the Company who possess or have access to Confidential Information that would give an unfair advantage to a business in competition with the Company.

**Section 2(a)(iv)**

Alabama: The restriction contained in Section 2(a)(iv) will apply only to officers, employees, partners, principals, or members who hold or held a position uniquely essential to the management, organization or service of the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

Arizona: The restrictions set forth in Section 2(a)(iv) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: Section 2(a)(iv) shall be deemed deleted.

Georgia: The restrictions set forth in Section 2(a)(iv) shall apply only within the United States.

Indiana; Wisconsin: The restrictions set forth in Section 2(a)(iv) shall apply only with respect to hiring or attempting to hire any officers, employees, partners, principals or members of the Company who possess or have (or possessed or had) access to Confidential Information that would give an unfair advantage to a business in competition with the Company (except whose affiliation with the Company had been terminated for a period of six (6) months or longer at the time of solicitation for hire).

**Section 2(a)(v)**

Arizona: The restrictions set forth in Section 2(a)(v) shall apply during Employee's employment or service with the Company and for a period of twelve (12) months following Employee's termination of employment or service with the Company.

California: The restrictions set forth in Section 2(a)(v) shall apply only during Employee's employment or service with the Company. Following Employee's termination of employment or service with the Company, Employee shall not use trade secrets of the Company to violate Section 2(a)(v).

Colorado: The post-employment portion of the Restricted Period shall apply only if Employee earns at least 60% of the amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., earns at least $74,250 in 2024) in annual compensation.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

Georgia: The restrictions set forth in Section 2(a)(v) shall apply only with respect to those business relations of the Company with whom Employee had material contact during Employee's employment or service with the Company. Nothing in Sections 2(a)(v) shall restrict Employee from soliciting any business relation of the Company for any purpose that does not constitute Competing Services.

Illinois: The post-employment portion of the Restricted Period shall apply only if Employee has actual or expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($45,000 per year in 2024).

Louisiana: The restrictions set forth in Section 2(a)(v) shall apply only within the Referral Program Participation Restricted Territory (as defined in Section 2(b)).

Missouri: The restrictions set forth in Section 2(a)(v) shall not apply if Employee's services to the Company are limited to secretarial and/or clerical services.

South Dakota: The post-employment portion of the Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Restricted Period shall not apply to any employee who is a "Low-wage employee" within the meaning of § 40.1-28.7:8 of the Virginia Code.

Washington: For purposes of Sections 2(a)(v), the "Restricted Period" shall be the term of Employee's employment or service with the Company and a period of eighteen (18) months following Employee's termination of employment or service with the Company.

**Section 2(b)**

California; Minnesota; Montana; North Dakota; Oklahoma: The restrictions set forth in Section 2(b) shall apply only during Employee's employment or services with the Company.

Colorado: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns annualized cash compensation at or above the threshold amount for highly compensated workers as determined on an annual basis by the Division of Labor Standards of Statistics in the Department of Labor and Employment (i.e., $123,750 in annual compensation for 2024), as set forth in CO Rev. Stat. 8-2-113.

District of Columbia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns or is reasonably expected to earn at or above the minimum qualifying annual compensation ($154,200 in 2024) per year (which amount shall increase each year in proportion to the annual average increase, if any, in the Consumer Price Index for All Urban Consumers in the Washington Metropolitan Statistical Area published by the Bureau of Labor Statistics of the United States Department of Labor for the previous calendar year adjusted to the nearest whole dollar).

District of Columbia; Georgia; Idaho; Illinois; Indiana; Maryland; Michigan; North Carolina; Pennsylvania; South Carolina; Texas; Virginia; Wisconsin: The following sentence shall be added to the end of Section 2(b):

> Notwithstanding the foregoing, nothing in this Section 2(b) shall prohibit Employee from being employed or engaged, during the post-employment portion of the Referral Program Participation Restricted Period, by any person or entity in a role that does not have responsibility for, or require performance of, any of the same or similar functions, duties or activities that Employee performed or had oversight for on behalf of the Company.

Georgia: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee (a) customarily and regularly solicits for Company customers or prospective customers; or (b) customarily and regularly engages in making sales or obtaining orders or contracts for products or services to be performed by others; or (c) performs the following duties: (i) has a primary duty of managing the enterprise in which Employee is employed or of a customarily recognized department or subdivision thereof; (ii) customarily and regularly directs the work of two or more other employees; and (iii) has the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (d) performs the duties of a key employee or of a professional.

Idaho: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is a "key employee," which means any employee or independent contractor who (i) has, by reason of the Company's investment of time, money, trust, exposure to the public or exposure to technologies, intellectual property, business plans, business processes and methods of operation, customers, vendors or other business relationships during the course of employment or service, gained a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company and, as a result, has the ability to harm or threaten the Company's legitimate business interests, and/or (ii) is among the highest paid five percent (5%) of the Company's employees and independent contractors.

Illinois: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee has actual or

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

expected annual earnings exceeding the threshold as set forth in 820 ILCS 90/10 ($75,000 per year in 2024, increasing to $80,000 starting in 2027).

Louisiana: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the Referral Program Participation Restricted Territory (as defined below), that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes hereof, "Referral Program Participation Restricted Territory" shall mean (A) each of the following parishes and municipalities for so long as the Company carries on business in such parish or municipality: Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson, Jefferson Davis, La Salle, Lafayette, Lafourche, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John The Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union, Vermilion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana and Winn; and (B) any other state, municipality or locale in the United States in which the Company carries on business for so long as the Company continues to carry on business therein.

Maine: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee, at the time Employee enters into this Agreement, earns wages in excess of four hundred percent (400%) of the federal poverty level.

Massachusetts: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason except as set forth in this Section 2(b) below (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, own, be employed in a Restricted Capacity by, or perform services in a Restricted Capacity for, any advisory firm, anywhere in the United States in which Employee, during the last two (2) years of Employee's employment or service with the Company provided services or had a material presence or influence, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company, without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.** For purposes of this Section 2(b), "Restricted Capacity" means any capacity (whether as an owner, partner, employee, officer, director, independent contractor, consultant, advisor or in any other capacity calling for the rendition of services, advice, or acts of management, operation or control) in which Employee would provide or engage in services that are the same as or substantially similar to the services Employee provided to the Company during the then most-recent two (2) years of Employee's employment with or service to the Company. Notwithstanding anything to the contrary in this Section 2(b), the post-employment portion of the restrictions contained in this Section 2(b) will not apply if (A) the Company terminates Employee's employment and services without Cause (as defined below) or because of a layoff, (B) Employee is classified as a non-exempt employee under the Fair Labor Standards Act, (C) Employee is an undergraduate or graduate student enrolled in a full-time or part-time undergraduate or graduate

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

educational institution, or (D) Employee is age 18 or younger ("Disqualifying Reason"). For purposes of this Section 2(b), "Cause" means, in addition to "Cause" as defined in any other agreement between Employee and the Company, a reasonable and good faith basis for the Company to be dissatisfied with Employee's job performance, conduct, or behavior. As additional consideration for Employee's obligations under this Section 2(b), unless there is a Disqualifying Reason, the Company shall pay Employee during the post-employment portion of the Referral Program Participation Restricted Period at a rate equal to 50% of Employee's highest annualized base salary within the two years immediately preceding Employee's last day of employment (with such payments to be paid to Employee in equal installments over the course of the Referral Program Participation Restricted Period, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard payroll practices) (the "Garden Leave Payments"); provided, however, in the event that the Company, in its discretion, waives Employee's obligations under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to Employee shall cease. Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with Employee's obligations under this Section 2(b). Any Garden Leave Payments paid by the Company will be payable as salary continuation in accordance with its standard payroll practices as described above. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Nevada: The following shall be added to the end of Section 2(b):

Notwithstanding the foregoing, during the post-employment portion of the Referral Program Participation Restricted Period, this Section 2(b) shall not restrict Employee from providing a service to a former client, customer or other business relation if: (i) Employee did not solicit such client, customer or other business relation; (ii) the former client, customer or business relation voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations set forth in Section 2(b) regarding time, geographic area and scope of the restrained activity, other than any limitation on providing services to a former client, customer or business relation who seeks the services of Employee without any contact instigated by Employee.

New Hampshire: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee earns above 200% of the federal minimum wage.

Idaho; Nebraska; North Carolina; South Carolina; Pennsylvania; Texas; Wisconsin: The following shall replace Section 2(b):

If (i) Employee is approved as a business development officer (a "BDO") or in any substantially similar capacity by the Schwab Advisor Network®, the Fidelity Wealth Advisor Solutions® program, and/or any other referral channel program in which the Company may elect to participate in the future, not including the SmartAsset program (each, a "Referral Program"), and (ii) Employee's primary job responsibility is to work directly with any such Referral Program for the benefit of the Company, Employee covenants and agrees that, during Employee's employment or service with the Company and for a period of twelve (12) months after termination of Employee's employment or service with the Company for any reason (the "Referral Program Participation Restricted Period"), Employee shall not, directly or indirectly, individually or on behalf of any other person or entity, own, manage, operate, control, assist (financially or otherwise), be employed by (or accept employment with), consult with, sell to or otherwise participate in the operation, ownership, management, or control (whether as an employee, officer, director, member, owner, partner, agent, creditor, independent contractor, employee, sales representative or advisor) any advisory firm, anywhere in the United States in which Employee provided services or had a material presence or influence during Employee's employment or service with the Company, that is participating or has applied to participate in any such Referral Program in which Employee participated, as described in the foregoing clauses (i) and (ii) above, at any time during the then most-recent two (2) years of Employee's employment with or service to the Company without prior written consent of Firm. **For the avoidance of doubt, the restrictions set forth in this Section 2(b) shall not apply if Employee does not participate in any Referral Program as described in the foregoing clauses (i) and (ii) above, including without limitation if Employee is a Wealth Advisor who services clients generated from a Referral Program, but is not otherwise (1) approved as a BDO or in any substantially similar capacity by a Referral Program and (2) whose primary job responsibility is to work directly with any such Referral Program for the benefit of the Company.**

Oregon: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if (i) (A) Firm informs Employee in a written employment offer received by Employee at least two (2) weeks before the first day of Employee's employment that a non-competition agreement is required as a condition of employment or (B) Employee executes this Agreement upon a *bona fide* advancement, (ii) Employee is classified as exempt under state wage and hour law, (iii) Employee has access to trade secrets of the Company or competitively sensitive Confidential Information, and (iv) as of the date of Employee's termination of employment, the total amount of Employee's annual gross salary and commissions, calculated on an annual basis, exceeds $108,581 (adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the date of Employee's termination of employment); provided, however, that if Employee does not satisfy prongs (ii) or (iv) of the foregoing, in order for the restrictions set forth in Section 2(b) to apply to such Employee during the post-employment portion of the Referral Program Participation Restricted Period, the Company agrees to pay such Employee, during the post-employment portion of the Referral Program Participation Restricted Period, the greater of compensation equal to at least fifty percent (50%) of (X) Employee's annual gross base salary and commissions at

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

the time of Employee's termination of employment or (y) $108,581, adjusted annually for inflation pursuant to the Consumer Price Index for All Urban Consumers, West Region (All Items), as published by the Bureau of Labor Statistics of the United States Department of Labor immediately preceding the calendar year of the termination of Employee's employment (the "Garden Leave Payments"); provided, further, that (1) in the event that the Company, in its discretion, waives such obligations of Employee under Section 2(b) at any time during the post-employment portion of the Referral Program Participation Restricted Period, the Company's obligation to make the Garden Leave Payments to such Employee shall cease, (2) Employee's right to receive and retain any Garden Leave Payments is conditioned on Employee's compliance in full with such Employee's obligations under this Section 2(b), and (3) any Garden Leave Payments paid by the Company will be payable as salary continuation, less all applicable federal, state and local taxes and withholdings, in accordance with the Company's standard regular payroll practices. Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise.

Rhode Island: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has annual earnings at or below two hundred fifty percent (250%) of the federal poverty level as established by the United States Department of Health and Human Services federal poverty guidelines (excluding overtime), (ii) is 18 years of age or younger, (iii) is an undergraduate or graduate student or (iv) is an employee who is nonexempt under the Fair Labor Standards Act.

South Dakota: The post-employment portion of the Referral Program Participation Restricted Period shall apply only for so long as the Company continues to conduct a wealth management business within the United States.

Virginia: The post-employment portion of the Referral Program Participation Restricted Period shall not apply if Employee (i) has average weekly earnings less than the average weekly wage of the Commonwealth as determined by the Virginia Employment Commission, (ii) is an intern, student, apprentice or trainee employed, with or without pay, at a trade or occupation in order to gain work or educational experience or (iii) is an independent contractor compensated at an hourly rate that is less than Virginia's median hourly wage for all occupations for the preceding year, as reported by the U.S. Bureau of Labor Statistics. Notwithstanding the foregoing, Section 2(b) shall apply if Employee's compensation is derived in whole or in predominant part from sales commissions, incentives or bonuses.

Washington: The post-employment portion of the Referral Program Participation Restricted Period shall apply only if Employee is (i) an employee of the Company whose earnings from the Company exceed the threshold set forth in RCW 49.62.020 when annualized ($120,559.99 in 2024) or (ii) an independent contractor of the Company or any of its Subsidiaries whose earnings from the Company exceed the threshold set forth in RCW 49.62.030 per year ($301,399.98 in 2024), each amount to be adjusted annually for inflation as calculated by the Washington Department of Labor and Industries pursuant to RCW 49.62.040; provided, however, in the event that at any time Employee's compensation level exceeds such thresholds, as of such time the full Referral Program Participation Restricted Period shall be in place. Further, to the extent Employee's employment or service is terminated by the Company as part of a layoff, then the post-employment portion of the Referral Program Participation Restricted Period shall be enforced only to the extent that Firm, at its option, continues to pay Employee his or her base salary, at the annual rate in effect as of the date of Employee's termination of employment, in accordance with Firm's regular payroll practices, and subject to deduction for any compensation earned through subsequent employment during the period of enforcement ("Garden Leave Payments"). Employee acknowledges and agrees that any Garden Leave Payments shall reduce (and shall not be in addition to) any severance or separation pay that Employee is otherwise entitled to receive from the Company pursuant to an agreement, plan or otherwise. Furthermore, if Employee earns less than twice the applicable state minimum hourly wage, Section 2(b) shall not restrict, restrain or prohibit Employee from having an additional job, supplementing Employee's income by working for another employer, working as an independent contractor or being self-employed, provided that such additional services do not raise issues of safety for Employee, coworkers or the public, or interfere with the reasonable and normal scheduling expectations of the Company. Nothing in the foregoing sentence alters the obligations of Employee to the Company under existing law, including the common law duty of loyalty and laws preventing conflicts of interest and any corresponding policies addressing such obligations.

**Section 3(b)**

Arizona; Florida; Georgia; Illinois; New Jersey; South Carolina; Virginia: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company.

Wisconsin: The following language shall replace Section 3(b):

> Subject to Sections 3(h) and 22 below, Employee agrees that Employee shall not, during employee's employment or service with the Company and for a period of twenty-four (24) months after termination of Employee's employment or service with the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Company for any reason, or, to the extent the information qualifies as a trade secret, at all times following Employee's employment, directly or indirectly disclose any Confidential Information to any person or entity, or utilize for himself or herself or any other person or entity any of the Confidential Information for any purpose (including, without limitation, in the solicitation of Actual or Prospective clients of the Company), except in the course of performing duties assigned to Employee by the Company. As applied to Confidential Information that does not constitute a trade secret under applicable law, the nondisclosure provision shall apply only in geographic areas where the unauthorized disclosure or use of Confidential Information would be competitively damaging to the Company.

**Section 3(h)**

Washington: The following language shall be added to the end of Section 3(h):

Nothing in this Agreement shall prohibit or is intended to restrict or impede Employee from exercising Employee's rights under Washington's Silenced No More Act or from disclosing or discussing (i) illegal acts of discrimination, harassment, retaliation, wage and hour violations, sexual assault, or other conduct recognized as being against a clear mandate of public policy occurring in the workplace, at work-related events, between employees, or between an employer and an employee, whether on or off the employment premises, or (ii) information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Employee has reason to believe is unlawful.

**Section 4**

California: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement shall not apply to an invention that qualifies fully under the provisions of California Labor Code Section 2870, which provides as follows:

"Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer."

Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 2870 through 2872 of the California Labor Code.

Illinois: The following language shall be added to the end of Section 4:

The assignment of Inventions and Invention Ideas as described in this Agreement is intended to comply, and shall be construed in accordance with, 765 ILCS 1060/1 to 1060/3.

Utah: The following language shall be added to the end of Section 4:

Pursuant to Sections 34-39-1 to 34-39-3 of the Utah Code, the assignment of inventions as described in this Agreement shall not apply to an invention that is (i) created by Employee entirely on Employee's own time and (ii) not an Employment Invention. For this purpose, "Employment Invention" means any invention or part thereof conceived, developed, reduced to practice or created by Employee that is: (A) conceived, developed, reduced to practice or created by Employee: (x) within the scope of Employee's employment or service; (y) on the Company's time; or (z) with the aid, assistance or use of any of the Company's property, equipment, facilities, supplies, resources or intellectual property; (B) the result of any work, services or duties performed by Employee for the Company; (C) related to the industry or trade of the Company; or (D) related to the current or demonstrably anticipated business, research or development of the Company. Nothing in this Agreement is intended to expand the scope of protection, if any, provided to Employee by Sections 34-39-1 to 34-39-3 of the Utah Code.

**Section 8**

California, Connecticut, Wisconsin: Section 8 shall be deemed deleted.

**Section 21**

California: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

accordance with the internal laws of the State of California, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of California. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Colorado: The following language shall replace Section 21:

This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any and all claims arising out of or relating to this Agreement, Employee's employment, or Employee's cessation of such employment, shall be brought exclusively in the federal or state courts located in the State of Colorado. Employee consents to the personal jurisdiction of such courts, and hereby waives (a) any objection to jurisdiction or venue, or (b) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

Massachusetts: The following shall be added to the end of Section 21:

Notwithstanding anything to the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction and shall be brought solely in the business litigation session of the Superior Court of the Commonwealth of Massachusetts, in Suffolk County, Massachusetts.

Minnesota: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Minnesota, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Minnesota, and the parties agree to jurisdiction and venue therein.

Washington: The following shall be added to the end of Section 21:

Notwithstanding anything in the contrary in this Section 21, any action, claim, suit, charge, complaint, litigation, arbitration or similar proceeding based upon, arising out of, or relating to this Agreement shall be exclusively governed by and construed in accordance with the internal laws the State of Washington, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Any dispute based upon, arising out of or relating to Section 2 of this Agreement shall be heard in the state or federal courts of Washington, and the parties agree to jurisdiction and venue therein.

**Section 24**

Colorado: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has carefully read and considered all of the terms and conditions of this Agreement, including the restraints imposed under Section 2. Employee acknowledges the Company's business success and competitive position in the industry are dependent on the Company's exclusive possession of trade secrets. Employee agrees that these restraints are (a) intended to protect and necessary for the reasonable and proper protection of the Company's trade secrets, (b) reasonable in respect of subject matter, length of time, and geographic area, and (c) supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, and that employment opportunities outside the scope of these restraints exist and remain available to Employee, and that Employee's skill sets are transferable to other industries and businesses not in competition with the Company. Employee acknowledges that each of these covenants has a unique, very substantial, and immeasurable value to the Company, and that Employee has sufficient assets and skills to provide a livelihood while such covenants remain in force.

Employee acknowledges receipt of a separate notice that Firm has provided to Employee contemporaneously with this Agreement attached hereto as Exhibit A (if applicable), which identifies this Agreement by name, states that this Agreement contains non-competition and non-solicitation covenants that could restrict Employee's options for subsequent employment following the termination of Employee's employment or service with the Company, and directs Employee to the specific sections of this Agreement containing such covenants. If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges receipt of this Agreement and such separate notice from Firm before Employee accepted an offer of employment or service with the Company. If Employee is entering into

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


this Agreement as a current employee of Firm, Employee acknowledges receipt of this Agreement and such separate notice from Company at least fourteen (14) days before the earlier of the effective date of this Agreement, or the effective date of the consideration for this Agreement.

District of Columbia: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least 14 calendar days to review the restrictive covenants set forth in this Agreement. To the extent, for purposes of Section 2(b), the post-employment portion of the Referral Program Participation Restricted Period applies to Employee, Employee acknowledges receipt of the following notice: "The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. The Company has determined that Employee is a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendments Act of 2020, contact the District of Columbia Department of Employment Services (DOES)."

Illinois: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that (a) Employee has had at least fourteen (14) calendar days to review this Agreement, including the restrictive covenants set forth herein, (b) Employee has been advised of Employee's right to consult with counsel prior to agreeing to be bound by this Agreement, including the restrictive covenants set forth herein, and (c) the restrictions contained in this Agreement (including in Section 2) are supported by valid, sufficient, and mutually-agreed-upon consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers. The Company may, but is not required to, provide a bonus payment or other compensation or benefits to Employee as additional consideration for the restrictions contained in Section 2.

Maine: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee acknowledges and agrees that Employee has had at least three (3) business days to consider the non-competition and other restrictive covenants set forth in this Agreement. Employee further understands that the non-competition provision set forth in Section 2(b) that applies following Employee's termination of employment shall not take effect until the later of the end of Employee's first year of employment with or service to the Company and six (6) months after Employee executes this Agreement.

Massachusetts: The following language shall be included as a new Section 24 titled "Acknowledgements":

Employee has been advised of Employee's right to consult with counsel prior to executing this Agreement. Employee acknowledges that (i) if Employee is entering into this Agreement in connection with Employee's commencement of employment, Employee has received a copy of this Agreement on the earlier of (A) a formal offer of employment, and (B) ten (10) business days before commencement of Employee's employment, and (ii) if Employee is entering into this Agreement following commencement of employment, Employee has received this Agreement at least ten (10) business days before it becomes effective. Employee acknowledges and agrees that the restrictive covenants contained in Section 2 are supported by mutually-agreed-upon, fair, reasonable, valid, and sufficient consideration, which in addition to Employee's employment or continued employment, compensation and benefits, includes professional training related to the Company's business, access to and acquisition of the Company's trade secrets and other Confidential Information, and authorization to communicate and develop goodwill with the Company's customers .

New Hampshire: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee has been provided a copy of this Agreement prior to Employee's acceptance of an offer of employment or service with the Company.

Oregon: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with the Company, Employee acknowledges and agrees that Employee was informed in a written offer from Firm that Employee received at least two weeks before the first day of Employee's employment or service with the Company that a non-competition agreement is required as a condition of employment or service.

Washington: The following language shall be included as a new Section 24 titled "Acknowledgements":

If Employee is entering into this Agreement in connection with the commencement of Employee's employment or service with

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Company, Employee acknowledges and agrees that the terms of this Agreement, including the restrictive covenants in Sections 2 and 3, were disclosed in writing to Employee before Employee accepted an offer of employment or service with the Company.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

SUPREME COURT, COUNTY OF NEW YORK

Index No: ________________ Date Index Issued: ________________

**For Court Use Only:**
IAS Entry Date
Judge Assigned
RJI Filed Date

**CAPTION** Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS, LLC

Plaintiff(s)/Petitioner(s)

-against-

BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING** Check only one box and specify where indicated.

**COMMERICIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ◉ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (*specify*): ________________

***NOTE:** For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**TORTS**
- ○ Asbestos
- ○ Environmental (*specify*): ________________
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): ________________
- ○ Other Negligence (*specify*): ________________
- ○ Other Professional Malpractice (specify): ________________
- ○ Other Tort (specify): ________________

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○Assisted Reproduction ○Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration [see ***NOTE*** in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○Initial ○Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): ________________
- ○ Other Special Proceeding (*specify*): ________________

**MATRIMONIAL**
- ○ Contested

***NOTE:** If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI ADDENDUM (UCS-840M)**.*
*For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).*

**REAL PROPERTY** Specify how many properties the application includes: _______
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○Residential ○Commercial

Property Address: ________________

***NOTE:** For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*
- ○ Partition

***NOTE:** Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.*
- ○ Tax Certiorari (*specify*): Section:________ Block:________ Lot:________
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): ________________

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution [see ***NOTE*** in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): ________________

**STATUS OF ACTION OR PROCEEDING** Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ◉ | ○ | If yes, date filed: 11/17/2026 |
| Has a summons and complaint or summons with notice been served? | ○ | ◉ | If yes, date served: ________ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: ________ |

**NATURE OF JUDICIAL INTERVENTION** Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice — Date Issue Joined: ________
- ○ Notice of Motion — Relief Requested: ________ Return Date: ________
- ○ Notice of Petition — Relief Requested: ________ Return Date: ________
- ◉ Order to Show Cause — Relief Requested: TRO, PI & expedited discovery Return Date: ________
- ○ Other Ex Parte Application — Relief Requested: ________
- ○ Partition Settlement Conference
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Waiver of Court Costs, Fees, and Expenses
- ○ Writ of Habeas Corpus
- ○ Other (specify): ________________

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: SCS Capital Management LLC<br>Role(s): Plaintiff | Davis Wright Tremaine LLP, Michael V. Rella, Shanaye Carvajal, Thomas P. DeFranco, 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020; (212) 880-3973; MichaelRella@dwt.com; ShanayeCarvajal@dwt.com; TomDeFranco@dwt.com | ○ YES ○ NO | |
| ☐ | Name: Focus Financial Partners, LLC<br>Role(s): Plaintiff | Davis Wright Tremaine LLP, Michael V. Rella, Shanaye Carvajal, Thomas P. DeFranco, 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020; (212) 880-3973; MichaelRella@dwt.com; ShanayeCarvajal@dwt.com; TomDeFranco@dwt.com | ○ YES ○ NO | |
| ☐ | Name: Brad Parsons<br>Role(s): Defendant | Fisher & Phillips LLP, Jeffrey Csercsevits, Christopher J. Merken, Two Logan Square, 100 N. 18th Street, 12th Floor, Philadelphia, PA 19103; (610) 230-2159; jcsercsevits@fisherphillips.com; cmerken@fisherphillips.com | ○ YES ◉ NO | |
| ☐ | Name: Thryve Wealth Management LLC<br>Role(s): Defendant | Fisher & Phillips LLP, Jeffrey Csercsevits, Christopher J. Merken, Two Logan Square, 100 N. 18th Street, 12th Floor, Philadelphia, PA 19103; (610) 230-2159; jcsercsevits@fisherphillips.com; cmerken@fisherphillips.com | ○ YES ◉ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |
| ☐ | Name:<br>Role(s): | | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 11/17/2026 /s/ Michael V. Rella
Signature

4276051 Michael V. Rella
Attorney Registration Number Print Name

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

New York State Unified Court System | nycourts.gov

# Request for Judicial Intervention Commercial Division Addendum

**UCS-840C** (05/2026)
Page **1** of **2**
nycourthelp.gov

**Supreme Court**
**County of** NEW YORK

**Plaintiff/Petitioner** (persons/entities that started the case):
SCS CAPITAL MANAGEMENT LLC and FOCUS FINANCIAL PARTNERS

**Index #:**

**Defendant/Respondent** (persons/entities the case is against):
BRAD PARSONS and THRYVE WEALTH MANAGEMENT LLC

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- ☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; technology transactions and/or commercial disputes involving or arising out of technology; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)
- ☐ Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units
- ☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only
- ☐ Shareholder derivative actions (without consideration of the monetary threshold)
- ☐ Commercial class actions (without consideration of the monetary threshold)
- ☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions
- ☐ Internal affairs of business organizations
- ☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters
- ☐ Insurance coverage as defined by **22 NYCRR 202.70 subdivisions (b)(9) and (b)(10)**
- ☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)
- ☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $________________________________

Plaintiff/Petitioner's claim for equitable or declaratory relief, including a brief description of the intended benefit, right being protected, or injury being averted through the equitable or declaratory relief sought and its monetary value:

breach of restrictive covenants and tortious interference

Defendant/Respondent's counterclaims:

- For counterclaims seeking monetary relief, provide a brief description of the claim, including the amount of compensatory damages sought, excluding punitive damages, interest, costs, and counsel fees claimed
- For counterclaims seeking equitable or declaratory relief, provide a brief description, including the intended benefit, right being protected, or injury being averted through the relief sought and its monetary value

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Date: 11/17/2026

/s/ Michael V. Rella
Signature

Michael V. Rella
Print Name

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.